UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA          )
                                  )
                                  )
            v.                    )          Cr. No. 07-10289-MLW
                                  )
                                  )
DARWIN JONES,                     )
            Defendant.            )
                                  )

MEMORANDUM AND ORDER

WOLF, D.J.                                        January 21, 2009

I.   SUMMARY

     This is a difficult and disturbing case.  Defendant Darwin

Jones is charged with being a felon in possession of a firearm and

faces a long sentence if convicted.  This case is difficult because

Jones filed a motion to suppress which, depending on the resolution

of disputes concerning the facts leading up to his seizure on the

night of July 3, 2007, might have been meritorious.  If Jones'

motion to suppress had been meritorious, the government would, as

a practical matter, have had to dismiss the case because the

firearm that he was carrying could not be admitted into evidence.

     This case is disturbing because of repeated government

misconduct that, if not discovered, might have frustrated the

court's ability to find the facts reliably and might have deprived

Jones of his right to due process.  As described in this

Memorandum, in an effort to justify the seizure of Jones, the

government argued, and Boston Police Officer Rance Cooley falsely

1

testified, that there was justification to stop Jones because, despite the dark and the distance between them, he identified Jones as he rode his bicycle down Middleton Street in Dorchester, Massachusetts.  Cooley testified that his suspicions were raised when Jones pedaled away from him because Cooley knew Jones and Jones had never avoided Cooley before.

However, Cooley had on several earlier occasions told the lead prosecutor in this case, Suzanne Sullivan, that he did not recognize Jones on Middleton Street and did not identify the man who had been on the bicycle as Jones until later, when other officers had tackled Jones at another location. Cooley's important inconsistent statements were not disclosed to Jones until the court conducted an <u>in</u> <u>camera</u> review of Sullivan's notes, just before the suppression hearing was complete.  Sullivan and her supervisor, James Herbert, acknowledge that Cooley's prior inconsistent statements constituted material exculpatory evidence, and that the failure to disclose them violated the government's constitutional duty under <u>Brady v. Maryland</u>, 373 U.S. 419 (1963), its progeny, and the court's orders.

Because Cooley's prior inconsistent statements were ultimately disclosed in time for his false testimony to be discredited, Jones has not been deprived of due process or otherwise prejudiced by the government's misconduct.  On the facts as the court has now found them, Jones' motion to suppress is not meritorious.  It is not

2

appropriate to reward Jones, and punish the public, by dismissing this case to sanction the government's misconduct.  Rather, the focus of any sanction should be on the prosecutor primarily responsible for that misconduct, Sullivan.

Therefore, for the reasons described in detail in this Memorandum, the motion to suppress is being denied and the government is being provided an opportunity to seek to show cause why sanctions should not be imposed on Sullivan.


II.  PROCEDURAL HISTORY AND GOVERNMENT'S VIOLATION OF ITS DUTY TO DISCLOSE MATERIAL EXCULPATORY INFORMATION

On the night of July 3, 2007, Jones was arrested by members of the Youth Violence Task Force, a joint effort of the Boston Police Department and the Massachusetts State Police.  On July 31, 2007, Jones was charged, by complaint, in this federal court with being a felon in possession of a firearm in violation of 18 U.S.C. §922(g)(1).  On August 29, 2007, Jones was indicted for allegedly committing that offense.

Assistant United States Attorney Suzanne Sullivan, a member of the United States Attorney's Organized Crime Task Force headed by James Herbert, is the lead prosecutor in this case.  On July 30, 2007, she met with Rance Cooley, a Boston Police Officer who participated in the arrest of Jones and prepared the incident report.  As described in detail in §III, _infra_, Cooley did not write in his incident report that he recognized Jones when he saw

3

a man on a bicycle turn and pedal away on Middleton Street. Rather, the report states that Jones was identified "later."   <u>See</u> Ex. 9.

According to Sullivan's notes and testimony, Cooley told her on July 30, 2007, that he knew Jones from the neighborhood in which he had been arrested, had talked to him many times, and was on a "first-name basis" with Jones. Oct. 30, 2008 Tr. at 82-83, 119; Ex. 11 (Sullivan's Jul. 30, 2007 notes).

On January 30, 2008, Jones filed a motion to suppress, arguing that his Fourth Amendment rights were violated because he was stopped without the justification necessary to make that seizure and subsequent search reasonable.   The government was given until April 15, 2008 to respond to the motion in order to accommodate Sullivan, who was on maternity leave.

On April 7, 2008, Sullivan met with Cooley again.   Cooley told her that before July 3, 2007 he had encountered Jones 50 to 100 times.   Oct. 30, 2008 Tr. at 81-82; Ex. 11 (Sullivan's Apr. 7, 2008 notes).   Cooley stated twice, however, that he did not immediately know that the man riding the bicycle on Middleton Street was Jones. Oct. 30, 2008 Tr. at 85; Ex. 11 (Sullivan's Apr. 7, 2008 notes). Rather, Cooley said, he first recognized Jones after Jones had been taken to the ground by fellow officers while running between Marden Avenue and Middleton Street sometime later.   Oct. 30, 2008 Tr. at 86-88; Ex. 11 (Sullivan's Apr. 7, 2008 notes).

4

Nevertheless, in the April 15, 2008 Government's Opposition to the Motion to Suppress, at 3, Sullivan wrote that on Middleton Street "Cooley recognized Jones."  Sullivan also wrote that "in the dozens of prior encounters Officer Cooley had with Jones in the vicinity of that same neighborhood over the prior approximately two years, Jones had never attempted to flee from the officer."  Id. at 11.  The government argued that because Cooley knew Jones, identified him on Middleton Street, and knew Jones had never fled before, Cooley reasonably regarded it as suspicious that Jones was unwilling to speak to the officers that evening.  The government also asserted that an evidentiary hearing was neither necessary nor appropriate.

With its Opposition, the government submitted affidavits of Cooley and Massachusetts State Trooper William Cameron.  In his affidavit, Cooley stated that on Middleton Street: "Jones made eye contact and then abruptly turned the bicycle around," ¶9; "[p]rior to the date of the offense, I had known defendant Jones for approximately two years.  Over that time period, I have had dozens of encounters with Jones in that same neighborhood area," ¶19; "[i]n each of those prior encounters with Jones, he has never run away from me," ¶20.  Cameron's affidavit was in many parts word for word the same as Cooley's, but did not state that Cooley identified the bicyclist as Jones while on Middleton Street. In somewhat different language, both Cooley and Cameron stated that in the cut

through between Marden Avenue and Middleton Street Jones later struck Cameron, thus providing probable cause to justify his arrest.

On August 12, 2008, the court held a conference concerning the motion to suppress.  In explaining the government's position, Sullivan stated that there was reasonable, particularized suspicion to stop the bicyclist when he left Middleton Street because Cooley then knew the man was Jones and flight was contrary to Jones' behavior in all of their previous encounters.[1]  After the court observed that in many respects the affidavits of Cooley and Cameron were identical, Sullivan explained that she had met with them together and drafted the affidavits.  Counsel for Jones explained that from the defendants's perspective, the motion to suppress raised important issues of credibility, particularly concerning the claim that Jones assaulted Cameron and, therefore, that there was probable cause to arrest and search him.

Despite the government's objection, the court scheduled for October 27, 28, and 29, 2008, a hearing at which testimony would be taken because possibly material facts were in dispute.  The court orally ordered the government to produce to the defendant, by October 10, 2008, all material exculpatory information.  It reminded Sullivan that the duty of disclosure was a continuing one,

---

[1]A transcript of the August 12, 2008 hearing has not been prepared.

and that if in the future a witness said anything inconsistent with his or her prior statements, the government had a duty to disclose the inconsistent statements.   Sullivan stated that she understood her continuing duty to disclose inconsistent statements.

On October 24, 2008, Sullivan met with Cooley again.   Cooley reiterated that he did not determine that the bicyclist was Jones until Jones was on the ground between Marden Avenue and Middleton Street.   Oct. 30, 2008 Tr. At 99-100; Ex. 11 (Sullivan's notes on trial outline).

At the outset of the suppression hearing on October 27, 2008, Sullivan stated that she had, by October 10, 2008, produced to the defendant all exculpatory information.   This was not true. She had not informed Jones that, contrary to the contention in the government's Opposition and in Cooley's affidavit and anticipated testimony, Cooley had on several occasions told Sullivan that he did not identify the bicyclist as Jones on Middleton Street.

However, on October 28, 2008, Cooley repeatedly testified that on Middleton Street he immediately recognized the man on the bicycle as Jones. See, e.g., Oct. 28, 2008 Tr. at 10-11, 13, 114, 141. He also testified that the sole reason that he was intent on catching the man on the bicycle was that Jones had never fled from him before.   Id. at 94-5, 135-36, 141-42.

Contrary to Sullivan's representation on August 12, 2008, Cooley claimed that Cameron was not present when he met with her to

prepare his affidavit.  <u>Id.</u> at 51.  Therefore, the court ordered Sullivan, who had been joined by her supervisor Herbert, to review her notes to determine whether they included any exculpatory information that was required to be disclosed to the defendant under <u>Brady v. Maryland</u>, <u>supra</u>, <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995), and related cases, including any information that would impeach Cooley's testimony that he met with Sullivan alone.  Oct. 28, 2008 Tr. at 66, 72. Later on October 29, 2008, Sullivan sent the court a copy of her notes for <u>ex</u> <u>parte</u> <u>in</u> <u>camera</u> review.

On October 29, 2008, Sullivan explained that she had reviewed her notes and in her opinion there was no information in them that was required to be disclosed.  She stated that the government had provided the notes for the court's review only "out of an abundance of caution."  Oct. 30, 2008 Tr. at 112, 114. After the court pointed out that a very brief review had indicated several possibly important discrepancies between Cooley's testimony and what he had previously told Sullivan, Sullivan provided a copy of her notes to Jones' counsel.

On October 30, 2008, Jones' counsel pointed out the many times reflected in Sullivan's notes that Cooley had told her that he did not identify the man on the bicycle as Jones on Middleton Street. These prior statements directly contradicted the assertion made in the government's Opposition to the motion to suppress, and in Cooley's affidavit and repeated testimony. Cooley's claim that he

8

recognized Jones on Middleton Street was important to the government's contention that there was reasonable suspicion to chase and stop Jones when he first pedaled away from the approaching officers.

Rule 116.2(A)(2) of the Local Rules of the United District Court for the District of Massachusetts defines exculpatory information as including "all information that is material and favorable to the accused because it tends to . . . [c]ast doubt on the admissibility of evidence that the government anticipates offering its case-in-chief . . ."  It has been long and clearly established that exculpatory information includes information that is potentially useful in impeaching government witnesses, as well as information that directly tends to negate guilt.  See Giglio v. United States, 405 U.S. 150, 153-54 (1972); United States v. Misla-Aldavondo, 478 F.3d 52, 63 (1st Cir. 2007).  Both Sullivan and Herbert, who reviewed her notes before they were submitted to the court for in camera review, now admit that the government made an error in not, by October 10, 2008, disclosing the many, various statements inconsistent with Cooley's affidavit and anticipated testimony that were memorialized in Sullivan's notes.  See Oct. 30, 2008 Tr. at 117, 119, 124-126.

This error had the potential both to injure the court's ability to find the facts properly and to violate Jones' right to due process.  See Giglio, 405 U.S. at 154.  That potential might

9

have been realized if the government's argument against holding an evidentiary hearing had been persuasive.  However, the error was discovered in the course of the suppression hearing. Cooley was recalled to testify further and was thoroughly cross-examined based on the information revealed by Sullivan's notes. <u>See</u> Oct. 30, 2008 Tr. at  29-41, 48-50. The government has since abandoned its reliance on the claim that justification to stop Jones existed because Cooley recognized him on Middleton Street and regarded his flight as suspiciously inconsistent with Jones' conduct on prior occasions.

Therefore, this case is analogous to <u>United States v. Osorio</u>, which the First Circuit in 1991 characterized as involving "the recurring problem of belated government compliance with its duty to provide timely disclosure of exculpatory evidence," caused in <u>Osorio</u> by "astounding negligence." 929 F.2d 753, 755 (1991). "When dealing with cases of delayed disclosure 'the critical inquiry is . . . whether the tardiness prevented defense counsel from employing the material to good effect.'" <u>Id.</u> at 757 (quoting <u>United States v. Devin</u>, 918 F.2d 280, 290 (1st Cir. 1990)).  In the instant case, Jones eventually received the information to which he was constitutionally entitled and his counsel used it effectively to impeach Cooley's testimony thoroughly.  Therefore, Jones has not been prejudiced.

Nevertheless, the court is considering whether to impose

10

sanctions on the government and/or the lead prosecutor, Sullivan. Generally, the supervisory powers of the court should not be used to redress harmless error. See United States v. Santana, 6 F.3d 1, 11 (1st Cir. 1993). However, "the use of supervisory power to dismiss an indictment, in the absence of injury to the defendant, may not be entirely a dead letter . . . [the Supreme Court has left] open the possibility that the goal of deterring future misconduct would justify using the supervisory power to redress conduct not injuring defendants if the conduct is plainly improper, indisputably outrageous, and not redressable through the utilization of less drastic disciplinary tools." Id. (citation omitted).

The egregious failure of the government to disclose plainly material exculpatory evidence in this case extends a dismal history of intentional and inadvertent violations of the government's duties to disclose in cases assigned to this court.[2]  However, this court has long shared the view expressed in United States v. Modica, 663 F.2d 1173, 1184 (2d Cir. 1981), that generally a defendant should not be rewarded, and the public should not be punished, for a prosecutor's violation of constitutional and ethical duties that do not prejudice the defendant. See United States v. Kelly, 543 F. Supp. 1303, 1313 (D. Mass. 1982) (quoting

---

[2]Some of the cases assigned to this court in which the government improperly failed to disclose important information are described in Attachment A to this Memorandum.

Deputy United States Attorney Mark. L. Wolf).  Rather, in some such cases a sanction should be imposed on the prosecutor personally. Id.

The First Circuit has held that "sovereign immunity forecloses the imposition of monetary sanctions against the federal government in criminal cases."  United States v. Horn, 29 F.3d 754, 766 (1st Cir. 1994).  However, "[t]here would seem to be no sovereign immunity bar to imposing a monetary penalty as a sanction against a rogue attorney merely because she happens to represent the federal government."  Id. at 767 n.14.  In addition:

> Courts have many other weapons in their armamentarium. This case [Horn] aptly illustrates the point.  The district judge ordered, among other things, the removal and quarantine of the lead prosecutor, the suppression of tainted documents, and the advance disclosure of the government's trial strategy.  In addition, the judge could have ordered the lead prosecutor to pay the accumulated fees, see Chilcutt, 4 F.3d at 1319 (upholding order that government counsel pay, inter alia, for the time spent by defense counsel at contempt hearing, without being reimbursed); United States v. Sumitomo Marine & Fire Ins. Co., 617 F.2d 1365, 1370-71 (9th Cir. 1980) (upholding imposition of monetary sanction for discovery abuse against government attorney as the "only available target for such sanctions"), but did not see fit to do so.  He also could have ordered the prosecutor to attend ethics seminars at her own expense, see Chilcutt, 4 F.3d at 1319, dispatched her to the Justice Department's internal disciplinary office, see Hasting, 461 U.S. at 506 n.5, 103 S.Ct. at 1979 n.5, or publicly reprimanded the Justice Department itself, see United States v. Prince, 1994 WL 99231 at *1-2, 1994 U.S. Dist. LEXIS 2962 at *1-*4 (E.D.N.Y. 1994).

Id. at 766-67 (footnotes omitted).

In Horn, the First Circuit expressed confidence that such

sanctions show "that the court has ample means at its disposal ...

to catch the Justice Department's attention, punish the culprit,

and deter future prosecutorial excesses." Id. at 767.  Experience

has caused this court to be more skeptical.[3]

In any event, the court is considering imposing sanctions on

Sullivan.  The court assumes that her failure to disclose material,

exculpatory information was not intentional, in part because

Sullivan produced her notes for the court's in camera inspection.

Nevertheless, the violations were clear and inexcusable.  If the

error by an experienced prosecutor was inadvertent, it seems only

---

[3]This court's experience includes the following.  In Ferrara
v. United States, 456 F.3d 278, 291, 293 (1st Cir. 2006),
intentional misconduct by Assistant United States Attorney
Jeffrey Auerhahn was characterized by the First Circuit as
"egregious," "outrageous," "feckless," "blatant," and as painting
a "grim picture."  It required the release of a member and an
associate of La Cosa Nostra from prison.  See Ferrara v. United
States, 384 F. Supp. 2d 384, 408 (D. Mass. 2005); Ferrara v.
United States, 372 F. Supp. 2d 108, 133 (D. Mass. 2005). However,
after an investigation and report by the Department of Justice
Office of Professional Responsibility, the sole sanction was what
was intended to be a secret written reprimand for Auerhahn's
file.  See July 2, 2007 Order in Barone v. United States, Civ.
No. 98-11104-MLW and Ferrara v. United States, Civ. No. 00-11693-
MLW.  Similarly, although the Auerhahn matter was, in July, 2007,
referred to Bar Counsel of the Board of Bar Overseers for
prosecution of disciplinary proceedings in this District Court,
Bar Counsel has not acted.

The only sanction on a prosecutor imposed by this court that
seems to have been successful was an order that an inexperienced
prosecutor who repeatedly failed to disclose material exculpatory
information attend a seminar on wrongful convictions and report
on that experience.  See United States v. Castillo, Cr. No. 01-
10206-MLW, Apr. 18, 2002 Order and prosecutor's Apr. 21, 2002
affidavit in response to it.

to be explained by ignorance of or utter indifference to the constitutional duty she repeatedly claimed to have understood and obeyed.   This court is consequently concerned that similar representations by other federal prosecutors are not reliable.

Accordingly, Sullivan and the United States Attorney are being ordered to file affidavits seeking to show cause why she should not be sanctioned in order to punish her misconduct and to attempt to send an important message to her colleagues. The court will also consider whether the imposition of additional sanctions on the government are necessary or appropriate


III. THE FACTS RELATING TO THE MOTION TO SUPPRESS

After the evidentiary hearing held in October, 2008, the court finds that the following facts have been proven by a preponderance of the credible evidence.

At about 10:30 p.m. on July 3, 2007, an unidentified individual called 911 and reported a disturbance near her home at 18 Marden Avenue in the Dorchester/Mattapan area of Boston, Massachusetts.  This was a neighborhood in which many arrests for drugs and guns had recently been made.  It is fairly characterized as a "high crime" area.  See United States v. Andrade, No. 08-1175, 2008 WL 5412923 at *6 (1st Cir. Dec. 31, 2008). Among other things, the caller stated "there's a group of boys outside of my house and they're smoking marijuana and they're playing loud music... they're

known drug dealers.... There's about 15 of them, they're all gang bangers, they all carry weapons.... I didn't see anybody with a gun now, but... they're from the Lucerne Street area." Alleged gang members from Lucerne Street had recently been indicted in the federal court.  The caller also stated that the group consisted of all black males between the ages of 16 to 22, and that the music was coming from a white Mitsubishi Gallant.

In response to the call, a Boston Police dispatcher directed an unmarked police cruiser to Marden Avenue.  On that night, Boston Police Officers Scott Pulchansingh and Leiley Melendez, and Boston Housing Authority Police Officer Jason Altavesta were in the cruiser. The dispatcher stated on a radio frequency accessible to other officers: "Marden Ave., it's coming in IV [investigate] drug, about 15 kids. Caller states they're all gang bangers and have weapons, blasting music, drinking and smoking pot, all about 16 to 22, said they're from Lucerne." The cruiser went to Marden Avenue.

Pulchansingh, who was driving, and his colleagues arrived at Marden Avenue shortly before 11:00 p.m.  They found a group of about eight young black men and women.  The officers performed a Field Intelligence Observation ("FIO").  More specifically, they obtained the identities of everyone in the group and pat-frisked the men.  They did not find any drugs or weapons. Nor did they find any liquor, loud music, or a Mitsubishi Gallant.

Shortly after 11:00 p.m., Cooley and Troopers Cameron and

15

Stephen Johnson, who worked with Cooley on the Youth Violence Strike Force, also responded to the dispatch. They parked their vehicle and walked down Middleton Street toward a cut-through to Marden Avenue. They were in plain clothes, with their badges hanging from their necks.

From about thirty yards away, they saw a group of black men and women walking. A man on a bicycle was riding next to the group. The officers did not say anything to the group. A second or two after the officers saw the man on the bicycle, and he apparently saw them, the man turned and pedaled away at a normal rate of speed, not as fast as possible. The man on the bicycle did not make eye contact with the officers or say anything.

On Middleton Street, neither Johnson, who had previously interacted with Jones many times, nor Cameron recognized Jones as the man on the bicycle. However, as explained earlier, Cooley repeatedly testified that he immediately recognized the bicyclist as Jones, that he had participated in many FIOs of Jones, and that Jones' departure was inconsistent with his uniformly cooperative behavior in prior encounters with Cooley. Cooley claims that he asked his colleagues, "Why did Mr. Jones flee?" Oct. 28, 2008 Tr. at 24.

Cooley testified that if he had not recognized Jones and considered his departure inconsistent with Jones' prior conduct, he would not have pursued him because the bicyclist had only turned to

go away and that alone was not suspicious.  <u>See</u> Oct. 28, 2008 Tr. at 135-36.  However, Cooley called the dispatcher, said that a gentleman on a bicycle in a mustard colored shirt had just taken off down Theodore Street, and asked that other officers try to find him on nearby Winston Street.

The court finds for many reasons that Cooley's testimony that he identified the man on the bicycle as Jones on Middleton Street was false.  Cooley's incident report, which was prepared later that night, does not indicate that he recognized Jones on Middleton Street.  <u>See</u> Ex. 9.  Rather, Cooley wrote that, "when officers approached the group <u>a</u> <u>male</u> who was on a bicycle began to peddle in the opposite direction." <u>Id.</u> (emphasis added).  He also wrote that Pulchansingh and his colleagues "followed the male who was <u>later</u> identified as Darwin Jones." <u>Id.</u> (emphasis added).

In addition, as demonstrated by Sullivan's notes which the government improperly failed to disclose before the suppression hearing, Cooley on several occasions prior to the hearing told the prosecutor that he did not identify the man on the bicycle while on Middleton Street.  <u>See</u> Ex. 11 (Sullivan's notes of Apr. 7, 2008 interview with Cooley at 2; Sullivan's notes of Oct. 6, 2008 at 5, 11).  To the contrary, consistent with his July 4, 2007 report, Cooley repeatedly told Sullivan that he first realized that the bicyclist was Jones after Jones had been tackled by several police

officers.  <u>Id.</u>[4]

It is evident to the court that Cooley did not get a
sufficiently good look at the face of the man on the bicycle on
Middleton Street to identify him then.  It was about 11:00 p.m.
and, therefore, dark.  Based in part on the view that was taken,
the court finds that the bicyclist was not near a street light.
Cooley's description of the bicyclist as wearing a mustard-colored
shirt proved to be wrong because Jones was wearing a white shirt
when he was captured.  If Cooley could not distinguish a yellow or
orange shirt from a white one, he certainly could not identify the
very dark-skinned Jones, from about thirty yards away, on a dark
night, in the one or two seconds he surveyed him as part of the
larger group.

Cooley was found in another case to have testified
untruthfully.[5]  The court finds that he did so again in this case

---

[4]Cooley testified that he did not write in his report that
Jones was the man on the bicycle because he did not know his
name.  The court finds that this testimony too was false, in part
because Cooley also told Sullivan that he had previously spoken
with Jones many times and was on a first-name basis with him.
<u>See</u> Ex. 11 (Aug. 30, 2008 notes of interview of Cooley).

[5] On March 14, 2006, Justice Raymond Dougan of Boston
Municipal Court granted a motion to suppress evidence seized by
Cooley in <u>Commonwealth v. Marshawn Garden</u>, No. 0601SC131-7.
Justice Dougan stated, "The court does not credit at all Cooley's
testimony that he saw the muzzle of a gun through a partially
open back seat rest when he was searching the passenger
compartment of the Honda." Slip op. at 3. The Supreme Judicial
Court affirmed the suppression order, in part based on Judge
Dougan's finding that "at the time the officer [Cooley] searched
the passenger compartment of the Honda, the rear back seat was

when he testified that he recognized Jones on Middleton Street and considered his departure suspicious because Jones had never fled when approached by officers before.

In any event, Cooley, Johnson, and Cameron conducted a quick FIO of the members of the group walking on Middleton Street.  They obtained their identities, frisked the men, and did not find any guns or drugs.  The officers then went to the cut-through between Marden Avenue and Middleton Street.

Pulchansingh and his colleagues were still in the neighborhood in their unmarked cruiser when Cooley radioed for help in finding the man on the bicycle.  They looked for the bicyclist on Winston Road, but did not see him.  However, at the intersection of Winston and Willowwood Street they saw a man on a bicycle going toward Marden Avenue.  He accelerated after apparently seeing and, the officers reasonably inferred, recognizing the unmarked vehicle as a police cruiser.  The cruiser's sirens and lights were intermittently activated in an effort to get the man on the bicycle to stop.  However, he did not stop until he had almost reached the dead-end of Marden Avenue with the cruiser close behind him.  The cruiser may have accidentally hit the bicycle and knocked him off.

The man on the bicycle did not obey what he understood to be an order to stop.  Rather, he ran as fast as he could to the cut-

---

locked in place, and provided no access to the trunk." Commonwealth v. Garden, 451 Mass. 43, 52 n.10 (2008).

through between Marden Avenue and Middleton Street with Pulchansingh right behind him, and Melendez and Altavesta following Pulchansingh. At least one of the officers yelled "stop, police."

The cut-through was a narrow chute about seven yards long and bounded by a fence about five feet nine inches high. As Jones entered the chute, Pulchansingh was about two or three yards behind him. Cameron was stationed at the Middleton Street end of the chute, with Johnson and Cooley behind him. At least one of those officers also shouted, "stop, police." Once in the chute, Jones was caged. The officers had prevented him from escaping by sealing both ends of the chute and had no intention of letting him leave, at least until they had questioned him.

Jones did not stop, however. Rather, he kept running. He was tackled initially by Cameron. Pulchansingh, who was then only a few feet behind Jones, grabbed his legs and Jones was taken to the ground.[6]

---

[6]The court does not find credible the testimony of Cameron and Johnson that Jones struck Cameron in the head with his forearm before Cameron tackled him. Cooley's incident report only states that Jones "attempted to strike" Cameron. Ex. 9. Cooley testified that Cameron told him the following day that this was an error in the report. However, Cameron testified that although he had read the report, he did not remember talking to Cooley about it, and would have talked to him to correct any errors. Similarly, Johnson testified that he read the report and he did not ask Cooley to correct it in any way. Cameron and Johnson were visibly nervous when testifying on this issue. In addition, the court finds that they each also testified untruthfully in United States v. Nygell Jones, Cr. No. 07-10339-MLW, and again in this case when they each stated that their testimony was truthful in the Nygell Jones case. In Nygell Jones,

After he was on the ground, Jones said, "the gun is in my pocket."  At that point Cooley first recognized that the man who had been on the bicycle was Jones.

In a subsequent search at the scene the officers found a gun in Jones' pocket.  During a routine booking search, the officers found crack cocaine in Jones' pocket and marijuana in his sneaker.

IV.  THE FOURTH AMENDMENT WAS NOT VIOLATED BECAUSE THE OFFICERS HAD
     REASONABLE ARTICULABLE SUSPICION WHEN THE DEFENDANT WAS
     SEIZED.

As the First Circuit has written:

> The Fourth Amendment provides that "the right of the
> people to be secure in their persons, houses, papers, and
> effects, against unreasonable searches and seizures,
> shall not be violated." U.S. Const. Amend. IV.  The
> primary purpose of the Fourth Amendment is "to prevent
> arbitrary and oppressive interference by enforcement
> officials with the privacy and personal security of
> individuals.'" I.N.S. v. Delgado, 466 U.S. 210 (1984)
> (quoting United States v. Martinez-Fuerte, 428 U.S. 543,
> 554 (1986)).

United States v. Ford, 548 F.3d 1, 4 (1st Cir. 2008).  However,

"[n]ot every interaction between a police officer and a citizen

---

Cameron and Johnson had written police reports that each contained the same incorrect month, year, and date, as well as several paragraphs that were identical, word-for-word. Although it would not have violated any rule or policy for one to have copied the police report of the other, both Cameron and Johnson testified that they did not do so, but prepared their reports independently, although Cameron testified that they may have "bounced ideas off each other." Nygell Jones June 24, 2008 Tr. at 73. For these and other reasons, the court finds that Jones did not strike Cameron with his forearm before being tackled.

constitutes a seizure triggering Fourth Amendment protections." <u>Id.</u>
Therefore, where, as here, it is alleged that a defendant's Fourth
Amendment rights have been violated, it is necessary to determine
when a seizure occurred and whether there was sufficient
justification to render it reasonable.  <u>See</u> <u>id.</u>  In addition, it is
necessary to decide the nature of the seizure in order to determine
the degree of justification for it that the Fourth Amendment
requires.  "If the encounter amounts to more than a minimally
intrusive interaction, a seizure occurs, either a <u>de facto</u> arrest
requiring probable cause or an investigative (or <u>Terry</u>) stop
necessitating reasonable suspicion." <u>Id.</u>

Because Jones has sufficiently alleged a <u>prima facie</u> violation
of the Fourth Amendment, the government bears the burden of proving
that the Fourth Amendment was not violated by a preponderance of
the evidence. <u>See</u> 2 John Wesley Hall, <u>Search and Seizure</u> §45.44
(2007); <u>United States v. Lopez</u>, 380 F.3d 538, 543 (1st Cir. 2004).
As described below, Jones was not seized before he was tackled by
Cameron and Pulchansingh at the end of the cut-through between
Marden Avenue and Middleton Street.  At that time, the officers
knew that the bicyclist was in a high crime area, left Middleton
Street at a normal rate of speed after seeing several officers,
accelerated his pace when he saw an unmarked cruiser following him,
refused to stop for the officers in the cruiser when directed to do
so, and fled instead.  This was sufficient to provide the

reasonable, articulable suspicion required for a stop pursuant to
Terry v. Ohio, 379 U.S. 1 (1968).  See Illinois v. Wardlow, 528
U.S. 119, 124-25 (2000); United States v. Franklin, 323 F.3d 1298,
1301-02 (11th Cir. 2003); United States v. Gordon, 231 F.3d 750,
756 (11th Cir. 2000).

Prior to the time that Jones fled from Pulchansingh and his
colleagues, it is doubtful that the objectively reasonable,
articulable suspicion required to make a valid, brief investigative
stop required by Terry existed.  See United States v. Ramos, Cr.
No. 04-101-98-MLW, 2008 WL 4117184, *6-9 (D. Mass. Aug. 29, 2008)
(summarizing the Supreme Court and First Circuit jurisprudence
concerning Terry); Andrade, 2008 WL 5412923 at *4-5 (describing the
standards for determining whether a Terry stop was valid).  The
collective knowledge of the participating officers must be
considered because "where law enforcement officers are jointly
involved in executing an investigative stop, the knowledge of each
officer should be imputed to others jointly involved in executing
the stop.  United States v. Cooke, 277 F.3d 82, 86 (1st Cir. 2002);
see also United States v. Meade, 110 F.3d 190, 193-94 (1st Cir.
1997)."  Ramos, 2008 WL 4117184 at *11.  When Cooley asked that
someone try to stop the bicyclist, the participating officers
collectively knew that an unnamed but identifiable tipster had
reported that there were about fifteen boys on Marden Avenue with
guns and drugs, but investigation of about eight men and women

23

found there had revealed neither.  All that had been ascertained at that point was that at 11:00 p.m., in a high crime area, an unidentified man on a bicycle had, after apparently seeing law enforcement officers, turned and pedaled away at a normal rate of speed.

In determining whether there was adequate justification for a seizure it is permissible to consider that the conduct in question occurred in a high crime area.  See Wardlow, 528 U.S. at 124; Andrade, 2008 WL 5412923 at *6; United States v. Aitoro, 446 F.3d 246, 252-53 (1st Cir. 2006); United States v. McKoy, 428 F.3d 38, 40 (1st Cir. 2005).  However, "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." Wardlow, 528 U.S. at 124; see also Brown v. Texas, 443 U.S. 47, 52 (1979) ("The fact that [the defendant] was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that [he] himself was engaged in criminal conduct."); Ford, 548 F.3d at 2-3 (government conceded that reasonable suspicion necessary to justify a stop was absent when defendant walked rapidly in high crime area after seeing police); McKoy, 428 F.3d at 40 (a traffic violation in a high crime area and a nervous driver insufficient to justify a pat-frisk); United States v. Swindle, 407 F.3d 562, 568 (2d Cir. 2005) (defendant's "entering a known drug house does not suggest that a

crime was afoot.").

"Headlong flight - whenever it occurs - is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of it." Wardlow, 528 U.S. at 125; see also United States v. Wright, 485 F.3d 45, 47-48 (1st Cir. 2007); Aitoro, 446 F.3d at 252; Franklin, 323 F.3d at 1302(stop justified because defendant "did not turn and start to walk away. He did not act like he was going about his business. Instead, he took "headlong flight'"). However, Jones did not engage in "headlong flight" when he left Middleton Street. He merely pedaled away at a normal rate of speed. Even this could contribute to a finding of reasonable, particularized suspicion. See Gordon, 231 F.3d at 757. However, while the test is objective reasonableness, see Terry, 392 U.S. at 21, and subjective intent does not render otherwise lawful conduct unconstitutional, see Whren v. United States, 517 U.S. 806, 813 (1996), it is noteworthy that even Cooley acknowledged that it would not have been suspicious for a person simply to turn and pedal away rather than deal with the police at 11:00 p.m. at night.

In Wardlow, the reasonable, particularized suspicion justifying a brief encounter between the police and the defendant was found where officers in an area known for heavy drug trafficking saw a person holding an opaque bag who left in unprovoked, headlong flight as soon as he noticed the police. See 528 U.S. at 121, 123-25. In Aitoro, the First Circuit found the

required justification for a <u>Terry</u> stop where police in a high crime area with frequent drug selling activity were observed by two men who appeared to recognize them, one of whom said "Oh shit" before both sprinted away from the officers. <u>See</u> 446 F.3d at 249, 252-53. The First Circuit stated, however, that, "[t]his case would be closer to the outer bounds of <u>Wardlow</u> had the surveillance officer not heard one of the two fleeing men cry 'Oh shit' before turning to run..." <u>Id</u>. at 252.

In the instant case, there was on Middleton Street less suspicious activity than in <u>Aitoro</u> or <u>Wardlow</u>. No officer observed Jones with an opaque bag or other suspicious object. He did not say anything before he left. Nor did he engage in "headlong flight" after seeing the officers. Therefore, if no more reason for suspicion developed before Jones was seized, this case would probably be beyond the outer bounds of <u>Wardlow</u> and Jones' motion to suppress would probably be meritorious. <u>See</u> <u>McKoy</u>, 428 F.3d at 40.

However, Jones was not seized on Middleton Street. Rather, Cooley merely asked that other officers try to find the unidentified man on the bicycle and, after participating in the FIO of the group on Middleton Street, joined Cameron and Johnson in looking for him as well.

As a result of Cooley's radio request, Pulchansingh and his colleagues spotted and followed the man on the bicycle. At least until the siren and lights of Pulchansingh's unmarked cruiser were

intermittently activated, the officers' conduct did not implicate, let alone violate, the Fourth Amendment.

"Not every interaction between a police officer and a citizen constitutes a seizure triggering Fourth Amendment protections." Ford, at 548 F.3d at 4. For example, "[w]hen police officers approach individuals on the street . . . to ask questions" their conduct "does not implicate the Fourth Amendment." Id.; see also United States v. Drayton, 536 U.S. 194, 200-01 (2002); United States v. Smith, 423 F.3d 25, 27 (1st Cir. 2005).

In Michigan v. Chesternut, 486 U.S. 567, 574-75 (1988), the Supreme Court applied this principle to a police chase of an individual and held that "[t]he police[] were not required to have a particularized and objective basis for suspecting [the defendant] to pursue him" because the chase alone did not constitute a seizure and, therefore, the Fourth Amendment was not implicated. Similarly, in Brower v. County of Inyo, 489 U.S. 593, 595-97 (1989), a twenty mile police chase was presumed not to be a seizure. In County of Sacramento v. Lewis, 523 U.S. 833, 844 (1998), the Supreme Court explicitly held that "a police pursuit in attempting to seize a person does not amount to a 'seizure' within the meaning of the Fourth Amendment." See also United States v. Brown, 169 F.3d 89, 92 (1st Cir. 1999) (In California v. Hodari D., 499 U.S. 621, 626 (1991) the Supreme Court "reject[ed] the contention that a pursuit qualifies as a seizure . . ."). Accordingly, no degree of suspicion

was required to justify the officers' efforts to find Jones to determine whether he would answer questions voluntarily.  Cf. Ford, 548 F.3d at 4; United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997).

In Chesternut, the Supreme Court held that accelerating to catch up with the defendant and a short drive next to him was "not 'so intimidating' that [the defendant] could reasonably have believed that he was not free to disregard the police presence and go about his business." 486 U.S. at 576 (quoting INS v. Delgado, 466 U.S. 210, 216 (1984)).  The Court explained:

> the police conduct involved here would not have communicated to the reasonable person an attempt to capture or otherwise intrude upon respondent's freedom of movement.  The record does not reflect that the police activated a siren or flashers; or that they commanded respondent to halt, or displayed any weapons; or that they operated the car in an aggressive manner to block respondent's course or otherwise control the direction or speed of his movement.  While the very presence of a police car driving parallel to a running pedestrian could be somewhat intimidating, this kind of police presence does not, standing alone, constitute a seizure.

Id. at 575 (footnotes omitted).

In contrast, in the instant case the officers did intermittently activate the cruiser's siren and flashing lights. A reasonable person would have understood that he was not free to leave.  See id.; Swindle, 407 F.3d at 566 ("the officers initiated a Terry stop . . . when, with overhead emergency lights activated, they tried to pull over [defendant's] vehicle . . . . [A]ny reasonable driver would understand a flashing police light to be an

order to pull over . . ."); <u>United States v. Woodrum</u>, 202 F.3d 1, 8-9 (1st Cir. 2000) (flashing of police lights communicates to a person that stopping is not optional). Therefore, if Jones had submitted and waited for the officers to question him, a <u>Terry</u> seizure would have occurred.   The testimony indicates that Jones would have routinely been pat-frisked and at least the gun he was carrying would have been found.   It is doubtful that the required reasonable, particularized suspicion to justify such a search and seizure would have then existed.   <u>See</u> <u>Aitoro</u>, 446 F.3d at 252-53; <u>McKoy</u>, 428 F.3d at 40; <u>Woodrum</u>, 202 F.3d at 7-8.

However, Jones did not obey the order to stop communicated by the siren and flashing lights.   Rather, after he got off the bicycle, or was accidently knocked off of it by the cruiser, he immediately began a rapid, headlong flight from the officers.

In 1991, the Supreme Court addressed a similar scenario and clarified the implications of <u>Chesternut</u>. In <u>Hodari D.</u>, the Supreme Court wrote:

> The narrow question before us is whether, with respect to a show of authority as with respect to application of physical force, a seizure occurs even though the subject does not yield.   We hold that it does not.
>
> ****
>
> The word "seizure" . . . does not remotely apply [] to the prospect of a policeman yelling "Stop, in the name of the law!" at a fleeing form that continues to flee.   That is no seizure. . . . An arrest requires either physical force . . . or, where that is absent, submission to the assertion of authority.

499 U.S. at 626.

The First Circuit has interpreted <u>Hodari D.</u> as applying to all seizures, including <u>Terry</u> stops, and not merely formal arrests. <u>See</u> <u>United States v. Zapata</u>, 18 F.3d 971, 976 (1st Cir. 1994) ("In <u>Hodari D.</u> Justice Scalia [meant] the term 'arrest' . . . to be conterminous with the modern conception of 'seizure of the person.'"); <u>United States v. Smith</u>, 423 F.3d 25, 31 (1st Cir. 2005) ("To constitute a seizure, there must not only be a show of authority sufficient to make a reasonable person believe that he was not free to leave, but also submission to that authority"). Therefore, because he fled from the officers in the cruiser, Jones was not then seized.

This conclusion is not qualified if it is assumed that the cruiser hit Jones' bicycle and knocked him off, either accidentally or even deliberately.  If the cruiser accidentally bumped the bicycle, no violation of the Fourth Amendment occurred. "Violation of the Fourth Amendment requires an intentional acquisition of physical control." <u>Brower</u>, 489 U.S. at 596. "[A] Fourth Amendment seizure does not occur whenever there is a governmentally caused termination . . . and governmentally <u>desired</u> termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement <u>through</u> <u>means intentionally applied</u>." <u>Id.</u> at 596-97 (emphasis in original).

30

More significantly, even if the cruiser bumped the bicycle as part of an intentional effort to stop Jones and he was briefly seized, that seizure ended when he fled.  As the Supreme Court has explained, "[t]o say that an arrest is effected by the slightest application of physical force, despite the arrestee's escape, is not to say that for Fourth Amendment purposes there is a continuing arrest during the period of fugitivity."  Hodari D., 499 U.S. at 625.

As indicated earlier, the use of the cruiser's siren and flashing lights directing Jones to stop may not have been reasonably justified.  However, "[a]ttempted seizures of a person are beyond the scope of the Fourth Amendment." Lewis, 523 U.S. at 845 n.7. Because a mere order to stop that is not obeyed is not a seizure, "it is the rule 'that an unreasonable order to stop does not violate the Fourth Amendment and that the grounds for a stop may thus be based on events that occur after the order to stop is given.'" United States v. Muhammad, 463 F.3d 115, 123 (2d Cir. 2006) (quoting Swindle, 407 F.3d at 568-69); see also United States v. Valentine, 232 F.3d 350, 352, 359 (3d Cir. 2000) (reversing decision to suppress based only on information available to officers before defendant disobeyed order to stop); United States v. Johnson, 212 F.3d 1313, 1317 (D.C. Cir. 2000) (basing finding of reasonable suspicion on defendant's "furtive" hand gestures made after defendant disobeyed apparently unjustified order to put his

hands up); <u>United States v. Santamaria-Hernandez</u>, 968 F.2d 980, 981, 983 (9th Cir. 1992) (reversing decision to suppress because officers lacked justification to stop a vehicle when they activated their lights and siren based, in part, on events after the order to stop was disobeyed).

This "rule" is derived from the reasoning in <u>Hodari D.</u>.  In <u>Hodari D.</u>, officers in a high crime area were observed by several youth who fled when they saw the officer's vehicle approach. 499 U.S. at 623.  One of the officers saw the fleeing defendant throw away what appeared to be a small rock which, when recovered, proved to be crack cocaine.  <u>Id</u>. at 623.  The Supreme Court held that the defendant was not seized until he was tackled by one of the officers.  <u>Id</u>. at 629.  It wrote that "the rock of cocaine, at least if [the officer] recognized it as such, would provide reasonable suspicion for the unquestioned seizure that occurred when he tackled Hodari."  <u>Id</u>. at 624.

Relying on <u>Hodari D.</u> in another case of a fleeing suspect, the Eleventh Circuit held that "[b]ecause [the defendant] was seized when he was tackled, the officers can consider everything that happened up to that point to establish reasonable suspicion." <u>Franklin</u>, 323 F.3d at 1301; <u>see also</u> <u>Swindle</u>, 407, F.3d at 568-69; <u>Valentine</u>, 232 F.3d at 358-59.

The Second Circuit applied this principle in <u>Muhammad</u>, a case analogous to the instant action.  In <u>Muhammad</u>, the defendant's

"detention was initiated when [an officer] activated the patrol's spotlight and overhead lights." 463 F.3d at 123. Because the officer had only an uncorroborated report that a gun was seen in a bicyclist's hand in a high crime area, <u>id</u>. at 118, 122-123, the Second Circuit stated that the officer's conduct "may be considered an unreasonable order to stop since reasonable suspicion was lacking at that point." <u>Id</u>. at 123. However, Muhammad did not stop after the lights were activated. <u>Id</u>. at 119. Rather, he accelerated the speed of his bicycle in what was reasonably regarded as an effort to flee. <u>Id</u>. at 119, 123. "Muhammad was not seized until he was physically restrained when the patrol cars came together and the officers were able to take him by the arm as he straddled his bicycle." <u>Id</u>. at 123. Muhammad's flight after the officers activated the cruiser's lights and directed him to stop provided the additional, particularized fact that converted the initial unreasonable order to stop into a justified <u>Terry</u> seizure. <u>Id.</u>

Similarly, Jones was not seized before he was tackled by Cameron and Pulchansingh at the end of the cut-through between Marden Avenue and Middleton Street. <u>See</u> <u>Hodari D.</u>, 499 U.S. at 626 ("a seizure 'requires either physical force or, where that is absent, submission to authority"); <u>Muhammad</u>, 463 F.3d at 123; <u>Franklin</u>, 323 F.3d at 1301. At that time, the officers had the reasonable, particularized suspicion necessary to justify a <u>Terry</u>

stop.    More  specifically:  Jones  was  in  a  high  crime  area,
see Wardlow, 528 U.S. at 124, Aitoro, 446 F.3d at 252-53, McKoy,
428 F.3d at 40; upon seeing officers on Middleton Street, he turned
and pedaled away at a normal rate of speed, see Gordon, 231 F.3d at
756-57; when Jones saw and recognized Pulchansingh's cruiser he
accelerated  his  pace,  see  Muhammad,  463  F.3d  at  123;  and  most
significantly,  when  directed  to  stop  by  the  activation  of  the
cruiser's  siren  and  lights,  he  engaged  in  "headlong  flight."
Wardlow, 528 U.S. at 124-25, Aitoro, 446 F.3d at 252-53.[7]

---

[7]In Swindle, the Second Circuit found that the officers'
order directing the defendant to stop was an unreasonable, "clear
abuse of police authority."  407 F.3d at 569.  While applying the
reasoning and ruling of Hodari D., the Second Circuit stated that
"[r]equiring a police officer to have reasonable suspicion to
order a stop would be truer to Fourth Amendment values than the
current rule."  Id. at 570.  In explaining this view, it wrote:

> A substantial argument could be made that a broader
> definition of "seizure" – or some other remedy – is
> required to adequately protect Fourth Amendment values
> from the harms flowing from police initiation of Terry
> stops without reasonable suspicion.  Although the
> Hodari D. Court stated that "[o]nly a few of those
> orders [to stop], we must presume, will be without
> adequate basis," id. at 627, the possibility that
> unreasonable orders are infrequent does not necessarily
> make them acceptable.  Even if the kind of order given
> in Swindle's case is rare – and we do not suggest that
> it is – we see no persuasive reason for the law to
> tolerate it.  In view of what we believe to be the
> controlling cases, however, we must affirm a conviction
> that was achieved with evidence obtained by an abuse of
> police power.  A remedy for Swindle's Fourth Amendment
> complaint can come only from higher authority.

Id. at 573.

This court understands that "compliance with police orders

34

The seizure of the gun from Jones was also permissible.   "The propriety of an officer's actions after an initial stop depends on what the officer knows (or has reason to believe) and how events unfold.   The touchstone is reasonableness.   Thus, in determining whether a pat-down search is an appropriate step following a valid Terry stop, the key is whether, under the circumstances, the officer is justified in believing that the person is armed and dangerous to the officer or others."   United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004) (quotation and citation omitted).   In this case, after being tackled, Jones stated that he had a gun in his pocket.   It was, therefore, eminently reasonable for the officers to search for it and to seize the weapon.

Drugs were found in Jones' pocket and sneaker during a routine booking search.   Such a search was permissible.   See Illinois v. LaFayette, 462 U.S. 640, 646 (1983); United States v. Edwards, 415 U.S. 800, 804 (1974); Swain v. Spinney, 117 F.3d 1, 5-6 (1st Cir. 1997).

As the gun and drugs were seized from Jones in the course of a valid Terry stop and subsequent reasonable searches,   the merit of the government's claim that the officers had probable cause to arrest Jones for violating several state laws is not material.

---

to stop should [] be encouraged."   Hodari D., 499 U.S. at 627. However, it joins the Second Circuit in questioning the Supreme Court's assumption that unreasonable orders and actions, in violation of the Fourth Amendment, are rare.

However, the court notes that there was not probable cause to believe that Jones was resisting arrest in violation of M.G.L. c. 268 §328 because the statute only applies when officers intends to effect a formal arrest rather than make a brief investigative stop, which was the officers' intent in this case.  See Commonwealth v. Pagan, 63 Mass. App. Ct. 780, 784 (2005).

Similarly, there was not probable cause to arrest Jones for disorderly conduct in violation of M.G.L. c. 272 §53.  The offense of disorderly conduct is defined by Section 250.2 of the Model Penal Code, subsections (a) and (c).  See Commonwealth v. Sholley, 432 Mass. 721, 727-28 (2000). Disorderly conduct is committed by a person who, "with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, [] (a) engages in fighting or threatening, or in violent or tumultuous behavior; or... (c) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor." Id. at 727 n.7. When the cruiser directed Jones to stop, there was no reason to believe that he had been fighting or been disorderly in any other way.  Any hazardous condition after that was created by the pursuit of Jones and Cameron's decision to block his exit from the cut-through between Marden Avenue and Middleton Street.

In addition, there was not probable cause to believe that Jones committed an assault and battery on a police officer.  As described earlier, see note 6, supra, the court does not believe

36

Cooley's recently contrived contention that Jones struck Cameron with his forearm before he was tackled.  Rather, performing their duty as they saw it, Cameron and Pulchansingh tackled the fleeing Jones.  They used force on Jones.  Jones did not intentionally use force on Cameron.  Therefore, he could not have been properly arrested for assault and battery.  See Commonwealth v. Ford, 424 Mass. 709, 711 (1997); United States v. Fernandez, 121 F.3d 777, 779 n.1 (1st Cir. 1997).

Arguably, there was probable cause to believe that Jones assaulted Cameron by running toward him and thus causing the officer an apprehension of immediate bodily harm to which he in effect consented by deciding to tackle Jones. See Commonwealth v. Chambers, 57 Mass. App. Ct. 47-51 (2003).  However, in its original memorandum in opposition to the motion to suppress, the government relied on the claim that Jones intentionally struck Cameron with his forearm before being tackled.  See Memorandum (Docket No. 28) at 4.  As described earlier, this claim is belied by Cooley's incident report and is not proven by the credible evidence presented at the hearing. However, as the seizures and searches at issue have now been found to be valid for other reasons, it is not necessary to decide the government's recent claim that a simple assault on Cameron occurred as Jones was running toward him.

V.   ORDER

In view of the foregoing, it is hereby ORDERED that:

37

1.   Defendant Darwin Jones' Motion to Suppress (Docket No. 25) is DENIED.

2.   United States Attorney Michael Sullivan and Assistant United States Attorney Suzanne Sullivan shall, by February 5, 2009, file affidavits seeking to show cause why sanctions should not be imposed on the government and/or Ms. Sullivan for the misconduct described in Section II of this Memorandum and addressing what sanctions would be most appropriate if the court decides to impose any.

Among other things, the United States Attorney shall address what, if any, recent efforts have been made to educate Assistant United States Attorneys of their duties under Brady v. Maryland, its progeny, and the related Local Rules; why the clear, now admitted, error by Ms. Sullivan, supervised by Herbert, occurred; whether there are appropriate Department of Justice programs that the court might order Ms. Sullivan attend; Ms. Sullivan's annual salary; whether there is any reason that the court should not be concerned that the serious error made by Ms. Sullivan will recur in other cases; and what action, if any, the United States Attorney intends to take to address Ms. Sullivan's misconduct and to prevent future similar misconduct by prosecutors by his office.[8]

Ms. Sullivan's affidavit shall, among other things, address

---

[8]The court recognizes that the question of whether to prosecute the law enforcement officers for their false testimony in this case is a matter of prosecutorial discretion.

why she did not disclose the material exculpatory evidence at issue before the hearing on the motion to suppress; why she represented at the hearing, after reviewing her notes, that they included no material exculpatory evidence; what training, if any, she received concerning her duty to disclose to defendants material exculpatory information, including impeaching information; her professional background; and why the court should not be concerned that she will repeat her errors in the future.

The United States Attorney and Ms. Sullivan may also, by February 5, 2009, file memoranda addressing whether sanctions should be imposed on Ms. Sullivan and/or the government and, if so, what sanctions are most appropriate.


     /s/ Mark L. Wolf
UNITED STATES DISTRICT JUDGE

ATTACHMENT A

The repeated failure to disclose information in cases assigned to this court include, but are not limited to, the following noteworthy examples. The government withheld information that an informant was available as a possible alternative to a warrant for a "roving bug" used to intercept a La Cosa Nostra induction ceremony and also withheld accurate information concerning when the location of that ceremony was received. See United States v. Ferrara, 771 F. Supp. 1266, 1308 (D. Mass. 1991); United States v. Salemme, 91 F. Supp. 2d 141, 269-89 (D. Mass. 1991).

In, Ferrara v. United States, 456 F.3d 278, 291, 293 (1st Cir. 2006), committing what the First Circuit characterized as "egregious," "outrageous," "feckless," and "blatant misconduct," the lead prosecutor, Jeffrey Auerhahn, intentionally withheld important exculpatory information that directly negated the guilt of Vincent Ferrara on charges that Ferrara had directed Pasquale Barone to murder Vincent James Limoli in aid of racketeering. See also Ferrara v. United States, 384 F. Supp. 2d 384, 387-88 (D. Mass. 2005). As a result, both Ferrara and Barone were released from prison. See Ferrara, 384 F. Supp. 2d at 408; Ferrara v. United States, 372 F. Supp. 2d 108, 133 (D. Mass. 2005).

In United States v. Salemme, 91 F. Supp. 2d at 212-15 (D. Mass. 1999), the government disobeyed court orders that required the disclosure of documents indicating that Federal Bureau of

Investigation Special Agent John Connolly told informants James "Whitey" Bulger and Stephen Flemmi of witnesses providing evidence against them.  The witnesses were subsequently murdered.  Connolly was recently convicted for his complicity in one of the murders.

In United States v. Diabate, 90 F. Supp. 2d 141 (D. Mass. 2000), this court declared a mistrial and dismissed the case without prejudice because the government failed to disclose documents very valuable to the defense and improperly allowed officers' notes to be destroyed.  The Diabate decision recounts other, then recent failures of the government to disclose information.

In United States v. Castillo, Cr. No. 01-10206-MLW, the court in 2002 declared a mistrial because of the government's failure to disclose important impeaching evidence, and dismissed the case with prejudice after the problem recurred and caused irreparable prejudice to the defendant at his second trial.

In November, 2002, the court was required to declare a mistrial in United States v. Henderson, Cr. No. 01-10264-MLW, because of the belated disclosure of exculpatory information that the government was required to provide the defendant prior to the hearing on his motion to suppress, which had to be reopened.

In November, 2002, in United States v. Baskin, Cr. No. 01-10319, the court was again required to reopen a concluded hearing on a motion to suppress because, as the government acknowledged, it

had failed to obey an order to provide the defendant with certain material exculpatory information before the hearing.

In <u>United States v. Anderson</u>, 249 F. Supp. 2d 60, 61-2 (D. Mass. 2003), the government charged an FBI employee with making a false statement rather than perjury, which had a higher guideline range for imprisonment, and falsely represented that the defendant's statements were not made under oath. The court, however, reviewed the relevant documents and discovered the misrepresentation.

In <u>United States v. Diaz</u>, Cr. No. 05-30042-MLW, the court declared a mistrial in a case alleging that members of the Latin Kings gang distributed drugs because of the government's failure to disclose material impeaching information concerning a cooperating witness. Shortly before the scheduled second trial, the government dismissed the case because it realized it had repeated the error.