UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 07-10289-MLW |
| | ) | |
| DARWIN JONES, | ) | |
| Defendant | ) | |

MEMORANDUM AND ORDER

WOLF, D.J.                                        May 18, 2009

I.   SUMMARY

        This is yet another matter that arises out of "misconduct
committed by a federal prosecutor who should have known better."
United States v. Horn, 29 F.3d 754, 757 (1st Cir. 1994).  Defendant
Darwin Jones was charged with being a felon in possession of a
firearm.  If convicted of that charge he would have been subject to
a mandatory minimum sentence of ten years in prison.

        Jones filed a motion to suppress, alleging that the police did
not have the reasonable, articulable suspicion necessary to justify
the seizure and search of him that led to the discovery of the
firearm at issue.  As described in detail in the January 21, 2009
Memorandum and Order:

> [I]n an effort to justify the seizure of Jones, the
> government argued, and Boston Police Officer Rance Cooley
> falsely testified, that there was justification to stop
> Jones because, despite the dark and the distance between
> them, he identified Jones as he rode his bicycle down
> Middleton Street in Dorchester, Massachusetts. Cooley
> testified that his suspicions were raised when Jones
> pedaled away from him because Cooley knew Jones and Jones
> had never avoided Cooley before.
>
> However, Cooley had on several earlier occasions told the

lead prosecutor in this case, Suzanne Sullivan, that he did not recognize Jones on Middleton Street and did not identify the man who had been on the bicycle as Jones until later, when other officers had tackled Jones at another location. Cooley's important inconsistent statements were not disclosed to Jones until the court conducted an in camera review of Sullivan's notes, just before the suppression hearing was complete. Sullivan and her supervisor, James Herbert, acknowledge that Cooley's prior inconsistent statements constituted material exculpatory evidence, and that the failure to disclose them violated the government's constitutional duty under Brady v. Maryland, 373 U.S. 419 (1963), its progeny, and the court's orders.

United States v. Jones, 2009 WL 151587 (D. Mass. Jan. 21, 2009) at *1; see also id. at *2-4.

Cooley's prior inconsistent statements were discovered and disclosed in time for his false testimony to be discredited. Id. at *1, 8. Indeed, the government abandoned reliance on it. Nevertheless, the motion to suppress was denied on other grounds. Id. at *1, 9-16.

The court did, however, immediately consider whether sanctions should be imposed on Ms. Sullivan and/or the government. The court concluded that it was not appropriate to reward Jones, and punish the public, by dismissing the case against him because of the government's misconduct. Id. at *1. Nevertheless, that misconduct is too serious to ignore.

The prosecutorial misconduct in this case arose out of false testimony by a Boston Police officer. Id. at 1, 8 and n.4. False testimony by Boston Police officers and those working with them has both a long and recent history in cases before this court. See

2

<u>United States v. Rullo</u>, 748 F. Supp. 36, 45 (D. Mass. 1990)(perjury by at least one Boston Police officer defeats operation of the inevitable discovery rule and results in suppression of firearm)[1]; <u>United States v. Jones</u>, 2009 WL 151587 at *9, n.6 (finding that Massachusetts State Troopers William Cameron and Stephen Johnson testified falsely in <u>United States v. Nygell Jones</u>, Cr. No. 07-10339-MLW, and again in the instant case).   Moreover, "[t]he egregious failure of the government to disclose plainly material

---

[1]In 1990, this court wrote in <u>Rullo</u> that:

> Notwithstanding the importance and urgency of combatting crime generally, or of the "War on Drugs" particularly, improper testimony by law enforcement officers remains unacceptable in the United States district courts. This is one of the first cases to arise from the joint federal, state and local operations of the new Boston Drug Task Force. It is essential that the state and local law enforcement officials now increasingly likely to appear in United States district courts understand that misconduct generally, and fabricating testimony specifically, is not only wrong, but may jeopardize the important cases they have bravely taken personal risks to investigate and wish to prosecute successfully.

748 F. Supp. at 45.   This admonition has not proven to be effective.

The court recognizes that the decision whether to prosecute a government witness for his or her false testimony is a matter of prosecutorial discretion.   Such misconduct has been prosecuted before. <u>See, e.g.</u>, <u>United States v. Collatos</u> 798 F.2d 18 (1st Cir. 1986).   In any event, it be should be recognized that inconsistent statements by Cooley on an important point led to Ms. Sullivan's problems in the instant case.   Prosecutors should understand that, among other things, they will be acting in their own enlightened self-interest if they make more successful efforts to assure that government witnesses testify candidly and consistently.

exculpatory evidence in this case extends a dismal history of intentional and inadvertent violations of the government's duties to disclose in cases assigned to this court." <u>Jones</u>, 2009 WL 151587 at *5 and n.2.[2] Therefore, the court ordered United States Attorney Michael Sullivan and Ms. Sullivan to file memoranda and affidavits seeking to show cause why sanctions should not be imposed on the government and/or Ms. Sullivan.

The required submissions were made. The United States Attorney and Ms. Sullivan acknowledged that what they characterized as "mistakes" were made in this case. <u>See</u> <u>United States v. Jones</u>, 2009 WL 1111210 at *1 (D. Mass. Apr. 27, 2009)(citing submissions). They argued, however, that no sanction for Ms. Sullivan's misconduct is necessary or appropriate. <u>Id.</u> They requested a hearing if the court continued to contemplate imposing sanctions. <u>Id.</u>

After considering the submissions by the United States Attorney and Ms. Sullivan, the court "remain[ed] concerned about how and why the repeated errors in this case occurred, and also about the risk that such errors by Ms. Sullivan and other prosecutors will recur." <u>Id.</u> The court informed the United States Attorney and Ms. Sullivan that it was considering a range of

---

[2]Some of the cases assigned to this court in which the government improperly failed to disclose important information were described in Attachment A to the January 21, 2009 Memorandum and Order, 2009 WL 151587 at *17-18.

possible sanctions, particularly including:

> ordering that Ms. Sullivan reimburse the District Court
> for at least some of the time spent by defendant's
> Criminal Justice Act Counsel in dealing with issues
> caused by her failures to disclose material exculpatory
> information.  In addition, because training involving
> only prosecutors does not seem to be sufficient, the
> court is considering ordering Ms. Sullivan to attend a
> program on the disclosure of exculpatory information
> involving judges and defense lawyers, as well as
> prosecutors, which the court would organize.

Id. at *5 (footnote omitted).  Therefore, the requested hearing was
scheduled.

Counsel for Ms. Sullivan subsequently filed a memorandum and
numerous letters on her behalf.  After being rescheduled to
accommodate Ms. Sullivan's counsel, a hearing was held on May 12,
2009.  The now Acting United States Attorney Michael Loucks,
Assistant United States Attorneys James Herbert and Dina
Chaitowicz, Ms. Sullivan, and her attorney each addressed the
court.

For the reasons described in this Memorandum, the court is not
appointing counsel to investigate and possibly prosecute Ms.
Sullivan for criminal contempt of the order directing her to
produce all material exculpatory evidence prior to the commencement
of the suppression hearing on October 27, 2008.  Cf. In re Special
Proceedings, 373 F.3d 37, 41-44 (1st Cir. 2004); United States v.
Stevens, Cr. No. 08-231 (EGS) (D.D.C. Apr. 7, 2009) (Order) (Docket
No. 372).  Such an appointment is not necessary or appropriate
because it does not appear that Ms. Sullivan specifically intended

to violate that order or intentionally misrepresented that she had done so. See United States v. Michaud, 928 F.2d 13, 15 (1st Cir. 1991);  United States v. Berandelli, 565 F.2d 24, 30 (2d Cir. 1977).  However, the court does intend to institute criminal contempt proceedings in future cases if there is good reason to be concerned that discovery orders have been intentionally violated.

As also discussed in this Memorandum, if Ms. Sullivan did not intend to mislead, she has still not adequately explained why on April 15, 2008, she filed a memorandum and affidavit of Cooley asserting that Cooley recognized Jones as the bicyclist on Middleton Street when her notes and testimony demonstrate that he told her on April 7, 2008 that he did not know that the bicyclist was Jones until Jones was tackled by other officers later at another location.  See Jones, 2009 WL 151587 at *8.  On at least October 6, 2008, and evidently on October 24, 2008 as well, Cooley again told Ms. Sullivan that he did not recognize the bicyclist as Jones on Middleton Street.  Yet Ms. Sullivan allowed him to testify repeatedly on October 28, 2009, that he immediately recognized the bicyclist as Jones on Middleton Street.  She did not disclose her notes, or the information that they contained, concerning Cooley's important contradictory statements to her.  Indeed, as Ms. Sullivan testified on May 12, 2009, she did not even review her notes to determine if they contained exculpatory information that she was required to disclose.

Ms. Sullivan's failure to produce the crucial information contained in her notes reflects a fundamentally flawed understanding of her obligations, or a reckless disregard of them, despite many years of experience as a prosecutor, substantial training by the Department of Justice, and an explanation of her obligations by this court on August 12, 2008. See Jones, 2009 WL 151587 at *3. The persistent recurrence of inadvertent violations of defendants' constitutional right to discovery in the District of Massachusetts persuades this court that it is insufficient to rely on Department of Justice training programs for prosecutors alone to assure that the government's obligation to produce certain information to defendants is understood and properly discharged.

Therefore, this court is arranging to have a program presented on discovery in criminal cases involving judges, defense lawyers, and prosecutors. The program will be organized by United States District Judge Douglas P. Woodlock, assisted by Magistrate Judge Leo Sorokin. As Ms. Sullivan has offered to attend that program, it is not necessary to order her to do so. Her colleagues will be at least invited, and perhaps ordered, to attend as well. In addition, the Attorney General will be asked to designate a representative to participate in the program.

The court is also continuing to consider whether Ms. Sullivan should be ordered to reimburse the District Court for at least some of the time spent by Jones' Criminal Justice Act counsel in dealing

with issues caused by her failure to disclose material exculpatory information.[3]  See Horn, 29 F.3d at 766-67; Jones, 2009 WL 1111210 at *2.  However, Ms. Sullivan has requested that, if necessary, the court defer for six months deciding whether any sanction is appropriate.  Suzanne Sullivan February 10, 2009 Affidavit ("Aff."), ¶6.  The court is granting that request.

More specifically, the court will defer deciding whether to take any further action concerning Ms. Sullivan because it is satisfied that she has a previously unblemished record and reputation for being an ethical prosecutor, she has since this issue arose made substantial efforts to educate herself on how to discharge her discovery obligations properly, and she is genuinely contrite.  Therefore, although a sanction may prove to be necessary and appropriate to recognize the seriousness of her misconduct and to deter a repetition of it by other prosecutors, there is no immediate need for a sanction to improve Ms. Sullivan's performance.

In addition, recent changes in the leadership of the Department of Justice and the United States Attorney's Office make it appropriate to defer deciding whether sanctions should be

---

[3]  The affidavit of Jones' counsel John Palmer indicates that he spent at least seven hours dealing with matters relating to the late disclosure of the exculpatory evidence.  See John F. Palmer May 4, 2009 Affidavit, ¶2-4.  As Criminal Justice Act counsel are compensated at the rate of $110 per hour, the public has been compelled to pay at least approximately $750 in attorney's fees relating to Ms. Sullivan's misconduct.

imposed on the government for the misconduct in this case.  On April 14, 2009, Attorney General Eric Holder "announced comprehensive steps to enhance the Justice Department's compliance with rules that require the government to turn over certain types of evidence to the defense in criminal cases."  April 14, 2009 Department of Justice Press Release: Attorney General Announces Increased Training, Review of Process for Providing Materials to Defense in Criminal Cases, available at http://www.usdoj.gov/opa/pr/2009/April/09-opa-338.html.      In addition, the new Attorney General recently promised  the Chief Judges of the United States District Courts that he would improve the performance of the Department of Justice's Office of Professional Responsibility ("OPR") and make the Department's disciplinary process much more transparent.  See Joe Palazzolo, "Holder Promises Judges a New Day at DOJ," The National Law Journal, May 4, 2009, Col. 1.  Attorney General Holder has provided promising evidence that his words will be matched by deeds by requesting that the conviction of United States Senator Ted Stevens be vacated and the case against him dismissed because of the government's repeated failure to disclose important exculpatory evidence to Senator Stevens.  See Stevens, Cr. No. 08-231 (EGS) (D.D.C. Apr. 1, 2009) (Docket No. 324).

Similarly, the new Acting United States Attorney for the District of Massachusetts, Michael Loucks, has expressed his

determination to improve his office's performance in discharging its duty to disclose material exculpatory evidence.   Mr. Loucks' conduct in prior cases indicate that he takes this duty seriously. For example, in <u>United States v. Diaz</u>, this court declared a mistrial in a case alleging that members of the Latin Kings gang distributed drugs because of the government's failure to disclose material exculpatory information concerning a cooperative witness. Cr. No. 05-30042-MLW (D. Mass. September 27, 2006) (Docket No. 125).   As First Assistant United States Attorney, Mr. Loucks subsequently caused the case to be dismissed shortly before the scheduled second trial because he realized that the same error had been repeated. <u>Id.</u> (D. Mass. Dec. 19, 2006) (Government's Motion to Dismiss Without Prejudice) (Docket No. 158).   Thus, the court has reason to expect that Mr. Loucks, as well as Attorney General Holder, will perform in a way that diminishes the need for sanctions in this case.

Therefore, the court is deferring for at least six months the decision as to whether to impose sanctions on the government and/or Ms. Sullivan for the misconduct in this case.   The court is requiring the Department of Justice and Ms. Sullivan to file additional affidavits in November, 2009, addressing whether their performance and progress have obviated the need to impose sanctions in this matter.

II.  DISCUSSION

    A.  Background

    It is axiomatic that the government has a constitutional duty to disclose to a defendant material exculpatory evidence.  See Brady v. Maryland, 373 U.S. 83 (1963).  It has been long and clearly established that exculpatory evidence includes information that is potentially useful in impeaching government witnesses.  See Giglio v. United States, 405 U.S. 150, 153-54 (1972).

    Nevertheless, in the District of Massachusetts the government has had enduring difficulty in discharging its duty to disclose material exculpatory information to defendants in a timely manner. For example, in 1991, in a case of "astounding negligence," the First Circuit described "the recurring problem of belated government compliance with its duty to provide timely disclosure of exculpatory evidence." United States v. Osorio, 929 F.2d 753, 755 (1st Cir. 1991).  The First Circuit had addressed before the "'sloppy practice' in the prosecutor's office with respect to disclosures" and found that in Osorio "[t]he negligence fit[] that pattern of practice."  Id. at 760 (quoting United States v. Ingraldi, 793 F.2d 408, 413 (1st Cir. 1986)).[4]

_____

    [4]  The pattern of failures to produce discovery addressed in Osorio was not, in that era or now, unique to the District of Massachusetts.  For example, in 1984 Judge Reena Raggi of the Southern District of New York wrote that, "Giglio problems recur with disturbing frequency in the cases tried before this court." United States v. Prince, 1994 WL 99231 at *1 (E.D.N.Y. March 10, 1994).  More recent examples are discussed below.

Despite the First Circuit's admonitions in <u>Osorio</u>, inadvertent and deliberate violations of the government's duty to disclose material exculpatory information continued to occur. For example, during a 1993 trial before this court it was discovered that Assistant United States Attorney Jeffrey Auerhahn, "repeatedly improperly failed to disclose exculpatory evidence to [defendant Pasquale] Barone. Seven or eight of those discovery violations concerned the failure to disclose exculpatory information relating to [Walter] Jordan's testimony." <u>See</u> <u>Ferrara v. United States</u>, 384 F. Supp.2d 384, 402 (D. Mass. 2005), <u>aff'd</u> 456 F.3d 278 (1st Cir. 2006). In 2003, it was discovered that Mr. Auerhahn had withheld powerful exculpatory information provided by Jordan that directly negated the guilt of Barone and his co-defendant, La Cosa Nostra "Capo" Vincent Ferrara. <u>See</u> <u>Ferrara</u>, 384 F. Supp. 2d at 384, 409; 456 F.3d at 293. As a result, both men were released from prison. <u>See</u> <u>Ferrara v. United States</u>, 372 F. Supp. 2d 108, 133 (D.Mass. 2005), <u>aff'd</u> 456 F.3d at 280-81.

Prosecutorial misconduct concerning discovery in that period was also addressed in <u>United States v. Mannarino</u>, 850 F. Supp. 57 (D. Mass. 1994). In <u>Mannarino</u>, the destruction of a witness' handwritten statement by a police officer was characterized as "present[ing] yet again a pattern of sustained and obdurate indifference to, and unpoliced subdelegation of, disclosure responsibilities by the United States Attorney's Office in this

12

District." Id. at 59.

In 1994, the government's admitted failure to produce required discovery in a timely manner also jeopardized a conviction obtained after a two-month trial in another case before this court. See United States v. Walsh, 75 F.3d 1, 3, 8 (1st Cir. 1996).

Beginning in about 1996, the United States District Court for the District of Massachusetts created a committee of judges, prosecutors, and defense lawyers to develop revised Local Rules for criminal cases. As the report of the judicial members of the committee explained, this effort was initiated in meaningful measure because criminal:

> cases too often get to trial without legally required discovery having been provided. Such problems present judges with challenging issues to be resolved promptly, and threaten both the fairness of the trial and the finality of any conviction. See, e.g., United States v. Walsh, 75 F.3d 1 (1st Cir. 1996); United States v. Osorio, 929 F.2d 753 (1st Cir. 1991); United States v. Devin, 918 F.2d 280 (1st Cir. 1990); United States v. Mannarino, 850 F. Supp. 57 (D. Mass. 1994).

Report of the Judicial members of the Commission Established to Review and Recommend Revisions of the Local Rules of the United States District Court for the District of Massachusetts Concerning Criminal Cases, October 28, 1998, at 8.

In 1998, the new Local Rules were promulgated. They essentially codified the requirements of Brady, Giglio, and their progeny, providing a road map for prosecutors trying to discharge their discovery duties properly. Several of the provisions of the

14

Local Rules are pertinent to the instant case. Exculpatory information is defined with precision to include "all information that is material and favorable to the accused because it tends to . . . [c]ast doubt on the admissibility of evidence that the government anticipates offering in its case-in-chief, that might be subject to a motion to suppress or exclude, which would, if allowed be appealable pursuant to 18 U.S.C. § 3731." L.R. 116.2(A)(2). The government is required to provide such exculpatory information automatically, without a request, no later than 42 days after arraignment unless a declination procedure is invoked or an <u>ex parte</u> protective order is obtained. <u>See</u> L.R. 116.2(B)(1), 116.6(A) and (B). The Local Rules explicate the fact that the duty to disclose is a continuing duty, and when additional material exculpatory evidence is discovered or developed after an initial disclosure, it must be produced. <u>See</u> L.R. 116.7. The Local Rules also require the preservation of notes so they can be reviewed and produced if they contain material exculpatory information. <u>See</u> L.R. 116.9.

The revised Local Rules for Criminal Cases of the District of Massachusetts have been widely viewed as valuable and, indeed, worthy of emulation. For example, in response to a disturbing number of wrongful convictions resulting in death sentences, in 2002 the Illinois Commission on Capital Punishment recommended that the Illinois Supreme Court "adopt a rule defining 'exculpatory

evidence' in order to provide guidance to counsel in making appropriate disclosures." Report of the Commission on Capital Punishment (hereinafter "Illinois Report"), Ch. 8 at 119, available at http://www.idoc.state.il.us/ccp/index.html. It specifically proposed a modified version of the District of Massachusetts Local Rule, explaining that: "The Massachusetts District Court Rules not only define exculpatory evidence, but impose clearly defined requirements for disclosure. The Commission has revised the Rule to conform more closely to Illinois law." Id. at 120. The proposed revision of the Illinois rules has since been adopted. Compare Illinois Report, Ch. 8 at 120, available at http://www.idoc.state.il.us/ccp/index.html (proposing changes) with Illinois Supreme Court Rule 12(c) (incorporating changes).

Similarly, in 2003, the American College of Trial Lawyers issued a report titled, "Proposed Codification of Disclosure of Favorable Information Under Rules of Criminal Procedure 11 and 16." It wrote that:

> Most local rules that address Brady-Giglio disclosure obligations neither define the nature and/or scope of favorable information, nor require consultation with law enforcement officers, nor provide clear pre-trial or pre-plea deadlines for disclosure. The most notable exception is the District of Massachusetts which in 1998 promulgated the most extensive local criminal discovery rules in the nation. Massachusetts Local Rule 116.2 was enacted in response to federal prosecutors' indifference to pre-trial discovery obligations.

Id. at 11-12 (footnotes omitted) available at http://www.actl.com/content/navigationmenu/publication/allpublica

16

tions/default.html.

However, the District of Massachusetts revised Local Rules have not proved to be fully effective in preventing the inadvertent errors by prosecutors that have been discovered in some cases.[5] Noteworthy examples of such cases before this court include, but are not limited to, the following.

In United States v. Diabate, 90 F. Supp.2d 140 (D. Mass. 2000), this court declared a mistrial and dismissed the case without prejudice because the government failed to disclose documents very valuable to the defense and improperly allowed officers' notes to be destroyed.  The Diabate decision recounts other, then recent failures of the government to disclose information.  Id. at 148-50.

In United States v. Castillo, Cr. No. 01-10206-MLW, this court in 2002 declared a mistrial because of the government's failure to disclose important impeaching evidence, and dismissed the case with prejudice after the problem recurred and caused irreparable prejudice to the defendant at his second trial.

In 2002, this court was required to declare a mistrial in United States v. Henderson, Cr. No. 01-10264-MLW, because of the belated disclosure of exculpatory information that the government

---

[5]No rule will be fully effective in preventing the type of deliberate violations of the duty to provide material exculpatory information to defendants that is described in Ferrara, 384 F. Supp. 2d at 397 n.10, aff'd 456 F.3d at 293.

was required to provide the defendant prior to the hearing on his motion to suppress, which had to be reopened.

In 2002, in <u>United States v. Baskin</u>, Cr. No. 01-10319, this court was again required to reopen a concluded hearing on a motion to suppress because, as the government acknowledged, it had failed to obey an order to provide the defendant with certain material exculpatory information before the hearing.

In 2006, in <u>United States v. Diaz</u>, Cr. No. 05-30042-MLW, this court declared a mistrial in a case alleging that members of the Latin Kings gang distributed drugs because of the government's failure to disclose material impeaching information concerning a cooperative witness. Shortly before the scheduled second trial, the government dismissed the case because it realized it had repeated the error. <u>Id.</u> (D. Mass. Dec. 19, 2006)(Government's Motion to Dismiss Without Prejudice) (Docket No. 158).

The persistent problems discovered by this court may have occurred, at least in part, because the Department of Justice did not properly instruct its prosecutors or adequately educate them to understand the importance of their discovery obligations. For example, Ms. Sullivan became an Assistant United States Attorney in January, 2006, and in March, 2006, attended four days of training in the Department of Justice's National Advocacy Center. <u>See</u> Feb. 10, 2009 Suzanne Sullivan Aff., ¶¶2-3. At that time the voluminous United States Attorneys Manual ("USAM") did not have a section on

18

a federal prosecutor's duty to disclose material exculpatory
information. Section 9-500 of the Manual, "Policy Regarding
Disclosure of Exculpatory and Impeachment Information;" was added
to the Manual in October, 2006.   The addition to the United
States Attorneys Manual of a section on a prosecutors' duties under
<u>Brady</u> and <u>Giglio</u> was not an unprompted effort by the Department of
Justice to address a problem that it perceived and acknowledged.
Rather, it was part of an ardent and, to date, successful effort of
the Department to defeat a possible amendment to the Federal Rules
of Criminal Procedure.

The American College of Trial Lawyers report, <u>supra</u>, prompted
the Advisory Committee on Criminal Rules, on which the Department
of Justice is represented,[6] to begin in 2003 to consider amending
Federal Rule of Criminal Procedure 16 to require the disclosure of
exculpatory information.  May, 2007 Advisory Committee on Rules of
Criminal Procedure Report to Standing Committee at 19, available at
<u>http://www.uscourts.gov/rules/reports./CR05-2007.pdf.</u>   In 2007,
the Advisory Committee recommended amendment of Rule 16 despite the
opposition of the Department of Justice.   <u>Id.</u> at 18-26.   In
explaining the need for the proposed amendment, the Chair of the
Advisory Committee wrote to the Standing Committee on Rules of
Practice and Procedure:

---

[6]From 2005 to 2008, Chief Judge Mark L. Wolf was also a
member of the Advisory Committee.

The Committee is [] aware of a significant number of
cases in which the courts have found <u>Brady</u> violations, as
well as many more cases in which the courts have found
that exculpatory material was not disclosed – or was not
disclosed in a timely fashion – but nevertheless found no
constitutional violation because the failure to provide
the evidence did not deprive the defendant of due
process.   In many cases, the court found that the
undisclosed evidence was favorable to the defendant – and
material in the sense that term is generally used under
Rule 16 – but not material in a narrower constitutional
sense.   In order to meet this elevated constitutional
standard of materiality, the defense must establish a
reasonable probability that had disclosure been made the
result would have been different, <u>United States v.</u>
<u>Bagley</u>, 473 U.S. 667 (1985), or that the trial did not
result in a verdict worthy of confidence, <u>Kyles v.</u>
<u>Whitley</u>, 514 U.S. 419 (1995).   The attached materials
include brief descriptions of cases considering <u>Brady</u>
issues, as well as an annotation collecting cases.[7]

The reported cases are not, however, a true measure of
the scope of the problem, which it is impossible to
measure precisely.   The defense is, by definition,
unaware of exculpatory information that has not been
provided by the government.  Although some information of
this nature comes to light by chance from time to time,
it is reasonable to assume in other similar cases such
information has never come to light.   There is, however,
no way to determine how frequently this occurs.  For that
reason, the Advisory Committee places substantial weight
on the experience of highly respected practitioners, such
as the members of the American College of Trial Lawyers
and the practitioner members of the Advisory Committee,
who strongly support the need for an amendment to Rule
16.    Similarly, the Federal and Community Defenders
believe that a rule is needed.

---

[7]The materials referenced by the Advisory Committee are
appended to this Memorandum and Order as Exhibit A. It is clear
that the listed cases do not represent all of those in which
<u>Brady</u> violations were discovered in part because in many such
cases no decision was published.   For example, the Advisory
Committee materials cite only one of the five matters involving
<u>Brady</u> violations after 2001 in cases assigned to this court which
are described earlier in this Memorandum.

Id. at 20 (footnotes omitted).

Therefore, the Advisory Committee recommended an amendment to Rule 16 that would have required the government to disclose to the defendant all exculpatory information, not merely evidence that, when viewed after a conviction, is so important that there is a reasonable probability that had disclosure been made, the result would have been different.  Id. at 21 (citing Bagley, 473 U.S. at 682).  As the Chair of the Advisory Committee also wrote:

> The proposed amendment reflects the Advisory Committee's conclusions that (1) there is a strong case for codifying the prosecution's duty to disclose exculpatory and impeachment evidence in the Federal Rules, and (2) the disclosure under the rule should be broader in scope than the constitutional obligation imposed by Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.  The proposed amendment makes the prosecution's disclosure to the defense of exculpatory and impeachment material a standard part of pretrial discovery in federal prosecutions.
>
> The Committee did not come to the decision to recommend this amendment lightly.  The Department of Justice has consistently opposed the idea of amending Rule 16 to encompass exculpatory and impeachment material.  The Committee has considered the Department's concerns, and it revised the draft amendment, narrowing it substantially in several respects, in an effort to be responsive to these concerns.  During the time the amendment was under consideration . . . the Department also adopted an internal policy intended to address many of the concerns that prompted the consideration of an amendment.  The Advisory Committee welcomed the new policy, but ultimately concluded that it did not take the place of a judicially enforceable amendment to the Federal Rules.  The proposed rule and the Department's policy are not in conflict.  Rather, they would complement one another and focus appropriate attention on the importance of providing exculpatory and impeachment evidence and information to the defense in a timely fashion.

> After the Department's presentation of its new internal policy, the Committee voted 8 to 4 to forward the proposed amendment to the Standing Committee for publication.

<u>Id.</u>. at 18-19.

The Advisory Committee did not deem it sufficient to rely on the recent addition to the United States Attorneys Manual to address the serious problem it discerned in part because:

> [T]he new policy, like the remainder of the USAM, is not judicially enforceable; it "does not create a general right of discovery," "[n]or does it provide defendant with any additional rights and remedies." USAM § 9-5.001(E). <u>See</u> <u>also</u> USAM § 9-5.100 (preface) ("GIGLIO POLICY")(same). The Committee considered deferring consideration of the amendment to give the new policy time to take effect, but felt that it would not be feasible to monitor compliance. As noted above, the defense is generally unaware when the prosecution fails to provide exculpatory or impeachment information. Accordingly, although it welcomed the Department's recognition of the prosecution's constitutional and professional obligations in the United States Attorneys Manual, the Committee concluded that the new policy did not eliminate the need for a rule making disclosure a part of pretrial discovery.

<u>Id.</u> at 21.

However, the Department of Justice's continued opposition to the proposed amendment to Rule 16 persuaded the Standing Committee to reject it. September 2007 Committee on Rules of Practice and Procedure Report to Judicial Conference, available at http://www.uscourts.gov/rules/reports/ST09-2007.pdf. The Standing Committee based its rejection in part on its desire "to obtain information about the experience with the Department of Justice's recent revisions to its U.S. Attorneys' Manual." <u>Id.</u>

As the Advisory Committee recognized, it is not possible to determine the number of cases in which material exculpatory information is not disclosed. Defendants and the court are generally unaware when such information is withheld. However, recent cases strongly indicate that the revision of the United States Attorneys Manual has not solved the problem.

As described earlier, in April, 2009, Attorney General Holder moved to set aside the conviction of Senator Stevens and dismiss the case with prejudice. As the presiding judge in Stevens, Emmet G. Sullivan, subsequently wrote the Advisory Committee in urging it to propose again an amendment of Rule 16 to require the disclosure of all exculpatory information:

> At a hearing on [the] motion [to dismiss], the government informed me that during the course of investigating allegations of misconduct, which included several discovery breaches, and preparing to respond to the defendant's post-trial motions, a new team of prosecutors had discovered what the government readily acknowledged were two serious Brady violations:
>
> ******
>
> These Brady violations – revealed for the first time five months after the verdict was returned – came to light only after an FBI agent filed a complaint alleging prosecutorial and other law enforcement misconduct, a new Attorney General took office, and a new prosecutorial team was appointed to respond to the defendant's post-trial motions.

Letter from the Hon. Emmet G. Sullivan, United States District Judge of the United States District Court for the District of Columbia, to the Hon. Richard C. Tallman, Chair, Judicial

Conference Advisory Committee on the Rules of Criminal Procedure (Apr. 28, 2009).[8] The Attorney General's motion was granted and the case against Senator Stevens – who lost his bid to be re-elected after his wrongful conviction – was dismissed.  United States v. Stevens, Cr. No. 08-231 (EGS) (D.D.C. Apr. 7, 2009) (Order) (Docket No. 372).

Also in April, 2009, a district judge in the Southern District of Florida sanctioned the government and the prosecutors individually for a wide array of misconduct, including violations of their duty to disclose material exculpatory evidence.  See United States v. Shaygan, No. 08-20112-CR (D.D.C. Apr. 9, 2009) (Order on Motion for Sanctions under Hyde Amendment at 9, 19, 23-24, 32-38).  The sanctions included an order that the government pay approximately $600,000 of the defendant's legal fees under the

---

[8]It is noteworthy that, also in April, 2009, the Supreme Court ordered further review of a case of a Viet Nam veteran who was sentenced to death in 1982 by a state court in Tennessee because the prosecution withheld information that was helpful to the defendant concerning the jury's assessment of the most appropriate punishment for the proven murder.  See Cone v. Bell, 129 S.Ct. 1769 (2009).  In Cone, the Supreme Court wrote that "[a]lthough the Due Process Clause of the Fourteenth Amendment, as interpreted by Brady, only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations."  Id. at 1783 n.15 (citing and quoting Kyles v. Whitley, 514 U.S. 419, 437 (1995) and ABA Model Rule of Professional Conduct 3.8(d) (2008); but see id. at 1787 (Roberts, C.J., concurring in the judgement) ("The ABA standards are wholly irrelevant to the disposition of this case, and the majority's passing citation of them should not be taken to suggest otherwise").

Hyde Amendment, 18 U.S.C. § 3006A.[9]

Experience has educated this court to understand that the usual means employed by judges to respond to prosecutorial misconduct are ineffectual.  The court can publicly reprimand the prosecutor or the Department of Justice.  See Horn, 29 F.3d at 766-67.  A prosecutor should value his or her reputation. As Attorney General Robert H. Jackson's told the United States Attorneys in 1940:

> The lawyer in public office . . . must remember that his [or her] most alert and severe, but just, judges will be the members of his [or her] own profession, and that lawyers rest their good opinion of each not merely on results accomplished but on the quality of the performance.

Robert H. Jackson, United States Attorney General, speech to the Second Annual Conference of United States Attorneys: The Federal Prosecutor (April 1, 1940) in In the Name of Justice at 173 (Timothy Lynch ed., 2009).

Recognizing that published criticism of a named prosecutor may

_____

[9]The Hyde Amendment provides that "the court, in any criminal case (other than a case in which the defendant is represented by assigned counsel paid for by the public) pending on or after the date of the enactment of this Act [Nov. 26, 1997], may award to a prevailing party, other than the United States, a reasonable attorney's fee and other litigation expenses, where the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special circumstances make such an award unjust."  18 U.S.C. §3006A.  In the instant case Jones did not prevail on his motion to suppress and, in any event, was represented by "assigned counsel paid for by the public."  Thus, the Hyde Amendment does not apply to this matter.

haunt the attorney, this court has at times refrained from memorializing in writing or publishing an oral decision finding prosecutorial misconduct. See, e.g., United States v. Castillo, Cr. No. 01-10206-MLW. In other instances, the court has found it to be most appropriate to publish decisions naming the prosecutor who engaged in misconduct. See, e.g., Ferrara, 372 F.Supp.2d at 132. Neither approach has been sufficient to deter the misconduct that occurred in this and other cases. However, prosecutors should now foresee that they will likely be named in published decisions if this court is convinced that they have engaged in misconduct.

The First Circuit has stated that it may be sufficient to "catch the Justice Department's attention, punish the culprit, and deter future prosecutorial excesses" to "dispatch[] [the prosecutor] to the Justice Department's internal disciplinary office," OPR. Horn, 29 F.3d at 767. This court respectfully disagrees.

In 2003, United States Attorney Michael Sullivan asked this court to defer deciding whether misconduct by Assistant United States Attorney Auerhahn in failing to disclose crucial exculpatory information was intentional so that OPR could investigate. The United States Attorney represented that the results of the OPR investigation would be provided to the court. See Oct. 17, 2008 Michael J. Sullivan Aff. ¶8 (Barone v. United States C.A. No. 98-11104-MLW (Docket No. 89); Ferrara v. United States, C.A. No. 00-

26

11693-MLW (Docket No. 119)).  In reliance on this representation, the court did not in 2003 express its conclusion that Mr. Auerhahn had deliberately withheld the vital exculpatory information at issue.  <u>Barone</u>, C.A. No. 98-11104, Oct. 3, 2003 Tr. at 19-20. However, although the <u>Ferrara</u> case was still pending, the Department of Justice did not inform this court or the First Circuit that OPR had finished its investigation by January, 2005. <u>See</u> <u>Ferrara</u>, C.A. No. 00-11693-MLW (D. Mass. July 2, 2007) (Order and Attached Letter to Alberto Gonzales) (Docket No. 243).  Nor did the Department report that OPR had found that Mr. Auerhahn had unintentionally failed to discharge his duty to disclose material exculpatory information.  <u>Id.</u>

In April, 2005, this court held that Mr. Auerhahn's misconduct was deliberate.  <u>See</u> <u>Ferrara</u>, 384 F. Supp. 2d at 397 n.10.  In affirming that decision in 2006, the First Circuit characterized the prosecutor's misconduct as "blatant," "reckless," "manipulative," "deliberate," and "outrageous." <u>Ferrara</u>, 456 F.3d at 293.

This court received the results of the OPR investigation  from the Department of Justice in May, 2007, in response to a December, 2006 letter to Attorney General Alberto Gonzalez.[10]  It then learned

---

[10]The failure of the Department of Justice to report, as promised, the results of the OPR investigation concerning Mr. Auerhahn appears to be part of a pattern.  Since fiscal year 2006, OPR has not published its usual annual report on its activities. <u>See</u> OPR website, http://www.usdoj.gov/opr/reports.htm

that its "sanction" for Mr. Auerhahn's misconduct was what was intended to be a secret written reprimand by United States Attorney Sullivan who, before and after issuing it, publicly praised the prosecutor.  See, e.g., Shelly Murphy, "Judge Throws out Mobster's Sentence," The Boston Globe, Apr. 13, 2005, at A1 (quoting United States Attorney Sullivan's statement in defense of Auerhahn that "[h]e's a career prosecutor who's dedicated his career to public service") (internal quotation marks omitted).

In a January 2, 2008 letter to then Attorney General Michael Mukasey, this court wrote:

> [T]he Department's performance in the [Auerhahn] matter raises serious questions about whether judges should continue to rely upon the Department to investigate and sanction misconduct by federal prosecutors.  As one who took pride in assisting Attorney General Edward Levi in establishing [the Office of Professional Responsibility] more than thirty years ago, I sadly doubt that it is now capable of serving its intended purpose.

Ferrara, C.A. No. 00-11693-MLW (D. Mass. Jan. 4, 2008) (Order) (Docket No. 257). Attorney General Mukasey did not respond to this letter.

Judge Emmet G. Sullivan's recent decision not to rely on Department of Justice, but instead to appoint of a special counsel to investigate and possibly prosecute high ranking Department of Justice lawyers for contempt in the Stevens case, suggests that this court's 2008 prediction may be proving to be prophetic.  In

---

(listing reports through fiscal year 2006).

any event, this court does not now find that it would be sufficient to defer to OPR in this matter.

The United States District Court has its own process, established by its Local Rules, for having matters of apparent misconduct determined and, if appropriate, sanctioned by a panel of three district judges. <u>See</u> L.R. 83.6(5). The presumptive prosecutors in such a proceeding are the United States Attorney or Bar Counsel. <u>See</u> L.R. 83.6(9). As the United States Attorney may be subject to sanction, it would not be appropriate to appoint him to pursue this matter. Nor does the court have confidence that the appointment of Bar Counsel would prove to be an efficient and effective way to proceed in this case. <u>See</u> L.R. 83.6(5). In June, 2007, this court referred the matter concerning Mr. Auerhahn to Bar Counsel for prosecution before a panel of three federal judges. <u>Ferrara</u>, C.A. No. 00-11693-MLW (D. Mass. Apr. 28, 2008) (Order) (Docket No. 243). Bar Counsel accepted the appointment and reported that she would take action by October, 2007. However, no action has yet been taken.

There is another recent development that reinforces this court's sense that it is now particularly important that judges find effective means to themselves hold prosecutors and other government officials accountable when misconduct has been demonstrated. For almost 100 years the judicially crafted exclusionary rule has been relied upon as the primary means of

determining government misconduct.  See Weeks v. United States, 232
U.S. 383 (1914).   For example, the deliberate or reckless
withholding of material information from an application for a
search warrant will result in the suppression of the evidence
obtained in the execution of the warrant.  See Franks v. Delaware,
438 U.S. 154, 155 (1978).   In January 2009, the Supreme Court
decided Herring v. United States, 129 S.Ct. 695 (2009).  With Chief
Judge John Roberts writing for the five Justices in the majority,
the Supreme Court held that "when police mistakes are the result of
negligence . . . rather than systemic error or reckless disregard
of constitutional requirements," the exclusionary rule will not
operate to suppress the evidence at issue.  Id. at 704.

The ruling in Herring may prove to be an application or modest
extension of Franks and comparable cases such as United States v.
Leon, 408 U.S. 897 (1984), which established the good faith
exception to the exclusionary rule.  However, it has been suggested
that Herring foreshadows the elimination of the exclusionary rule
altogether. Adam Liptak, "Supreme Court Edging Closer to Repeal of
Evidence Ruling," N.Y. Times, January 31, 2009, at A1.[11] If the

---

[11]The New York Times article reported, in part, that:

''With Alito's replacement of O'Connor,'' said Craig M.
Bradley, a law professor at Indiana University,
''suddenly now they have four votes for sure and
possibly five for the elimination of the exclusionary rule.''

The four certain votes, in the opinion of Professor
Bradley and other legal scholars, are Chief Justice

exclusionary rule is eliminated, the need to hold individual prosecutors personally responsible for their misconduct will be magnified.

However, as described earlier, the conventional means for determining whether misconduct has occurred and sanctioning it are not efficient or effective. Neither referral to OPR, other disciplinary bodies, or public criticism has sufficiently deterred prosecutorial misconduct. Therefore, this court intends to address itself any future issues of possible prosecutorial misconduct and sanctions.

The Local Rules of the District of Massachusetts and court orders require that prosecutors, at defined times prior to motions to suppress, trials, and sentencing hearings, provide defendants with all material exculpatory information. In the future, if it appears to this court that such rules and orders may have been wilfully violated, the court is likely to give notice and institute criminal contempt proceedings pursuant to 18 U.S.C. §401 and Federal Rule of Criminal Procedure 42(a). If the interest of

---

Roberts, Justice Alito, Justice Antonin Scalia and Justice Clarence Thomas, who is also an alumnus of the Reagan administration.

The fate of the rule seems to turn on the views of Justice Anthony M. Kennedy, who has sent mixed signals on the question. As in so many areas of the law, there are indications that the court's liberal and conservative wings are eagerly courting him. They are also no doubt looking for the case that, with Justice Kennedy's vote, will settle the issue once and for all.

31

justice so requires, disinterested private counsel will be appointed to investigate and prosecute the matter, as has been done in the <u>Stevens</u> case. <u>See</u> Fed. R. Crim. P. 42(a)(2); <u>In re Special Proceedings</u>, 373 F.3d at 41-44; <u>Stevens</u>, Cr. No. 08-231 (E.G.S.) (D.D.C. Apr. 7, 2009) (Order) (Docket No. 375).  If a sentence of more than six months in prison is a possibility, the prosecutor will have a right to a jury trial.  <u>See</u> <u>Muniz v. Hoffman</u>, 422 U.S. 454, 476 (1975); <u>United States v. Pina</u>, 844 F.2d 1, 10 (1st Cir. 1988).  If the court decides that the maximum possible sentence that it might impose is six months,  the matter may, as is customary, be decided by the court. <u>See</u> <u>Muniz</u>, 422 U.S. at 475-76. If it is proven beyond a reasonable doubt that "(1) there was a lawful court order of reasonable specificity, (2) the [prosecutor] violated it and (3) the violation was wilful," the prosecutor will have been proven guilty of criminal contempt. <u>Michaud</u>, 928 F.2d at 15; <u>see also</u> <u>Berandelli</u>, 565 F.2d at 30 ("[T]he crime of criminal contempt requires a specific intent to consciously disregard an order of the court.") (citations and internal quotation marks omitted) (brackets in original).  If convicted of criminal contempt, the prosecutor may be incarcerated and/or fined.

In the circumstances of the instant case, the court also has the authority to sanction the prosecutor by ordering her to pay a monetary penalty, including the fees of defendant's Criminal Justice Act counsel that were generated by her misconduct.  Such a

sanction could be imposed pursuant to Federal Rule of Criminal Procedure 16(d)(2), as an exercise of the court's inherent supervisory powers, or both.

In the instant case, Ms. Sullivan failed to disclose the material exculpatory information that Cooley had on several occasions made statements to her that contradicted his affidavit and anticipated testimony that he recognized the bicyclist as Jones on Middleton Street.   These statements were memorialized in Ms. Sullivan's notes.

As described earlier, Rule 16 does not generally require the disclosure to a defendant of all material exculpatory evidence. That requirement is imposed by the constitution, and is implemented by the Local Rules of the District of Massachusetts and, often, by case-specific orders.   Rule 16(a)(1)(E), however, provides that, "[u]pon a defendant's request, the government must permit the defendant to inspect and copy . . . documents . . . or portions of [them], within the government's possession . . . and . . . material to preparing the defense."   Local Rule 116.1(A), which implements Rule 16, provides for automatic production of all discoverable material and information in the possession of the government without a motion or request.[12]   The duty to supplement an initial

_____

[12]Local Rule 116.1(A) states:

(1) Automatic Discovery. In all felony cases, unless a defendant waives automatic discovery, all discoverable material and information in the possession, custody, or

disclosure is codified in Local Rule 116.7.

Therefore, pursuant to Federal Rule of Criminal Procedure 16(a)(1)(D), Ms. Sullivan had a duty to disclose to the defendant the portions of her notes of April 7, October 6, 2008, and October 24, 2008, that memorialized Cooley's important inconsistent statements.

Under Rule 16(d)(2)(D), "[i]f a party fails to comply with this rule, the court may . . . enter any [] order that is just under the circumstances."  Therefore, if deemed appropriate, the court could impose a monetary sanction on Ms. Sullivan pursuant to Rule 16.

---

control of the government and that defendant, the existence of which is known, or by the exercise of due diligence may become known, to the attorneys for those parties, must be disclosed to the opposing party without formal motion practice at the times and under the automatic discovery procedures specified in this Local Rule.

As explained in the report concerning the revised Local Rules:

The new rules begin with a truly self-executing system of automatic discovery.  In all felony cases, unless a defendant promptly waives his right to automatic discovery, within 28 days of arraignment the government must provide the defendant with: all of the discovery provided by Federal Rule of Criminal Procedure 16(a)(1)(A)-(D) . . . . The defendant is obligated to provide comparable reciprocal recovery.  See Rule 116.1(D).

Report of the Judicial members of the Commission Established to Review and Recommend Revisions of the Local Rules of the United States District Court for the District of Massachusetts Concerning Criminal Cases, October 28, 1998 at 8-9.

The court also has the authority to impose monetary sanctions on Ms. Sullivan as an exercise of its inherent supervisory powers. "[T]he inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." Chambers v. Nasco, 501 U.S. 32, 45 (1991); see also Horn, 29 F.3d at 760 ("even though a particular abuse is covered by a specific statute or rule, a court still may invoke its supervisory power to address the abuse if the existing remedial provision is inadequate to the task."). Moreover, if, contrary to this court's conclusion, Ms. Sullivan's failure to disclose her notes memorializing material exculpatory information cannot be sanctioned under Rule 16, it is subject to the exercise of the court's inherent powers, which "exist to fill in the interstices." Chambers, 501 U.S. at 46; see also Horn, 29 F.3d at 760 ("the supervisory power doctrine is interstitial in the sense that it applies only when there is no effective alternative provided by rule, state, or constitutional clause."). There are at least "'three purposes to which the supervisory power may be dedicated: to implement a remedy for a violation of recognized rights, to preserve judicial integrity . . . and as a remedy designed to deter illegal conduct.'" Horn, 29 F.3d at 760. (quoting United States v. Hasting, 461 U.S. 499, 505 (1983). "It has been squarely held that a court's array of supervisory powers includes the power to assess attorneys' fees against other parties or their attorneys in befitting situations." Id. (citing Roadway

35

Express, Inc. v. Piper, 447 U.S. 752, 764 (1980).

In Horn, the First Circuit held that deliberate prosecutorial misconduct that inflicts some enduring prejudice to the defendant would justify the exercise of supervisory powers to order the prosecution to pay the attorneys' fees that misconduct generated. Id. at 758-59, 766. At least ordinarily, supervisory powers may not be relied upon to dismiss a case absent cognizable prejudice to a defendant before the court. See United States v. Santana, 6 F.3d 1, 11 (1st Cir. 1993). However, it remains an open question whether the use of supervisory powers to dismiss an indictment in the absence of prejudice to a defendant would be permissible as an effort to deter future misconduct if the conduct at issue "is plainly improper, indisputably outrageous, and not redressable through the utilization of less drastic disciplinary tools." Id.

In any event, in the instant case there has been inexcusable ignorance, or a reckless disregard, of a constitutional duty, and of the requirements of the Local Rules and a court order relating to that duty. The misconduct extends a long pattern of inadvertent failures to produce material exculpatory information, and cases of intentional misconduct as well. In these circumstances, the supervisory powers are available to permit a narrowly tailored sanction, imposed on the prosecutor personally, to recognize the seriousness of the offense, give integrity to the commands of the constitution and the court's orders, and to deter future

misconduct.  A financial sanction on the prosecutor, including requiring the payment of the reasonable attorneys' fees caused by her misconduct, would be one form of an appropriate narrowly-tailored response to the circumstances.  Such sanctions have been imposed on government lawyers in civil cases in which money was at stake.  <u>See, e.g.</u>, <u>Chilcutt v. United States</u>, 4 F.3d 1313, 1319 (5th Cir. 1993) (upholding order that government counsel pay, among other things, for time spent by defense counsel on contempt hearing without being reimbursed); <u>United States v. Sumitomo Marine & Fire Insurance Co.</u>, 617 F.2d 1365, 1370-71 (9th Cir. 1991) (upholding imposition of monetary sanction for discovery abuse against government attorney).  It would be illogical and injurious to the administration of justice to find that the court does not have comparable authority to sanction serious discovery abuses in criminal cases, in which a person's liberty is at issue.[13]

    B.    Sanctioning the Government and/or
           the Prosecutor

---

[13]At the May 12, 2009 hearing, Acting United States Attorney Loucks stated that the Department of Justice agreed that in the instant case the court has the authority to impose a monetary sanction on the prosecutor personally.  Assistant United States Attorney Chaitowitz, however, noted that there is a dearth of case law on the issue and that <u>Horn</u> involved deliberate misconduct that prejudiced the defendant and, therefore, is distinguishable from the instant case.  Counsel for Ms. Sullivan concurred with Ms. Chaitowitz.  The court recognizes the distinction between the instant case and <u>Horn</u>, but is not persuaded that the distinction is material with regard to the availability of supervisory powers to address the misconduct at issue here.

In this case, it would be permissible to sanction the government for failing to train and supervise Ms. Sullivan adequately, and to sanction her misconduct as well. However, Ms. Sullivan has requested that "this Court defer any decision on any sanction for a period of six months to allow [her] to demonstrate [her] commitment to not repeating these errors." Feb. 10, 2009 Suzanne Sullivan Aff., ¶6. It is appropriate to grant this request.

The court finds that some of the factors required to be considered in fashioning a sentence in a criminal case are relevant in the instant matter. See 18 U.S.C. §3553(a). First among them is the nature and circumstances of the misconduct. See 18 U.S.C. §3553(a)(1).

The misconduct here was serious and repeated. On April 7, 2008, Cooley twice told Ms. Sullivan that he did not immediately know that the man riding the bicycle on Middleton Street was Jones. Oct. 30, 2008 Tr. at 85; Ex. 11 (Sullivan's Apr. 7, 2008 notes). Rather, Cooley said, he first recognized Jones after Jones had been taken to the ground by fellow officers while running between Marden Avenue and Middleton Street sometime later." Oct. 30, 2008 Tr. at 86-88; Ex. 11 (Sullivan's Apr. 7, 2008 notes).

Nevertheless in the April 15, 2008 Government's Opposition to the Motion to Suppress, at 3, Ms. Sullivan wrote that:

> Jones made eye contact with the police and then abruptly
> turned the bicycle around and began to peddle away faster

38

> in the opposite direction. Officer Rance Cooley
> recognized Jones from numerous prior street encounters
> with him in the same neighborhood over the previous
> approximately two years. Due to Jones' actions and his
> flight, this prompted officers to pursue him.

This claim was reiterated on page 11 of her memorandum, where Ms.

Sullivan wrote:

> Here, officers can point to the following specific facts
> justifying their stop of Jones. Jones abruptly turned
> his bicycle and fled in the opposite direction upon
> seeing the police approach; in the dozens of encounters
> Officer Cooley had with Jones in the vicinity of that
> same neighborhood over the prior approximately two years,
> Jones had never attempted to flee from the officer.

Sullivan also drafted an affidavit from Cooley to support these

contentions. See Jones, 2009 WL 15187 at *3 (citing Cooley Aff.

¶¶9, 19).

Ms. Sullivan asserts that in making these arguments she was

not intentionally trying to mislead the court. She has not,

however, provided any comprehensible, let alone credible,

explanation for why she drafted a memorandum and affidavit that

were contradicted by Cooley's then recent, undisclosed statements

to her. In any event, if the government's argument that an

evidentiary hearing on the motion to suppress was not justified had

proved persuasive, the potential violation of Jones' constitutional

right to Due Process may never have been discovered.

As explained earlier, the Local Rules required the automatic

disclosure of Cooley's material exculpatory statements after they

were made in April, 2008. See L.R. 116.2 and 116.7. Ms. Sullivan

39

evidently gave no thought to her duty to comply with the Local Rules.

On August 12, 2008, the court ordered Ms. Sullivan to produce all material exculpatory information concerning the motion to suppress by October 10, 2008, and reminded her that her duty to do so was continuing.  On October 6, 2008, Cooley again told her that he did not recognize Jones as the man on the bicycle when they were on Middleton Street.

On October 10, 2008, Ms. Sullivan sent Jones' counsel a letter providing certain exculpatory evidence, referring to the Local Rules and <u>Giglio</u>.  She disclosed three state court decisions finding that Cooley had not testified truthfully at a hearing on a motion to suppress.  Letter from Assistant United States Attorney Suzanne Sullivan to John Palmer, Attorney for Darwin Jones, (October 10, 2008) (on file with court).  However, she made no reference to his important contradictory statements to her as recently as four days before.  Indeed, as she testified on May 12, 2009, Ms. Sullivan did not review her notes for any such information.  There is no indication that the failure to review her notes for exculpatory information was a departure from her usual practice.  In essence, it appears that despite long experience in the state courts, several years as a federal prosecutor, and training by the Department of Justice, Ms. Sullivan did not understand her discovery obligations.

40

On October 24, 2008, Cooley again told Ms. Sullivan, among other things, that he did not determine that the bicyclist was Jones until Jones was on the ground between Marden Avenue and Middleton Street.  Oct. 30, 2008 Tr. at 99-100; Ex. 11 (Sullivan's notes in trial outline).  This was not disclosed to Jones.

At the outset of the suppression hearing on October 27, 2008, in response to a question by the court, Ms. Sullivan stated that she had, by October 10, 2008, produced all material exculpatory information.  Oct. 27, 2008 Tr. at 2. This statement was not correct.  However, the court finds that it was not knowingly false.  Rather, it was a result of a lack of understanding by Ms. Sullivan of her obligations.

On October 28, 2008, the court ordered Ms. Sullivan, who had been joined by her supervisor, Mr. Herbert, to review her notes to determine whether they included any exculpatory information that was required to be disclosed, including any material impeaching information. On October 29, 2008, Sullivan represented that she had reviewed her notes and, in her opinion, there was no information that was required to be disclosed.  See Oct. 29, 2008 Tr. at 1-2. She stated that the government had provided the notes to the court for review "out of an abundance of caution." Id. at 5, 9; Oct. 30, 2008 Tr. at 112, 114.  After the court mentioned several discrepancies between the notes and Cooley's testimony, the notes were provided to Jones' counsel.  On October 30, 2008, Jones'

attorney pointed out the many times reflected in Ms. Sullivan's notes that Cooley had told her that he did not identify the man on the bicycle as Jones on Middleton Street.

Ms. Sullivan, Mr. Herbert, and United States Attorney Sullivan all acknowledge that it was a "mistake" not to disclose to Jones the notes and exculpatory information they contain prior to the suppression hearing.  Ms. Sullivan and Mr. Herbert explain that their review of the notes on October 28, 2008 was too quick and cursory, resulting in Ms. Sullivan's erroneous representation on October 29, 2008 that the notes contained no material exculpatory information.[14]  The court finds these explanations to be credible, in part because the government provided the notes to it for <u>in camera</u> review. Nevertheless, these errors are inexcusable.  The prosecution of a criminal case is not a game to be played casually or thoughtlessly.  Many years of a man's life were at stake in the suppression hearing.  The court's ability to make a properly informed decision on a matter of profound consequence was threatened.  Even when viewed as inadvertent, the misconduct was

---

[14]At the May 12, 2008 hearing, Mr. Herbert stated that as Ms. Sullivan's supervisor, and as one who too quickly reviewed her notes and agreed that they contained no material exculpatory information, he shares responsibility for the government's failures in this case.  He stated, therefore, that any sanction deemed necessary should be imposed on him, either instead of on Ms. Sullivan or in addition to any sanction imposed on Ms. Sullivan.  Although the court does not consider Mr. Herbert to be primarily or exclusively responsible in this matter, it will consider his request to sanction him too if it ultimately decides to sanction Ms. Sullivan.

very serious.   This militates in favor of imposing appropriate
sanctions.

The interest of general deterrence also weighs in favor of
sanctioning Ms. Sullivan and the government.  As described earlier,
there is a dismal history of violations of the government's duty to
disclose material exculpatory information in cases before this
court.  Cases such as <u>Stevens</u> and <u>Shaygan</u>, as well as those in the
attachments to this Memorandum, demonstrate that the experience of
this court is not unique.   The court recognizes that many
prosecutors strive earnestly and successfully to meet their
discovery obligations.  However, the deliberate and inadvertent
violations that continue to occur have a powerful impact on
individuals entitled to Due Process and a cancerous effect on the
administration of justice.

There are, however, factors that favor not imposing a sanction
on Ms. Sullivan or the government, at least at this time.   The
court has considered Ms. Sullivan's history and characteristics as
a prosecutor.  Her affidavits and testimony, confirmed by the many
letters on her behalf, indicate that she is an earnest public
servant.  She was for many years an Assistant District Attorney in
Plymouth County.  For several of those years she worked under then
District Attorney Michael Sullivan.  For the five years before she
became a federal prosecutor in 2006, Ms. Sullivan primarily handled
child abuse cases.  However, she testified that she also worked on

43

homicide cases. The letters on Ms. Sullivan's behalf from lawyers depict a prosecutor who does not have a "win at any cost" or "ends justifies the means" mentality.  Rather, Ms. Sullivan previously enjoyed a reputation as a prosecutor who was industrious and fair. She has never been subject to disciplinary action or, apparently, sanction.

The court is also satisfied that Ms. Sullivan is genuinely contrite.  She has taken full responsibility for her misconduct. Since that misconduct was discovered she has made a determined effort to educate herself on her responsibilities through study, and consultation with former federal prosecutors and defense lawyers.  She has also offered to attend the educational program that will be presented by the court as a result of this matter.  In addition, Ms. Sullivan is now receiving close supervision in the United States Attorneys' office.  It is, therefore, unlikely that she will again violate her duty to provide discovery.

The Department of Justice and United States Attorneys Office fully share responsibility for Ms. Sullivan's misconduct.  The Department hired a prosecutor who, despite long experience, did not understand her duties under <u>Brady</u> and <u>Giglio</u>, including her duty to review her notes and those of law enforcement agents for material exculpatory information.  Ms. Sullivan was given training by the Department and United States Attorney's Office.  However, at least with regard to discovery, it was obviously inadequate to serve its

intended purpose.   After a stint in the Major Crimes Unit, Ms. Sullivan was promoted to the more elite Organized Crime Unit, where she was apparently virtually unsupervised while its head, Mr. Herbert, spent substantial time in Washington, D.C. on an important special assignment.

It is equally evident that the response of OPR and United States Attorney Sullivan to the egregious misconduct of Mr. Auerhahn described earlier was insufficient to make Ms. Sullivan aware of her obligations and determined not to fail, even inadvertently, to provide defendants with the material exculpatory information necessary to satisfy their right to Due Process.   Nor was the publicity concerning this court's criticism of the Department's response to that serious misconduct sufficient to send Ms. Sullivan the necessary message.

However, there is reason for the court to hope that the past will not be prologue, and to give the new leadership of the Department of Justice and the office of the United States Attorney for the District of Massachusetts, as well as Ms. Sullivan, an opportunity to do so.

As explained earlier, Attorney General Holder has recently instituted measures intended to improve the Department's compliance with its discovery obligations in criminal cases.   See April 14, 2009 Department of Justice Press Release, supra.   These actions reportedly include:

45

Providing supplemental training to federal prosecutors throughout the Department on their discovery obligations in criminal cases. Training will begin in the coming weeks. Establishing a working group of senior prosecutors and Department officials from each component to review the discovery practices in criminal cases. The working group, to be headed by the Assistant Attorney General of the Criminal Division and the Chair of the Attorney General's Advisory Committee, will review the need for:

> Improvements to practices and policies related to the government's obligations to provide material to the defense in criminal matters;

> Additional resources, including staffing and information technology, needed to help prosecutors fulfill their discovery obligations;

> Additional discovery-related training for other Department prosecutors.

Id. As also described earlier, the Attorney General's request that Senator Stevens' conviction be vacated communicates to this court that he recognizes that the failure to disclose material exculpatory information is both serious misconduct and injures the public interest, either by contributing to a wrongful conviction or allowing a guilty person to escape punishment.

Similarly, Attorney General Holder has initiated action to improve the performance of the Department of Justice's disciplinary process. He has made a pledge to the Chief Judges of the United States District Courts that he will take complaints of prosecutorial misconduct seriously. See Palazzolo, supra. Recognizing that the current process for resolving complaints of

prosecutorial misconduct is unnecessarily slow and secret, he has also promised that OPR will perform in a more timely and open manner. Id. Once again, the Attorney General has taken action consistent with his comments by appointing a new acting head of OPR. Nedra Pickler, "US Attorneys Told to Expect Scrutiny," Associated Press, April 9, 2009.

In its seminal decision concerning the government's duty to disclose material exculpatory information, the Supreme Court wrote in Brady that:

> Society wins when not only the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when an accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: "The United States wins its point whenever justice is done its citizens in the courts."

373 U.S. at 87.[15]   In 1940, Attorney General Robert Jackson emphasized this point in an address to the United States Attorneys. He told them, in part, that:

> Nothing better can come out of this meeting of law enforcement officers than a rededication to the spirit of fair play and decency that should animate the federal prosecutor. Your positions are of such independence and importance that while you are being diligent, strict, and vigorous in law enforcement you can also afford to be just. Although the government technically loses its case, it has really won if justice has been done.

Jackson, supra.   Attorney General Holder reportedly reemphasized

---

[15]The quoted inscription is etched on the ceiling of the entrance to the Attorney General's office.

this point recently, telling new Assistant United States Attorneys:

> Your job as assistant US attorneys is not to convict people.  Your job is not to win cases.  Your job is to do justice.  Your job is in every case, every decision that you make, to do the right thing.  Anybody who asks you to do something other than that is to be ignored.  Any policy that is at tension with that is to be questioned and brought to my attention.  And I mean that.

Pickler, supra.

It has taken many disturbing experiences over many years to erode this court's trust in the Department of Justice's dedication to the principle that "the United States wins . . . whenever justice is done its citizens in the courts." Brady, 373 U.S. at 87. It will take time for the performance of the Department to restore that faith. However, in the instant matter the court finds that it is most appropriate to defer deciding whether to impose sanctions in order to give Ms. Sullivan, the United States Attorney for the District of Massachusetts, and the Attorney General an opportunity to begin to do so.

III. ORDER

In view of the foregoing, it is hereby ORDERED that:

1.   An educational program concerning discovery in criminal cases shall be held in the fall of 2009.  United States District Judge Douglas P. Woodlock will lead the planning for the program. He will be assisted by Magistrate Judge Leo Sorokin.  The Federal Public Defender and Chair of the Criminal Justice Act Board are

invited to participate in planning the program and/or to propose members of the defense bar to participate in doing so.  Acting United States Attorney Michael Loucks shall, by May 20, 2009, inform the court whether he wishes to participate in planning the program and, if not, propose candidates to represent him in doing so.  He shall also state whether he intends to require that all Assistant United States Attorneys who handle criminal cases attend the program unless excused by him.  When the group which will plan the program is constituted, the court will invite the Attorney General to designate a representative to participate in the program.

2.  The United States Attorney and Assistant United States Attorney Suzanne Sullivan shall, by November 20, 2009, update their submissions seeking to show cause why sanctions should not be imposed in this matter.  The United States Attorney's submission shall address the progress, if any, that has been made by the Attorney General in his efforts to minimize the risk that federal prosecutors will fail to produce required discovery in criminal cases, and to improve the Department of Justice's process for investigating and disciplining prosecutorial misconduct.


/s/ MARK L. WOLF
UNITED STATES DISTRICT JUDGE

49