UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal No. 07-10289-MLW |
| DARWIN JONES, | ) | |
| Defendant | ) | |

GOVERNMENT'S DECEMBER 1, 2009 RESPONSE
TO THE COURT'S MAY 18, 2009 ORDER

In Part III of its May 18, 2009 *Memorandum and Order*, the Court directed:

(1) the then Acting United States Attorney to, by May 20, 2009, "state whether he intends to require that all Assistant United States Attorneys who handle criminal cases attend the [Court's December 16, 2009 training] program unless excused by him"; and

(2) by November 20, 2009, "address the progress, if any, that has been made by the Attorney General in his efforts to minimize the risk that federal prosecutors will fail to produce required discovery in criminal cases, and to improve the Department of Justice's process for investigating and disciplining prosecutorial misconduct."

[Docket entry ("D.") 90, page 48].

On May 20, 2009 and September 18, 2009, then Acting United States Attorney Michael K. Loucks told the Court that he would strongly encourage Assistant U.S. Attorneys ("AUSAs") who handle criminal cases to participate in the program, consistent with the staffing needs and workload of the United States Attorney's Office for the District of Massachusetts ("USAO"), but would not require them to attend. [D.93 and D.102]. On October 23, 2009, anticipating that a new United States Attorney might be appointed before the training program was presented, the Court directed that the United States Attorney update her response to paragraph 1 of the Court's May 18, 2009

1

*Memorandum and Order* by December 1, 2009, and respond to paragraph 2 of the May 18, 2009

order by January 11, 2010.

In her response to paragraph 1 of the Court's May 18, 2009 *Memorandum and Order*, United

States Attorney Carmen M. Ortiz has advised the Court that she has encouraged AUSAs to attend

the program, but will not order them to do so. It is United States Attorney Ortiz's belief that the

AUSAs in the District of Massachusetts are highly professional attorneys who strive to do justice,

and that their voluntary participation in the program is the best way to ensure an open and fair

exchange of ideas at the program.

The government submits this memorandum, the response of the United States Attorney

(Exhibit 1) to paragraph 1 of the Court's May 18, 2009 *Memorandum and Order*, and the affidavit

of James B. Farmer, Chief of the Criminal Division (Exhibit 2), in support of its position that the

Court should not order the government to attend the program. On or before January 11, 2010, it will

submit additional materials to fully respond to paragraph 2 of the Court's May 18, 2009

*Memorandum and Order*.

## SOME PROCEDURAL HISTORY

As described in the Court's January 21, 2009 *Memorandum and Order*, the interview notes

of the trial Assistant United States Attorney ("AUSA") cast doubt on Officer Cooley's testimony

concerning when and to what extent he recognized Darwin Jones[1] and undermined the government's

---

[1]The AUSA explained that she believed Officer Cooley had recognized the defendant as
someone he knew from prior encounters but did not recognize the defendant as Darwin Jones (*i.e.*,
he did not fully "identify" the defendant) until after he was seized. [D.65, page 5 ("I understood
[Officer Cooley] recognized the defendant on some level as someone he had seen and interacted with
many times in the past")].

argument in opposition to Jones's motion to suppress which relied on Cooley's recognition of Jones.[2]

Ultimately, the government abandoned that argument [D.54; 11/5/08:63],[3] and the Court rejected it,

denying the defendant's suppression motion on another ground.[4]    It found, however that the

government violated "the government's constitutional duty under *Brady v. Maryland,* 373 U.S. 83

(1963), its progeny and the [C]ourt's orders,"[5] and that this error extended "a dismal history of

---

[2]In its original opposition to Jones's suppression motion, the government argued that Jones assaulted Trooper Cameron and that he was not seized until after that assault, a seizure supported by probable cause.  In the alternative, the government argued that if Jones was seized prior to the assault, it was a seizure supported by reasonable suspicion given the neighborhood (a high crime area), the time of night, Jones's suspicious behavior, and the fact that he behaved differently than he had during other encounters with Officer Cooley. [D.28].

[3]In its post-suppression hearing memorandum, the government more fully developed the argument that Jones was not seized until he was physically restrained by the police by which time, it argued, the police had probable cause to arrest him for assault, resisting arrest, and disorderly conduct.  The government also argued that the police had reasonable suspicion to conduct an investigatory stop of Jones given, *inter alia,* that they were responding to a late-night 911 call concerning a group of gang members in a high-crime neighborhood and Jones's behavior in turning and biking away from the police, and then abandoning his bicycle in his effort to avoid the police. [D.54].

[4]The Court found that Jones was not seized until he was tackled by the officers, at which time they had reasonable suspicion to conduct an investigatory stop given the neighborhood, that Jones turned and pedaled away upon seeing the police, that he then accelerated his pace, and that he engaged in headlong flight when asked to stop.

[5]Although the government acknowledges that mistakes were made, including that the information should have been disclosed pursuant to the recommended practices of the USAO,  there was no *Brady* violation.  First, the information was not "material" because the defendant was not prejudiced by its delayed disclosure, the Court having disposed of the suppression motion on another ground.  *Strickler v. Greene*, 527 U.S. 263, 289-90 (1999)(evidence is "material" only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.").  Second, assuming that *Brady* applies to suppression hearings, *see United States v. Marshall,* 109 F.3d 94, 97 (1st Cir. 1997)(assuming without discussion that it does), *and compare United States v. Gamez-Orduno*, 235 F.3d 453, 461 (9th Cir. 2000)(withholding information contrary to government's factual representations at suppression hearing violated due process), *with United States v. Stott*, 245 F.3d 890, 901 (7th Cir. 2001)("Supreme Court has not had the occasion to determine whether [*Brady*] rule requires

3

intentional and inadvertent errors."[6]  The Court assumed that the AUSA's error was unintentional [D.60, page 13], and ordered the AUSA and the United States Attorney to file affidavits explaining why sanctions should not be imposed on the AUSA or the government.  [D.60, page 14].

The affidavit of the then United States Attorney (Michael J. Sullivan) submitted in response to the Court's January 21, 2009 order described the extensive formal training on discovery issues that the USAO provides AUSAs directly and through the National Advocacy Center ("NAC") of the

_____

disclosure of impeachment evidence prior to a suppression hearing"), a *Brady* violation occurs only when material evidence has actually been suppressed.  *Strickler v. Greene*, 527 U.S. at 281-282 ("[T]he term '*Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence -that is, to any suppression of so-called '*Brady* material'-although, strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.").  As this Court has recognized, this case involves delayed disclosure, not suppressed evidence. [D.60 ("Because Cooley's prior inconsistent statements were ultimately disclosed in time for his false testimony to be discredited, Jones has not been deprived of due process or otherwise prejudiced by the government's misconduct.")].

[6]While the government acknowledges that it has made mistakes in the past, it most emphatically does not agree with the Court's characterization that the errors are persistent, nor with the suggestion that there is a pattern of errors.  *See* Affidavit of Michael J. Sullivan [D.65, ¶5], and the *Government's Response to Paragraph 1 of Part III of the Court's May 18, 2009 Memorandum and Order* [D.93].  Because the government does not dispute that errors have occurred in the past – and that some have been serious - it is not necessary to analyze each of the cases cited by the Court as evidence of the "persistent pattern."  The government's decision to proceed in this manner should not be taken as an implicit agreement with all of the Court's characterizations of the information that was belatedly disclosed or with all of its conclusions that further action was required in those cases. For instance, while in *United States v. Baskin*, Cr. No. 01-10319, this Court reopened a concluded hearing on a motion to suppress because of a report that the government discovered after the hearing, the government explicitly questioned the materiality of the report which contained only totem pole hearsay by an officer who was not a percipient witness to the event. [*See* Transcript of November 25, 2002 hearing, pages 13-15; Transcript of November 26, 2002 hearing, pages 100-101].

Department of Justice ("DOJ").  [D. #65, ¶6].[7]  It also explained that each AUSA has available to

him or her an immediate unit supervisor, a mentor, a section chief,[8] and a Senior Litigation Counsel

to consult regarding pretrial and trial practices. The affidavit described further training that would

be provided to the AUSA and stated that, as the AUSA's immediate supervisor had been working

in Washington, D.C. for a number of months,[9] a senior AUSA would be designated to provide the

trial AUSAs in that unit more immediate guidance. [D.65, ¶8].  The affidavit assured the Court that

additional focused training would be provided to all AUSAs to avoid similar problems. [D.65, ¶11].

In her affidavit, the AUSA explained the formal DOJ and USAO training she had received, as well

as her efforts to further educate herself on discovery matters. [D.65, pages 2-3, 12-14].   On April

29, 2009, the AUSA submitted a supplemental affidavit identifying additional efforts she had made

to further her understanding of her discovery obligations and additional training she had received,

which included mandatory criminal division training programs given by the USAO on February 13,

2009 and March 27, 2009 and programs entitled "*Brady/Giglio*" and "Discovery" provided on DOJ's

---

[7]Michael J. Sullivan's last day as United States Attorney was April 19, 2009, and AUSA Michael K. Loucks became the Acting U.S. Attorney on April 20, 2009.

[8]At the time the affidavit was drafted, the USAO had three Criminal Division section chiefs, each of whom supervised an area of prosecution – one (Laura Kaplan, the Violent and Organized Crime Section Chief) supervised the Strike Force/Gang Unit ("SFU"),  the Organized Crime Drug Enforcement Task Force, and the Major Crime Unit; another supervised the Economic Crime, Health Care Fraud, and Public Corruption Units; and one (James B. Farmer) supervised the Anti-Terrorism and National Security Unit.  The latter was also the USAO's designated "Criminal Chief."  Presently, the office has one Criminal Division Chief (James B. Farmer) and two Acting Criminal Division Deputy Chiefs (James F. Lang and John T. McNeil) who jointly supervise all the units in the Criminal Division.

[9]The AUSA's immediate supervisor, James D. Herbert, is the SFU chief.  In January 2008, he began working on an investigation that has required his presence in Washington, D.C. an average of four days each week. AUSA Herbert is typically in the Boston office on Fridays, but accessible to members of his unit by telephone and email while he is in Washington, D.C.

Justice Television Network. [D.77, ¶¶ 2, 4-5]. The AUSA also explained that a senior prosecutor had been recently assigned to review her caseload. [D.77, ¶3].

On April 27, 2009, after receiving all but the AUSA's second affidavit, the Court entered a second order. [D.74]. In it, the Court said that the AUSA's affidavit confirmed its assumption that the AUSA's error was not intentional [D.74, page 2]. It also recognized that DOJ provides "many" materials and opportunities for training. [D.74, page 3]. It stated, however, that these "materials and opportunities...were inadequate to prevent" the error that occurred in the case, and said that it was considering ordering the AUSA to reimburse the Court for time spent by CJA counsel in dealing with the discovery error and to attend a discovery program which the Court would organize. [D.74, page 4]. It scheduled a hearing to address these issues.

At the ensuing hearing, the Acting U.S. Attorney explained that the USAO conducts "a continuous training program," in which *Brady* and *Giglio* issues figure prominently. [5/12/09: 20 ("We have a series of topics. *Brady/Giglio* discovery is a significant chunk of that. When we get done with it, we then start talking about when we're going to start it up again.")]. The Acting U.S. Attorney advised the Court that the USAO held two discovery training sessions in the months following the Court's January order, and that this case was discussed in both. [5/12/09:17-18]. The Acting U.S. Attorney explained that AUSAs were reminded, among other things, that their search for *Giglio* material had to include a search of their own notes. [5/12/09:18-19]. A memorandum to this effect had also been circulated throughout the USAO, as had an April 2009 memorandum from DOJ reminding AUSAs of their discovery obligations. [5/12/09:20, 41]. And, the Acting U.S. Attorney further informed the Court, AUSAs are provided with an annotated set of local rules that describe their discovery obligations, the USAO's criminal division manual that addresses discovery

6

obligations, as well as a monograph on discovery issues prepared by an Assistant United States Attorney from another district, Daniel W. Gillogly.  [5/12/09:22-23].  Finally, the Acting U.S. Attorney informed the Court that Attorney General Eric H. Holder, Jr. indicated that DOJ planned to supplement the training for prosecutors on discovery. [5/12/09:35].  With respect to supervision of the SFU, the Acting U.S. Attorney explained that even though the SFU supervisor was often in Washington, D.C. on an assignment, he was still in frequent telephonic communication with AUSAs (including the AUSA in this case)  and, in addition, two experienced AUSAs had been designated to provide supervisory support to SFU AUSAs when needed.[10] The Court seemed to appreciate the intense efforts made by the USAO to train its assistants, and also recognized that there are limits to the effectiveness of supervision. [5/12/09:22-23 ("I fully accept...that all these efforts are made and [the AUSA] says she took them seriously"); 5/12/09:30 ("there should be supervision but, you know,

---

[10]James F. Lang, then Chief of the Major Crimes Unit and now Acting Deputy Chief of the Criminal Division, was assigned to handle approvals for cases similar to those handled by the Major Crimes Unit (for example, gun cases). [5/12/09:27].  Stephen P. Heymann, presently Chief of the Computer Crimes Unit, a former SFU AUSA, and a former Deputy Chief of the Criminal Division, was assigned to handle approvals for cases traditionally handled by the SFU.  [*Id.*].  In addition, the then Chief of the Violent and Organized Crime Section (who had been and is now again a SFU AUSA) has her office located in the SFU space and was available to answer questions and provide other supervisory support in AUSA Herbert's absence.  Moreover, in addition to these coverage arrangements, AUSA Herbert has spent considerable time while in Washington, D.C., supervising SFU business and, in addition to typically being in the Boston office one day each week, has been (as the Acting U.S. Attorney stated at the hearing) in frequent telephone contact with the AUSAs in his unit, including the AUSA in this case. [*See* 5/17/09:27].  Finally, two experienced AUSAs assigned to the SFU also had oversight responsibilities for this type of case and were available to assist and advise the AUSA: John A. Wortmann, Jr., who coordinates the Boston gun and gang cases, and Glenn A. MacKinlay, the Project Safe Neighborhoods Coordinator and Anti-Gang Coordinator.  AUSAs in the SFU who handle gun and gang cases tend to be in close communication with AUSA MacKinlay and/or AUSA Wortmann.

In or about August 2009, the SFU Unit Chief named an experienced prosecutor to serve as Acting Chief of the SFU in his absence.

7

ultimately, you know, you have to rely on the prosecutor who is primarily responsible, otherwise you're going to be severely limiting the number of cases you can do and it is not going to promote the public safety").[11]

The Court expressed its view that the fact that an error occurred meant that the USAO's training was insufficient, and asked the Acting U.S. Attorney whether he thought the Court should order a training program. The Court's prior orders did not suggest that it was considering mandating a training program for all criminal AUSAs, and the Acting U.S. Attorney stated that he wanted to research whether the Court could order all AUSAs to attend. [5/12/09: 24].

Shortly after the hearing, on May 15, 2009, the government filed a post-hearing pleading which confirmed that on April 24, 2009, the Acting U.S. Attorney forwarded to all AUSAs an email he received from the DOJ concerning the government's discovery obligations, which email contained hyperlinks to discovery materials (including, among other items, the relevant section of the United States Attorney's Manual, USAM §9-5.000). [D.88, page 1].[12] Along with the DOJ's email, the Acting U.S. Attorney had also sent his own message emphasizing that the government's disclosure obligations require the production of impeaching information contained in AUSA notes and continue during trial, when a witness's testimony in court may be contradicted by information contained in

---

[11]AUSA Herbert spoke at the hearing as well. AUSA Herbert expressed his remorse for the AUSA's situation and concern that perhaps there may have been other things that he could have done to avert the issues in the case [5/12/09:53-58]; for example, AUSA Herbert opined, he might have ordered the AUSA to turn the notes over to defense counsel directly. [5/12/09: 56]. AUSA Herbert's comments, however, are not in any way an admission to substandard supervision on his part, or to substandard training by the USAO.

[12]Section 9-5.000 of the USAM contains a number of sections, including DOJ's *Policy Regarding Disclosure of Exculpatory and Impeachment Information* (USAM §9-5.001), the section on the government's duty to disclose exculpatory information mentioned in the Court's April 27, 2009 and May 18, 2009 orders.

AUSA notes. [*Id.*]. The May 15, 2009 pleading also informed the Court that after a recent training on this case, two separate emails were sent to the AUSAs (one from the Acting U.S. Attorney and one from the appellate chief) emphasizing certain important points made during the program – including the need to turn over impeaching information contained in AUSA notes. [D.88, page 2].

On May 18, 2009, the Court issued a *Memorandum and Order* in which it found an "egregious error of the government to disclose plainly material exculpatory evidence" and further stated that the error was part of a "persistent recurrence of inadvertent [discovery] violations." [D.90, page 7]. The Court did not find that the AUSA's error was intentional, however. [D.90, pages 5-6]. The Court also stated that the AUSA's error in this case and government errors in other cases led it to believe that the government's training programs are insufficient, and opined that it "would be permissible to sanction the government for failing to train and supervise" the AUSA. [D.90, page 37]. The Court did not decide whether to impose a sanction on the government, stating that "recent changes in the leadership of the DOJ and the USAO make it appropriate to defer deciding whether sanctions should be imposed on the government for the misconduct in this case." [D.90, page 10]. Thus, the Court "defer[red] for at least six months the decision whether to impose sanctions on the government," and directed the government to file additional affidavits by November 20, 2009 addressing whether its "performance and progress have obviated the need to impose sanctions in this case." [D.90, page 48].

The Court also advised that it intended to organize a training program and directed the Acting U.S. Attorney to report by May 20, 2009 whether he would participate in the program and whether he intended "to require that all Assistant United States Attorneys who handle criminal cases attend the program." [D.90, page 48]. On May 20, 2009, the Acting U.S. Attorney advised the Court that

while he welcomed the opportunity to supplement the USAO's already-exhaustive training program

and would strongly encourage participation in the program, he would not require AUSAs to attend.

[D.93].

On June 1, 2009, the Court entered an order noting that there might be a new United States

Attorney in the fall and announcing that therefore it would "defer deciding whether to order that, as

a sanction for the government's failure to adequately train and supervise the lead prosecutor in the

case, it is necessary and appropriate to order that all [AUSAs] who handle criminal cases attend the

program unless excused by the Court." [D.97]. The Court ordered that the United States Attorney

"shall, by September 18, 2009, update the response to the May 18, 2009 Order concerning whether

she or he intends to require all Assistant United States Attorneys who handle criminal cases to attend

the program concerning discovery in criminal cases being organized by the Court."

On June 15, 2009, Attorney General Eric H. Holder, Jr. personally notified the Court of

DOJ's ongoing efforts to provide advice and training on discovery matters to AUSAs.[13]

On September 18, 2009, Acting United States Attorney Loucks complied with the Court's

June 1, 2009 order, reporting that his position regarding the training program was the same as it was

in June 2009. [D. 102]. On October 23, 2009, the Court issued a new order, directing the United

States Attorney (1) by December 1, 2009, to update her position on the training program; and (2) by

January 11, 2010, to "address the progress, if any, that has been made by the Attorney General in his

efforts to minimize the risk that federal prosecutors will fail to produce required discovery in

---

[13]Attorney General Holder's letter, appears in the public docket in *Ferrara v. United States*, Civil Action 00-11693 [D.285] and *Barone v. United States*, Civil Action 98-11104 [D.163], is attached to this pleading as Exhibit 3.

criminal cases, and to improve the Department of Justice's process for investigating and disciplining prosecutorial misconduct." [D.103; D.90].

## ARGUMENT

A.    *The record establishes that the USAO adequately trains and supervises its AUSAs*.

The Court's May 18, 2009, June 1, 2009, and October 23, 2009 orders indicate that the Court believes there was some sanctionable failure of training or supervision. The record that existed as of the May 18, 2009 order firmly establishes that the USAO conducts comprehensive training on discovery issues, and that AUSAs are well supervised. There is no evidence that the USAO's training or supervision is lax in any way.[14] People (including prosecutors, judges, and defense counsel) make mistakes for many reasons under circumstances that are not blameworthy.[15] The exigencies of life – for example, death or serious illness of a family member, physical illness of an AUSA, marital discord, stress, and overwork – and simple lack of comprehension can all lead to errors despite the most thorough supervision and training. Where the record establishes that the USAO adequately trains and supervises its AUSAs (as it does here), it cannot be faulted for such mistakes.

_____

[14]In its May 18, 2009 order, the Court stated that the AUSA was "apparently virtually unsupervised while [the SFU] head, Mr. Herbert, spent substantial time in Washington D.C. on an important special assignment." [D.90, page 44]. As discussed previously, the AUSA was not unsupervised: in addition to AUSA Herbert, who was available for consultation and who actually spoke frequently to the AUSA, the AUSA had available a number of other supervisors and senior personnel for consultation, including a section chief who was physically located in the same unit as she. *See* footnote 10, *above.*

[15]As the former United States Attorney noted in his affidavit: "Human beings make mistakes. *See United States v. Hasting*, 461 U.S. 499, 508 (1983)("taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and...the Constitution does not guarantee such a trial"); *United States v. Bogdan,* 302 F.3d 12 (1st Cir. 2002) (in which the Court of Appeals, reversing the district court, noted, "to err is human")."

In addition to the training and supervision previously discussed by the government, the government has continued its efforts to provide training on discovery issues and minimize the risk of future discovery errors.  In total, AUSAs have attended seven training sessions devoted to discovery in 2009 (on February 13, 2009, March 27, 2009, May 8, 2009, June 26, 2009, September 25, 2009, and two in November 2009).  The training has focused on best practices for compliance with Fed. R. Crim. P. 16, the Local Rules, and the government's *Brady* and *Giglio* obligations. While discovery training is part and parcel of the USAO's routine and ongoing training efforts, the Court's concerns also have been addressed and one of the training programs focused on the particular issues of this case (for example, the need to review AUSA notes and disclose material inconsistent statements, and the benefits of having a case agent present during witness interviews).  As set forth in the affidavit of Criminal Division Chief James B. Farmer, DOJ is also working hard to improve the government's performance in the area of discovery.  The November 2009 discovery training programs were mandated by the DOJ, and included an approximately two and one-half hour video program issued by the DOJ on the government's discovery obligations.  While our prior training and supervision more than adequately advised AUSAs of their obligations, the government's recent "performance and progress" certainly should ameliorate the Court's concerns.  [D.90, page 10].The factual record does not support an order sanctioning the government.

**B.**    ***Courts have supervisory authority with respect to matters inside the courtroom; that power does not support directing all criminal AUSAs to attend a training program.***  The Court has suggested that its supervisory power might authorize it to order all AUSAs handling criminal cases to attend a training program.  The Court's supervisory power does not extend so far.

12

In a variety of cases, the Supreme Court has recognized its own supervisory authority and that of the lower federal courts to formulate rules concerning the introduction of evidence or the management of the litigation process, and to ensure that courts have the incidental or ancillary authority that is absolutely necessary to permit the exercise of expressly granted powers.[16]   While the Supreme Court's cases do not explicate the source or define the precise scope of the courts' supervisory authority, it is notable that all of them have involved the courts' authority over their own

---

[16]*See, for example*, *McNabb v. United States*, 318 U.S. 332, 343-345 (1943)(court may formulate rules of evidence that operate to exclude a confession obtained when subject kept in detention for 14 hours and subjected to unremitting questioning); *Anderson v. United States*, 318 U.S. 350, 355 (1943)(similar); *Ballard v. United States*, 329 U.S. 187, 193 (1946)(Court could exercise its supervisory power over the administration of justice in the federal courts to reverse a conviction returned by a jury from which women were systematically excluded); *Mallory v. United States*, 354 U.S. 449 (1957)(similar to *McNabb*); *Marshall v. United States*, 360 U.S. 310, 313 (1959)(*per curiam*)("[i]n the exercise of [its] supervisory power to formulate and apply proper standards for enforcement of the criminal law in the federal courts," Court granted a new trial in a case where several jurors had read prejudicial news accounts of the defendant's past activities); *Elkins v. United States*, 364 U.S. 206 (1960)(Court invoked its supervisory power to overrule the "silver platter doctrine"); *United States v. Hale*, 422 U.S. 171 (1975)(in the exercise of its supervisory authority, Court granted new trial to defendant whose silence at police station was used to impeach him at trial); *Abney v. United States*, 431 U.S. 651, 662 n.8 (1977)("It is well within the supervisory powers of the courts of appeals to establish summary procedures and calendars to weed out frivolous claims of former jeopardy."); *Cuyler v. Sullivan*, 446 U.S. 335, 346 n.10 (1980)(courts may use supervisory authority to inquire into the existence of conflicts in cases of multiple representation, even though inquiry is not required by Sixth Amendment); *Thomas v. Arn*, 474 U.S. 140, 146 (1985)(supervisory power permits promulgation of procedural rules governing the management of litigation – in this case, the rule that requires that a party object to a magistrate's report to preserve an appeal)*; Frazier v. Heebe*, 482 U.S. 641, 646 (1987)(Court invoked its supervisory authority to prohibit arbitrary discrimination against members of the Louisiana Bar who reside and have their office out-of-state but who are otherwise qualified to join the bar); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)(courts have certain implied powers which are "necessary to the exercise of all others," for example, the "power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates"); *Ortega-Rodriguez v. United States*, 507 U.S. 234, 257 (1993)(courts of appeals have "inherent supervisory authority" "to create and enforce procedural rules designed to promote the management of their docket," including fugitivity dismissal rules).

activities.[17]  Of course, Article II, §2 of the Constitution, which extends judicial power only to "Cases and Controversies," *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 102 (1998), places a significant limitation on a court's exercise of supervisory power.  So too a court's exercise of its supervisory power is limited by the constitutional principle of separation of powers.  Thus, a federal court may not exercise general supervisory authority over a co-equal branch of government.  *See United States v. Payner*, 447 U.S. 727, 737 (1980)(Burger, J., concurring)("Orderly government under our system of separate powers calls for internal self-restraint and discipline in each Branch; this Court has no general supervisory authority over operations of the Executive Branch, as it has with respect to the federal courts.").

That a court may exercise supervisory authority only over its own affairs, even when it believes that a broader exercise of power is in the public's best interest, is illustrated by *United States v. Williams*, 504 U.S. 36 (1992), in which the Supreme Court held that although supervisory authority could be used to enforce legally compelled standards of prosecutorial conduct before the grand jury, it could not be used to prescribe those standards of conduct in the first place because the grand jury is an institution separate from the courts over whose functioning the courts do not preside.  504 U.S. at 50.  *See also United States v. Mitchell*, 322 U.S. 65, 70–71 (1944)(Supreme Court could not use its supervisory authority to exclude a statement made shortly after arrest even though the

---

[17]In *Rea v. United States*, 350 U.S. 214 (1956), the Supreme Court affirmed an order that extended outside the courtroom, but even so, there the power was invoked to give meaning to the court's suppression order.  In *Rea*, a federal district court suppressed the fruits of a search warrant obtained in violation of Fed. R. Crim. P. 41(e) in that the affidavit was insufficient on its face, no probable cause existed, and the affidavit was based on unsworn statements.  The officer immediately brought charges in state court and planned to testify there.  On the defendant's motion, the district court enjoined the officer from testifying in state court regarding the suppressed evidence (although it did not enjoin state officials).  The Supreme Court affirmed the district court's use of its supervisory power to prevent the thwarting of its suppression order.

defendant was thereafter illegally detained for eight hours. "Our duty in shaping rules of evidence relates to the propriety of admitting evidence. This power is not to be used as an indirect mode of disciplining misconduct." ).[18]

---

[18]The limitations that are placed on a court's supervisory power by the separation of powers doctrine are illustrated in a number of cases in which courts of appeals have issued writs of mandamus to district courts that have exceeded their authority. *See In Re United States of America*, 441 F.3d 44, 58 (1st Cir. 2006)(while Fed. R. Crim. P. 6 and the court's "inherent supervisory authority" provide a district court with some authority to investigate misconduct as to grand jury proceedings, that authority is "subject, of course, to the broader constitutional principle of the separation of powers," and "federal courts in the American criminal justice system generally do not have the power to act as investigators or prosecutors of misconduct, including misconduct by government prosecutors"); *In Re United States of America*, 503 F.3d 638, 641 (7th Cir. 2007)(district court could not delay defendant's guilty plea pursuant to a cooperation agreement and demand information from the government--for example, the names of case agents and witnesses, the status of investigations, and the government's tentative conclusions-- just because it thought the defendant could not make an informed decision to plead guilty without that information: "It is inappropriate for a court to presume that the prosecutor will act unreasonably. What is more, a judicial effort to supervise the process of reaching a decision intrudes impermissibly into the activities of the Executive Branch of government"); *In Re United States of America*, 398 F.3d 615, 618 (7th Cir. 2005)(district court did not have the authority to investigate the government for seeking from an earlier judge an *ex parte* order to release to third party "whatever grand jury material the prosecutor saw fit to release," or for seeking to know who within the United States Attorney's Office participated in the decision to file such a request: "How the United States reaches its litigating positions, who said what to whom within the prosecutor's office, and so on, are for the Attorney General and the President to evaluate"; moreover, the temptation for a court to seek a larger role in the conduct of litigants "must be resisted in order to maintain separation between executive and judicial roles, and between the formulation and evaluation of positions in litigation"); *In Re United States of America*, 397 F.3d 274, 286 (5th Cir. 2005)(district court did not have right to information relating to government's capital charging practices in absence of showing required by *United States v. Armstrong*, 517 U.S. 456 (1996), and could not order an adverse inference instruction as a sanction for the government's decision not to provide that information; "[t]his combination of legislating from the bench and acting as a quasi-defense attorney vis-a-vis the jury is unprecedented and *ultra vires*."); *In Re United States of America*, 345 F.3d 450, 452 (7th Cir. 2003)(district court judge did not have authority under Fed. R. Crim. P. 48(a) to refuse to honor the parties' agreement which provided that defendant would plead guilty to an obstruction count and government would dismiss deprivation of civil rights count; in refusing to dismiss the civil rights count, the district court judge was telling the government which crimes to prosecute and "in doing so, he stepped outside the boundaries of his authorized powers."); *In Re Grand Jury Subpoena of Rochan*, 873 F.2d 170, 174 (7th Cir. 1989)(district court order prohibiting Attorney General from participating in a particular grand jury investigation raised "sharp separation-of-powers concerns"). *See also United States v.*

In addressing the purposes of the supervisory power, the *Hasting* Court articulated the desire to "deter illegal conduct." *Hasting*, 461 U.S. at 505.[19] While this language may seem expansive, it is clear from the caselaw just recited (and the *Hasting* Court's citation to *Payner* in support of this purpose of supervisory power)[20] that it does not support a court's broad exercise of supervisory power over the Executive and in particular does not support an order directing all criminal AUSAs to attend a training program. In addition to the fact that the group of people to whom the Court's training order would be directed (all criminal AUSAs) did nothing sanctionable, such an order, designed to train members of the Executive Branch, goes far beyond the recognized uses of supervisory power, *e.g.*, the formulation of rules concerning the introduction of evidence or the management of the litigation process. The Court's supervisory authority simply does not extend so far as to support an order directing all criminal AUSAs to attend a training program.

C.     ***An order directing all criminal AUSAs to attend a training program is not a sparing use of the supervisory power.*** While the Court's supervisory power does not permit it to

---

*Jennings*, 960 F.2d 1488, 1491 (9th Cir. 1992)(reversing district court order excluding testimony of law enforcement officer because the government said it would not require prosecutor to personally review agency files: "[o]ne...limit [to a court's supervisory power] is our government's separation of powers"); *United States v. Dominguez-Villa*, 954 F.2d 562, 565 (9th Cir. 1992)("A district court does not have general supervisory powers over the co-equal executive branch of government," and may not require that AUSAs personally review personnel files of federal law enforcement officers).

[19]The Court identified three purposes underlying the exercise of supervisory power: "To implement a remedy for violation of recognized rights," "to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury," and "as a remedy designed to deter illegal conduct." 461 U.S. at 505.

[20]The *Payner* Court held that "the supervisory power does not authorize a federal court to suppress otherwise admissible evidence on the ground that it was seized unlawfully from a third party not before the court." 447 U.S. at 735. The Court noted in a footnote, later cited in *Hasting*, that supervisory power is intended both to deter illegal conduct and protect the integrity of the courts. *Payner*, 447 U.S. at 735 n.8; *Hasting*, 461 U.S. at 505.

generally manage activities outside the courtroom, other limits on supervisory power also preclude

ordering all criminal AUSAs to attend a training program, or to enter any other sanction against the

government.  Where a court is acting, as it should, within the confines of a case, it has the ability to

impose silence, respect, and decorum in its courtroom and ensure obedience to its orders, but its

powers are limited to those permitted by rule or statute, and those that, while "interstitial," are

indispensable to the Court's management of its docket.  *United States v. Horn*, 29 F.3d 754, 760 (1st

Cir. 1994)("the supervisory power doctrine is interstitial in the sense that it applies only when there

is no effective alternative provided by rule, statute, or constitutional clause"); *Chambers*, 501 U.S.

at 43 (courts have certain implied powers which are necessary to manage their affairs).  Fed. R.

Crim. P. 16 provides for remedies for violations of discovery orders, but that rule would not support

an order directing the government to attend a training program and, indeed, the Court has not

suggested otherwise.[21]  Nor is an order directing all criminal AUSAs to prophylactic training

---

[21]Fed. R. Crim. P. 16 is designed only to give the court authority to enter orders regarding the management of the case before it.  *See* Fed. R. Crim. P. 1 ("These rules *govern the procedure in all criminal proceedings* in the United States district courts"); Fed. R. Crim. P. 2 ("These rules are to be interpreted to provide for the just determination *of every criminal proceeding,* to secure simplicity in procedure and fairness in administration, and to eliminate unjustifiable expense and delay")(emphasis added).  Second, Fed. R. Crim. P. 16 is directed to "the parties" in the case, and this does not include all criminal AUSAs in the USAO.  *See* Fed. R. Crim. P. 16(d)(2)(permitting sanctions "[i]f a party fails to comply").  Rule 16, moreover, is subject to Fed. R. Crim. P. 52(a) which provides that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."  As the defendant suffered no prejudice, no further action is warranted in this case.  Notably, the Court has not suggested that Fed. R. Crim. P. 16 would support an order directing the government to attend a training program.

It should be noted that a court's supervisory power "does not include the power to develop rules that circumvent or conflict with the Federal Rules of Criminal Procedure," the Constitution, or a statute.  *Carlisle v. United States*, 517 U.S. 416, 426 (1996); *Thomas v. Arn*, 474 U.S. at 148. In particular, a federal court may not invoke supervisory power to circumvent the harmless error inquiry prescribed by Fed. R. Crim. P. 52(a).  *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254-255 (1988).  Nor may a court use its supervisory power to correct what might be perceived as

17

essential for courtroom management.   The government understands that the Court believes that
normal measures have not worked to ensure that errors never occur  [5/12/09:35],[22] but an order
directing all criminal AUSAs to training would nonetheless not be the kind of order that "cannot be
dispensed with...,   because [it is] necessary to the exercise of all [the Court's other powers]."
*Chambers*, 501 U.S. at 43.   In any event, putting aside this legal issue, the fact remains that (even
if, contrary to the realities and exigencies of life, errors could be entirely prevented), there is no
evidence that anything the entire USAO did or did not do caused the delayed disclosure in this case.

---

an unfairness in the application of a federal rule.  *Carlisle,* 517 U.S. at 426-428 (the Court's
"inherent supervisory power" did not permit it to ignore that the defendant's Fed. R. Crim. P. 29(c)
motion was one day late).

[22]Courts have noted, for example, the ability of a district court to publicly reprimand an
AUSA who it believes has engaged in misconduct, or report the AUSA to the DOJ's Office of
Professional Responsibility ("OPR").  *Horn*, 29 F.3d at 766-767; *Ramos Colon v. United States
Attorney for the District of Puerto Rico*, 576 F.2d 1, 6  (1st Cir. 1978).  In this case, the AUSA's
name appears in the Court's published opinions.  *United States v. Jones*, 620 F.Supp.2d 163 (D.
Mass. 2009); *United States v. Jones*, 609 F.Supp.2d 132 (D. Mass. 2009); *United States v. Jones*, 609
F. Supp.2d 113 (D. Mass. 2009).  Regarding OPR, the Court has commented that "at least until
Attorney General Holder's appointment, I have no confidence in the Office of Professional
Responsibility." [5/12/09:35; *see also* 5/12/09: 38-39, 83; D.90, pages 25-28; D.90, page 44].  The
Court's dissatisfaction with OPR's response in a prior case should not be the basis for abandoning
a report to OPR as a possible remedy for perceived misconduct.  Responsible bodies can reasonably
disagree on their assessment of the facts and the appropriate outcome of a case.  Moreover, an OPR
investigation makes a considerable impression on an AUSA.  It can be both disconcerting and
embarrassing for the AUSA, as OPR can recommend the AUSA's removal and several of the
AUSA's colleagues might be required to submit written responses to OPR and be interviewed.  In
any event, Attorney General Holder's personal response to the Court (*see* footnote 13, *above*) clearly
demonstrates OPR's awareness of and attentiveness to the Court's concerns and, concomitantly, the
lack of need for further action by the Court.

Nor should the Court be concerned that additional sanctions are needed to deter future errors.
[D. 90, page 42]. The increased efforts of the DOJ and USAO are designed to reduce discovery
mishaps.  Moreover, it is beyond dispute that the proceedings in this case, and the Court's
admonition that it will "institute criminal contempt proceedings in future cases if there is a good
reason to be concerned that discovery orders have been intentionally violated," [D.90, page 6; *see
also* D.90, page 30], have made clear the Court's frustration with even inadvertent errors.

Second, putting aside the narrowly-tailored remedies traditionally recognized as available to courts to deal with inappropriate conduct,[23] the Court of Appeals for the First Circuit has said that a court should not use its supervisory power as a remedy to deter illegal conduct unless it is confronted with prejudice and "extreme misconduct." *United States v. Horn*, 29 F.3d 754, 760 (1st Cir. 1994).[24]   Here, there was no prejudice [D.65], and the court cannot find "extreme misconduct" by all criminal AUSAs in the USAO.[25]

Finally, supervisory power must be exercised "with restraint and discretion," *Chambers*, 501 U.S. at 44, and must be reasonable in light of the concerns its use is designed to address.  *Thomas v. Arn*, 474 U.S. at 146-148.  *See also Horn*, 29 F.3d at 760 (supervisory power must be exercised

---

[23]*See* footnote 22, *above; see also Hasting,* 461 U.S. at 506 n.5.

[24]The significance of a finding of prejudice is seen in cases such as *Payner*, 447 U.S. at 727 (supervisory power may not be used to suppress evidence tainted even by gross illegalities that do not infringe upon a defendant's constitutional rights), and *Hasting*, 461 U.S. at 505 n.13 (a court may not use its supervisory power to reverse a conviction because of perceived prosecutorial misconduct which did not prejudice the defendant).

In *United States v. Santana*, 6 F.3d 1, 11 (1st Cir. 1993), the Court of Appeals for the First Circuit stated that "the Court's reasoning in *Hasting* may be read to leave open the possibility that the goal of deterring future misconduct would justify using the supervisory power to redress conduct not injuring defendants if the conduct is plainly improper, indisputably outrageous, and not redressable through the utilization of less drastic disciplinary tools."  It is unclear, at least to the government, exactly to what reasoning the *Santana* Court referred.  *Bank of Nova Scotia,* 487 U.S. 250, 256-257 (1988), however, decided five years later, makes clear that, except in those rare situations involving structural error, a court may not use its supervisory power to dismiss an indictment in the absence of prejudice.

[25]We also submit that such a finding is unwarranted as to the AUSA whose mistake, while serious, was unintentional. [D.60 ("The court assumes that her failure to disclose material, exculpatory information was not intentional"); D.74 (the AUSA's "affidavit indicates that it is appropriate to proceed on this assumption," *i.e.*, that her error was unintentional); D.90 ("it does not appear that [the AUSA] specifically intended to violate [the August 12, 2008 order to produce exculpatory evidence] or intentionally misrepresented that she had done so").  Our January 11, 2010 filing will address directly the question of why sanctions should not be imposed against the AUSA.

"with restraint and circumspection"), *and Anderson v. Dunn,* 19 U.S. (6 Wheat) 231 (1821) (court

is restricted to "the least possible power adequate to the end proposed").  This limitation ensures that

the judicial branch does not exceed its constitutional authority.  Ordering the entire USAO to attend

a training program is simply not a sparing use of that power.

## CONCLUSION

For all the reasons set out above and stated previously, the government respectfully states that

the Court should not order the USAO to attend the December 16, 2009 training program, nor should

it impose any other sanction against the United States.[26]

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:   */s/ Dina Michael Chaitowitz*
DINA MICHAEL CHAITOWITZ
Chief of Appeals

## Certificate of Service

I hereby certify that on December 1, 2009, I caused this pleading to be filed through the ECF
system will be sent electronically to the registered participants as identified on the Notice of
Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered
participants.

*/s/ Dina Michael Chaitowitz*
DINA MICHAEL CHAITOWITZ
Chief of Appeals

---

[26]As noted earlier, the government also believes that the Court should take no further steps
against the trial AUSA, an issue that will be addressed in its January 11, 2010 filing.

20