UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 07-10289-MLW |
| | ) | |
| DARWIN JONES, | ) | |
| Defendant. | ) | |

### SECOND SUPPLEMENTAL AFFIDAVIT OF SUZANNE SULLIVAN

I, Suzanne Sullivan, submit this second supplemental affidavit and state as follows:

1. On February 10, 2009, I filed an affidavit pursuant to the Court's Order in the above-entitled case. On April 29, 2009, I voluntarily submitted a supplemental affidavit to provide the Court with an update regarding the additional efforts that I had undertaken to broaden my understanding of prosecutors' discovery obligations and to demonstrate to the Court that there is no need to impose a personal sanction on me. I file this affidavit to update the Court as to further efforts I have undertaken since the May, 2009, hearing held in this matter.

I hope to show the Court that I personally have taken to heart the issues raised by the Court in this matter, including the need to continually educate myself as thoroughly as possible in order to meet my ethical obligations. Moreover, this experience has allowed me to further reflect on the important role that I play as a prosecutor in ensuring the fair and proper administration of justice.

2. Since the date of the filing of my prior affidavits in the Jones case, I have participated in several U.S. Attorney Office ("USAO") or DOJ sponsored training events. In

particular, I have attended or viewed the videos of the criminal division meeting/discovery trainings presented by the USAO on February 13, 2009, March 27, 2009, May 8, 2009, June 26, 2009, September 25, 2009 and November 20, 2009. These programs included both a detailed review of discovery obligations under the Local Rules of this Court, and a review of developments with respect to the Constitutional imperatives regarding discovery (from <u>Brady v. Maryland</u> to <u>Kyles</u> and its progeny).

     I should note that this case has been discussed in some of the intra-office trainings, with a focus on the Court's findings and rulings, as well as advice on best practices to address the Court's concerns. Further, the USAO has circulated the Court's decision and some of the pleadings filed in the case. Additionally, on November 6, 2009, I viewed the mandatory two hour DOJ training video entitled "Brady and Giglio Issues". This training session highlighted some judicial findings from around the country relating to prosecutors' discovery obligations. The format of this program - analyzing discovery issues in the context of specific cases - helped provide concrete examples of best practices. The instant matter was discussed in that presentation and was also listed on the handouts provided. On December 9, 2009, I attended a general ethics training within the USAO.

     3.    Since the dates of the filing of my prior affidavits, I have also continued to undertake additional efforts at self-education inside and outside of the DOJ. Specifically:

- I have reviewed information on various websites including: The Justice Project - Criminal Justice Reform Organization; The Innocence Network; ABA - Criminal Justice Section; and The Innocence Project. These sites explore various proposals

and efforts towards systemic reform designed to ensure the fair administration of justice. They contain vivid reminders of the impact that prosecutorial action has on individuals in the system.

- I have read <u>Improving Prosecutorial Accountability, A Policy Review - The Justice Project</u>. While much of this work focuses on state court practice, I found it useful for its emphasis on the link between discovery practices and the broader question of fairness and reliability in trials.

- I have also reviewed (a) the DOJ Professional Responsibility handout dated July, 2008; (b) the ABA Report - Standing Committee on Ethics and Professional Responsibility, dated July 8, 2009; and (c) a Law.com article of August 20, 2009, relating to an ethics panel committee. Additionally, I have read the judicial opinions relating to discovery in the <u>United States v. Ali Shaygan,</u> and the <u>United States v. Stevens</u> cases. I also attended the "Federal Court Judicial Forum 2009" held on November 5, 2009.

- I have read the 2009 BBA Task Force book entitled <u>Getting it Right, Improving the Accuracy and Reliability of the Criminal Justice System in Massachusetts</u> and found it to contain useful best practices and perspectives from both prosecutors and defense lawyers.

4. In addition to these training sessions, on or about February 18, 2009, I was assigned an office mentor (A.U.S.A. John Wortmann) whom I met with shortly thereafter. Since that time, I have continued to meet with him concerning (among other items) my ongoing

discovery obligations in cases to which I am assigned. Over the past ten months, I have also had my work on matters reviewed by either A.U.S.A. Wortmann or another senior prosecutor. I have also met with other experienced attorneys in the USAO to discuss discovery issues. I have had a significant number of meetings within the USAO with prosecutors and professionals to discuss the case and how to avoid discovery problems in the future.

5.      In addition to those individuals identified in previous affidavits that I have filed, I have also met with other former federal prosecutors to obtain their perspectives on discovery obligations and duties of a federal prosecutor. In particular, on August 26, 2009, and on December 21, 2009, I spoke with former DOJ Attorney Bob Keefe of Wilmer-Hale. On September 4, 2009, I met with former Assistant United States Attorney Michael Kendall. As with other former federal prosecutors with whom I have met or spoken, their advice to me went beyond merely laying out what they understood the law to be, but instead focused on practical ways to ensure fair proceedings and avoid even the appearance of violating the obligations of a prosecutor.

6.      On September 24, 2009, I met with Harvard Law School Associate Professor Alex Whiting, who teaches a course entitled "The Government Lawyer", to discuss this case and gain insight on discovery duties from the perspective of a former prosecutor and educator. Professor Whiting and I discussed the circumstances giving rise to the instant matter, as well as lessons to be learned from this case going forward and the general challenges and issues faced by federal prosecutors.

7.     On September 24, 2009, I also attended a discovery and ethics training program for prosecutors that was held at the Middlesex County District Attorney's Office and run by Deputy District Attorney Denise Casper Jefferson, a former federal prosecutor. That session not only served as a reminder of the governing law on criminal discovery, but again gave practical examples of cases to assist in spotting potential discovery situations on a going-forward basis.

8.     As I have indicated previously that I would do, I voluntarily attended the training program that was initiated by the Court and held on December 16, 2009. I found the program valuable. There was no discussion of any specific rule or approach that was not already familiar to me both from my experience as a prosecutor and from the extensive training and education that I have undertaken this past year. But, I found it reassuring, that my voluntary efforts at self education were thorough. One particular take away I gathered from one of the hypotheticals discussed during the program was relevant to the situation I faced in the <u>Jones</u> case; namely, how to address a witness who had previously been found to be untruthful by a court. In particular, I was reminded of how this sort of uncommon and unusual circumstance should have caused me to redouble my efforts to determine if any statements made by the witness to me or other members of the prosecution team could be construed as inconsistent. In other words, the panel was valuable in emphasizing that certain witnesses need special scrutiny. I also saw many of my colleagues at the training and I know from my conversations with them, before and after, they too take their obligations seriously. They, as well as I, paid close attention to the program. This training program and the experience of this case has reminded me that I should continue my practice of refreshing myself on my discovery obligations and evolving trends in this area of law

so that I can be more equipped to identify nuanced and perhaps not readily apparent discovery issues in future cases.

9. On December 23, 2009, I also spoke with Boston College Law School Professor and Academic Dean Michael Cassidy, who served as the moderator for the December 16, 2009, training program. We spoke, among other things, about the training program itself, about the obligations of a prosecutor, discovery and ethics issues, and of discharging ones duties. Dean Cassidy has also agreed to meet with me early in the new year to discuss these areas further.

10. Although not directly responsive to the Court's inquiries, I hope it might also be of interest to the Court to explain a little about my involvement in efforts that are largely collateral to my primary prosecutorial responsibilities, which, I believe, illustrate my deep and consistent commitment to principles of justice and fairness in the legal system. Shortly after beginning my employment at the USAO in 2006, I served as a representative from the USAO for the Court Assisted Recovery Effort Program (C.A.R.E.) run by Magistrate Judge Leo T. Sorokin. At the time, the C.A.R.E. program was still in the planning stages. In this regard, I attended the planning meetings for the program as well as worked with the initial "class" of participants in the program. I continued to be involved with C.A.R.E. for approximately 20 months. The program enabled me to observe the judicial system from a different vantage point, including vividly demonstrating the profound impact that drug addiction has on many defendants in the system.

Additionally, during my tenure at the USAO, I also volunteered to be involved in the Discovering Justice & Citizen Schools program for middle school students. That program

consisted of meeting with students once a week for approximately ten weeks and culminated in a moot court program held one evening in this courthouse. I enjoyed the opportunity to work with the students, most of whom appeared to have a genuine interest in learning about the criminal justice system.

Also, since I have been employed at the USAO, I have volunteered to be the point of contact for any domestic violence cases that might be handled by the USAO. Due to my professional background in handling domestic violence cases, I volunteered to work on these cases because I have an strong interest in assisting victims of violent crimes work through and with the justice system. In addition to these case specific responsibilities, I also regularly attend domestic violence meetings held by those in the law enforcement community who work in the field of domestic violence. I also strive to keep current on outreach projects in that field. I am also a member of the Human Trafficking Task Force and attend meetings at the Boston Police Department. In short, I take my role as a prosecutor very seriously and view these involvements as a vehicle to provide me with a broader insight to individuals who may be involved in the judicial system in some way or another.

11. As the Court is doubtless aware, this case has received substantial attention from various media outlets including the *Boston Globe, Boston Herald, Lawyer's Weekly*, *National Law Journal, Georgetown Law Review* and *ABA Journal*. My name has been published in those, and other media articles. I do not complain but only state that the personal toll on me has been enormous and I will continue to bear the burden of this experience.

12.     In answer to the Court's question in its Order of December 17, 2009, the fee being paid to Goodwin Procter for my representation is $30,595.44.  I am not responsible for paying that fee, which is paid directly by DOJ to Goodwin Procter pursuant to CFR §§ 50.15, 50.16 and Civil Division Administrative Directive 2120A.

13.     It is my earnest hope that the efforts outlined above, together with the efforts described in my previous affidavits, will demonstrate to the Court the seriousness of my commitment, not only to developing genuine insight into the circumstances giving rise to the Court's findings in this case, but also to maintaining a full and informed appreciation of my role and responsibilities as a prosecutor.  I have never been a win at all costs prosecutor.  I hope that the actions I have taken since the proceedings in this case, and my hard earned reputation for fairness and decency that has predated the events of this case demonstrate my dedication to ensuring the proper and fair administration of justice.  In that regard, I believe the issue has now been fully addressed without the need for any sanctions against me personally.

I hereby certify this <u>30th</u> day of <u>December</u>, 2009, that the foregoing is true to the best of my information, and belief.

<u>s/ Suzanne Sullivan</u>
SUZANNE SULLIVAN
