UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 07-10289-MLW |
| | ) | |
| DARWIN JONES, | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER

WOLF, D.J.                                    February 19, 2010

I.   SUMMARY

In January, 2009, the court ordered Assistant United States
Attorney Suzanne Sullivan and the United States Attorney to seek to
show cause why sanctions should not be imposed on Ms. Sullivan and
the government for her egregious error in failing to produce
plainly important exculpatory information to defendant Darwin
Jones.  See United States v. Jones, 609 F. Supp. 2d 113 (D. Mass.
2009); United States v. Jones, 609 F. Supp. 2d 132 (D. Mass. 2009);
United States v. Jones, 620 F. Supp. 2d 163 (D. Mass. 2009).  This
error extended "'a dismal history of intentional and inadvertent
violations of the government's duties to disclose in cases assigned
to this court.'" Jones, 620 F. Supp. 2d at 165 (quoting Jones, 609
F. Supp. 2d at 119).  Customary means of addressing errors and
intentional misconduct had proved inadequate to prevent the
repetition of violations of constitutional duties, the requirements
of the Federal Rules, Local Rules, and court orders concerning
discovery.  See id. at 175-77 ("Neither referral to [the Department
of Justice, Office of Professional Responsibility], other

disciplinary bodies, or public criticism has sufficiently deterred prosecutorial misconduct."). Therefore, the court gave notice that it was considering ordering Ms. Sullivan to personally reimburse the District Court for at least some of the cost of the time spent by the indigent defendant's court-appointed counsel in dealing with the issues raised by her errors. See Jones, 609 F. Supp. 2d at 134; Jones, 620 F. Supp. 2d at 166, 180; see also United States v. Horn, 29 F.3d 754, 758-59, 766 (1st Cir. 1994).

Ms. Sullivan asked that the court defer for at least six months deciding whether to sanction her so that she would have additional time to demonstrate that a sanction is not necessary or appropriate. May 12, 2009 Hearing Tr. at 84-85; see also Feb. 10, 2009 Suzanne Sullivan Affidavit ("Aff.") ¶6. The court granted that request and, as a result, also deferred deciding whether to sanction the United States Attorney for failing to adequately train and supervise Ms. Sullivan. See Jones, 620 F. Supp. 2d at 167-68, 185. In essence, the court found that there was reason to hope that the past would not be prologue, and that Ms. Sullivan, the new Attorney General, Eric Holder, and new leadership of the United States Attorney's Office would take actions that would obviate the need for sanctions. Id.

For the reasons described in this Memorandum, the court finds that this hope was not misplaced. Ms. Sullivan has continued her exceptional efforts to assure that her error is not repeated.

The United States Attorney's Office has made intensive efforts to better prepare its prosecutors to perform their duties to provide discovery. While the court remains skeptical that training involving prosecutors alone will suffice, representatives of the United States Attorney participated in planning the educational program prompted by this case, which was organized by the Court and involved prosecutors, defense lawyers, judges, and a law professor. That program was voluntarily attended by the vast majority of Assistant United States Attorneys in this District and by an official of the Department of Justice responsible for the training of federal prosecutors. The new United States Attorney, Carmen Ortiz, participated in the program, welcomed the "unique opportunity" that the program offered, judged it to have "considerable value," and pledged her best efforts to assure that her prosecutors always "do the right thing."

In addition, in January, 2010, Attorney General Holder instituted a series of initiatives to assure that prosecutors understand their duties concerning discovery and discharge them in a way that is faithful to the Department of Justice's highest aspirations and finest traditions.

Experience causes the court to have some doubt about whether the government's initiatives will succeed. However, the violation of the defendant's rights in this matter was unintentional rather

than deliberate,[1] and Ms. Sullivan is not likely to commit comparable errors in the future.  The new Attorney General and the current United States Attorney have made serious efforts to reduce the risk that other prosecutors will make similar errors. Therefore, in an effort to recognize the positive developments since May, 2009, and to encourage their continuation, the court has decided not to sanction the serious errors that were made in this case.


II.  BACKGROUND

Jones was charged with being a felon in possession of a firearm.  If convicted of that charge, he would have been subject to a mandatory ten year sentence.

Jones filed a motion to suppress, alleging that the police did not have the reasonable articulable suspicion necessary to justify the seizure and the search of him that led to the discovery of the firearm at issue.  As the court has previously explained:

> [I]n an effort to justify the seizure of Jones, the government argued, and Boston Police Officer Rance Cooley falsely testified, that there was justification to stop Jones because, despite the dark and the distance between them, he identified Jones as he rode his bicycle down Middleton Street in Dorchester, Massachusetts.  Cooley testified that his suspicions were raised when Jones pedaled away from him because Cooley knew Jones and Jones had never avoided Cooley before.

---

[1]If this matter had involved intentional misconduct, a significant sanction would have been required.

However, Cooley had on several earlier occasions told the lead prosecutor in this case, Suzanne Sullivan, that he did not recognize Jones on Middleton Street and did not identify the man who had been on the bicycle as Jones until later, when other officers had tackled Jones at another location. Cooley's important inconsistent statements were not disclosed to Jones until the court conducted an in camera review of Sullivan's notes, just before the suppression hearing was complete. Sullivan and her supervisor, James Herbert, acknowledge that Cooley's prior inconsistent statements constituted material exculpatory evidence, and that the failure to disclose them violated the government's constitutional duty under Brady v. Maryland, 373 U.S. 83 (1963), its progeny, and the court's orders.

Jones, 609 F. Supp. 2d at 115; see also id. at 115-18.

Cooley's prior inconsistent statements were discovered and disclosed in time for his false testimony to be discredited. Id. at 115, 121-22. Indeed, the government abandoned reliance on it. Nevertheless, the motion to suppress was denied on alternate grounds. Id. at 115, 122-29.

The court did, however, immediately consider whether sanctions should be imposed on Ms. Sullivan and/or the government. The court concluded that it was not appropriate to reward Jones, and punish the public, by dismissing the case against him because of the government's misconduct. Id. at 115. Nevertheless, the misconduct [was] too serious to ignore.

Jones, 620 F. Supp. 2d at 164-65 (quoting Jones, 609 F. Supp. 2d at 115, 121-29).

Therefore, the court provided Ms. Sullivan and the United States Attorney an opportunity to seek to show cause why sanctions should not be imposed on Ms. Sullivan and/or the government. See Jones, 609 F. Supp. 2d at 115.

Both the then United States Attorney, Michael Sullivan, and

Ms. Sullivan readily acknowledged that her notes containing important exculpatory information should have been provided to Jones before the hearing on his motion to suppress. <u>See</u> Feb. 10, 2009 Suzanne Sullivan Aff. ¶¶5, 6; Feb. 10, 2009 Michael Sullivan Aff. ¶7(c). Following a May 12, 2009 hearing, the court found that although Ms. Sullivan's errors were inexplicable and inexcusable, they were inadvertent mistakes made by "an earnest public servant" who was "genuinely contrite." <u>See</u> <u>Jones</u>, 620 F. Supp. 2d at 166, 182-83. As of May, 2009, Ms. Sullivan had made extensive efforts to educate herself on a prosecutor's discovery obligations and was also being more closely supervised. Therefore, the court found that it was "unlikely that she will again violate her duty to provide discovery." <u>Id.</u> at 183.

However, the court also found that:

> The Department of Justice and United States Attorney's Office fully share responsibility for Ms. Sullivan's misconduct. The Department hired a prosecutor who, despite long experience, did not understand her duties under <u>Brady</u> and <u>Giglio</u> [<u>v. United States</u>, 405 U.S. 150 (1972)], including her duty to review her notes and those of law enforcement agents for material exculpatory information. Ms. Sullivan was given training by the Department and United States Attorney's Office. However, at least with regard to discovery, it was obviously inadequate to serve its intended purpose.

<u>Id.</u> After admitted <u>Brady</u> violations were discovered in other cases, the last two United States Attorneys informed the court of the extensive efforts of the Department of Justice and their office to instruct prosecutors on their constitutional duty to disclose

material exculpatory information to defendants.  See, e.g., United
States v. Castillo, Cr. No. 01-10206-MLW, Jan. 11, 2002 Michael
Sullivan Aff., Jan. 17, 2002 Michael Sullivan Aff., March 19, 2002
Michael Sullivan Aff.; United States v. Diabate, Cr. No. 99-10253-
MLW, Jan. 20, 2000 Donald Stern Aff.  Yet these efforts proved to
be insufficient to prevent the recurrence of serious errors in
cases before this court and many others.  See Jones, 620 F. Supp.
2d at 170-76, 185-93.[2]

Nevertheless, in May, 2009, the court found that there was
reason "to hope that the past will not be prologue."  Id. at 183.

----

[2]Recent, prominent examples of cases involving Brady
violations include the following.  In United States v. Stevens,
Judge Emmet Sullivan vacated the conviction of, and dismissed the
case against, former Senator Ted Stevens of Alaska and appointed
a special counsel to investigate and possibly prosecute federal
prosecutors for criminal contempt.  593 F. Supp. 2d 177 (D.D.C.
2009); id., No. 372, Cr. No. 08-231 (EGS) (D.D.C. Apr. 7, 2009)
(Order); id., No. 375, Cr. No. 08-231 (EGS) (D.D.C. Apr. 8, 2009)
(Order).  In the Southern District of Florida, Judge Alan Gold
sanctioned the government and prosecutors individually for a wide
array of misconduct, including violations of the duty to disclose
material exculpatory evidence.  See United States v. Shaygan,
661 F. Supp. 2d 1289, 1295-96, 1306-07, 1310, 1315-19 (S.D. Fla.
2009).  Judge Gold imposed sanctions that included an order that
the government pay approximately $600,000 of the defendant's
legal fees under the Hyde Amendment.  Id. at 1323.  In United
States v. W.R. Grace, in response to "clear and admitted
violations of ... Brady and Giglio," District Judge Donald Molloy
instructed the jury to disregard the testimony of an important
witness concerning one defendant.  No. 1147, Cr. No. 05-07-DWM
(D. Mont. Apr. 28, 2009) (Order at *6, *13).  The jury ultimately
found all of the defendants not guilty.  See id. (May 8, 2009)
(Jury Verdicts as to W.R. Grace; Jack W. Wolter; Henry A.
Eschenbach; and Robert J. Bettacchi) (Nos. 1190, 1192, 1194,
1196).

After moving to vacate the unlawfully obtained conviction of Senator Ted Stevens and obtaining the dismissal of the case against him, Attorney General Holder, who had recently been appointed, "'announced comprehensive steps to enhance the Justice Department's compliance with rules that require the government to turn over certain types of evidence to the defense in criminal cases.'" Id. at 167 (quoting April 14, 2009 Department of Justice Press Release: Attorney General Announces Increased Training, Review of Process for Providing Materials to Defense in Criminal Cases, available at http://www.usdoj.gov/opa/pr/2009/April/09-opa-338.html); see also id. at 183-84. Similarly, the then new Acting United States Attorney, Michael Loucks, "expressed his determination to improve his office's performance in discharging its duty to disclose material exculpatory evidence." Id. at 168.

Despite these promising signs, "[t]he persistent recurrence of inadvertent violations of defendants' constitutional right to discovery in the District of Massachusetts persuade[d] this court that it is insufficient to rely on Department of Justice training ... alone to assure that the government's obligation to produce certain information to defendants is understood and properly discharged." Id. at 167. Therefore, preferring to try to promote improvement rather than to rely only on punishment to prevent errors, the court arranged for a program on discovery in criminal cases involving judges, defense lawyers, prosecutors, and a law

8

professor, which was organized by United States District Judge Douglas P. Woodlock and Magistrate Judge Leo Sorokin.  Id. at 167, 185.

    In May, 2009, the court concluded that:

> It has taken many disturbing experiences over many years to erode this court's trust in the Department of Justice's dedication to the principle that "the United States wins . . . whenever justice is done its citizens in the courts." Brady, 373 U.S. at 87.  It will take time for the performance of the Department to restore that faith.  However, in the instant matter the court finds that it is most appropriate to defer deciding whether to impose sanctions in order to give Ms. Sullivan, the United States Attorney for the District of Massachusetts, and the Attorney General an opportunity to begin to do so.

Id. at 184-85.

    The educational program organized as a result of this matter was held on December 16, 2009.  It had been stated in a December 8, 2009 Order that:

> After the Program, the court will have to decide whether sanctions should be imposed on Ms. Sullivan and/or the United States Attorney's Office. Jones, 620 F. Supp. 2d at 185. . . . [A] significant consideration will be whether any such sanction appears to be necessary or appropriate to deter future violations of the government's discovery obligations.  The court's most fundamental interest is in assuring that the criminal proceedings it conducts are fair, and that the decisions made in those proceedings are properly informed and final.  Honorable, able prosecutors – and there are many – share these interests.  Id. at 182 ("The court recognizes that many prosecutors strive earnestly and successfully to meet their discovery obligations.").

United States v. Jones, No. 106, 2009 WL 4730975 at *2 (D. Mass. Dec. 8. 2009).

In January, 2010, Ms. Sullivan and the government completed their supplementation of the record concerning the possible imposition of sanctions. As indicated earlier, and explained below, the court concludes that the imposition of sanctions is neither necessary nor most appropriate.


III. SANCTIONS ARE NOT BEING IMPOSED

Ms. Sullivan's conduct since May, 2009 reinforces the court's previously expressed view that she recognizes the gravity of her errors, is genuinely contrite, and is not likely to violate her duty to provide discovery to defendants in the future. See Jones, 620 F. Supp. 2d at 183. After May, 2009, Ms. Sullivan participated in several more training programs concerning discovery presented by the United States Attorney's Office and the Department of Justice. See Dec. 30, 2009 Second Supplemental Aff. of Suzanne Sullivan ¶2. Among other things, she watched a mandatory two hour Department of Justice training video on "Brady and Giglio Issues" that analyzed discovery obligations in the context of specific cases, including the instant matter. Id.

Ms. Sullivan has also made exceptional, independent efforts to educate herself on her discovery obligations. These have included consulting with former federal prosecutors, defense lawyers, and law professors. Id. at ¶¶5, 6. In addition, she has reviewed information on websites of organizations such as The Innocence

Project that promote improvements in the administration of criminal justice.  Id. at ¶3.  Ms. Sullivan reports that the information on those websites has provided her with "vivid reminders of the impact that prosecutorial action has on individuals in the system."  Id.

Ms. Sullivan also voluntarily attended the December 16, 2009 training program prompted by this case.  She reports that the program was "valuable," in various ways, including in emphasizing the need for prosecutors to be particularly thorough in searching for inconsistent statements made by witnesses, like the police officer in this case, previously found by a court to have been untruthful.[3]  Id. at ¶8.  Finally, Ms. Sullivan continues to

---

[3]It would not be accurate or fair to portray Ms. Sullivan as merely a victim of his lack of candor.  Boston Police Officer Cooley accurately wrote in his incident report that he did not recognize Jones as the man on the bicycle he saw briefly on Middleton Street before the man turned and peddled away.  See Jones, 609 F. Supp. 2d at 116.  In speaking with Ms. Sullivan to prepare the government's opposition to the motion to suppress, Cooley twice stated that he did not recognize the man on the bike to be Jones until he was apprehended several blocks from Middleton Street.  Nevertheless, in an effort to establish that there was reasonable suspicion to stop Jones, Ms. Sullivan wrote that on Middleton Street "'Cooley recognized Jones'" and considered his departure suspicious because "'in the dozens of prior encounters Officer Cooley had with Jones in the vicinity of that same neighborhood over the prior approximately two years, Jones had never attempted to flee from the officer.'" Id. (quoting Gov. Opposition to Motion to Suppress at 3, 11).  This contention was reiterated in the supporting affidavit of Cooley, which Ms. Sullivan drafted.  Id.

Similarly, prior to the hearing on the motion to suppress "Sullivan met with Cooley again.  Cooley reiterated that he did not determine that the bicyclist was Jones until Jones was on the ground between Marden Avenue and Middleton Street." Id. at 117.  Nevertheless, at the suppression hearing Sullivan repeatedly

consult a qualified mentor in the United States Attorney's Office concerning discovery issues. Id. at ¶4.

Therefore, the court concludes that it is not necessary to impose a sanction on Ms. Sullivan in order to deter her from repeating the egregious errors that threatened to deprive a defendant of his constitutional right to due process and of his liberty for at least ten years.[4]

The question remains whether a sanction should be imposed on Ms. Sullivan and/or the government in an effort to prompt more effective training and supervision, and to generally deter other

---

elicited from Cooley testimony that while on Middleton Street he recognized the man on the bicycle as Jones and was intent on catching him solely because Jones had never fled from him before. Id.

Therefore, Ms. Sullivan shares with Cooley the responsibility for the presentation of his false testimony. She is solely responsible for the failure to disclose to Jones Cooley's important, prior inconsistent statements. See Kyles v. Whitley, 514 U.S. 419, 438 (1995)(discussing "'the prosecutor's burden . . . to insure communication of all relevant information on each case to every lawyer who deals with it'" (quoting Giglio, 405 U.S. at 154)).

[4]The court has been informed that the Department of Justice Office of Professional Responsibility ("OPR") is investigating this matter in order to determine whether Ms. Sullivan should be disciplined by the Department. The Acting Counsel of OPR has agreed to provide OPR's report to the court. See Jones, Dec. 31, 2009 Order (attaching Nov. 19, 2009 letter from Mary Patrice Brown to Chief Judge Mark L. Wolf). However, the court wrote in May, 2009 and reiterated in December, 2009, that it did not intend to rely on the OPR investigation in deciding whether to sanction Ms. Sullivan. See Jones, 620 F. Supp. 2d at 176; Dec. 31, 2009 Order (attaching Dec. 22, 2009 letter from Chief Judge Mark L. Wolf to Mary Patrice Brown). The court has not relied on OPR's investigation.

prosecutors from committing the type of serious errors in discharging their discovery obligations that have persistently recurred. See Jones, 620 F. Supp. 2d at 169-75. The new United States Attorney, Ms. Ortiz, and her Assistants have generally responded to this matter in a positive and encouraging manner.[5] Since the instant matter arose, the United States Attorney's Office has held five training sessions devoted exclusively to discovery obligations in criminal cases. Dec. 1, 2009 Aff. of James B. Farmer ¶3. In addition, each Assistant United States Attorney has been required to complete an additional four hours of discovery training mandated by the Department of Justice. Id. at ¶5. The United States Attorney's Office has also offered to work with each

---

[5]The government's recent submissions have not been uniformly reassuring. For example, in the government's December 1, 2009 submission, signed on behalf of Ms. Ortiz by Assistant United States Attorney Dina Michael Chaitowitz, in contrast to the acceptance of legal responsibility and contrition expressed by Michael Sullivan and Suzanne Sullivan, the government for the first time argued that this matter did not involve a Brady violation because Cooley's important prior inconsistent statements were discovered by the court and disclosed to defense counsel. See Gov. Dec. 1, 2009 Response to the Court's May 18, 2009 Order at 3 n.5. The government reasoned that "a Brady violation occurs only when material evidence has actually been suppressed." Id. at 4 n.5. In the context of this matter, the government's argument is a manifestation of the attitude that the Supreme Court condemned when it wrote that:

> A rule [] declaring "prosecutor may hide, defendant
> must seek" is not tenable in a system constitutionally
> bound to accord defendants due process. . . .
> Prosecutors' dishonest conduct or unwarranted
> concealment should attract no judicial approbation.

Banks v. Dretke, 540 U.S. 668, 696 (2004).

federal investigative agency in the District of Massachusetts to develop joint training on discovery issues, among other things. Id.

In addition, prosecutors participated in planning and presenting the December 16, 2009 program on discovery organized by the Court. United States Attorney Ortiz spoke at the program, characterizing it as a "unique" opportunity to have prosecutors, defense lawyers, and judges discuss critical issues of common concern.[6] Acknowledging again that "mistakes" had been made, Ms. Ortiz expressed her commitment to assuring that her prosecutors always "do the right thing."

Ms. Ortiz also successfully encouraged the vast majority of her prosecutors to attend the December 16, 2009 program. Sixty-nine of the 91 Assistant United States Attorneys in the Criminal Division, including prosecutors from Springfield and Worcester, attended the program, and were joined by 12 members of the Civil Division who sometimes work on criminal cases. Gov. Dec. 30, 2009 Response to Court's May 18, 2009 and Dec. 8, 2009 Orders at 8-9. The DVD of the program will be made available to the Assistant United States Attorneys who did not attend. Id. at 9.

In addition, the December 16, 2009 program was attended by representatives of several District Attorneys, various federal

---

[6]A DVD of the program is hereby made part of the record in this case.

investigative    agencies,[7]    and    the    official    in    charge    of

_____

[7]The Federal Bureau of Investigation ("FBI") and the Drug Enforcement Administration ("DEA") were notably absent from the long list of federal agencies Ms. Ortiz stated were present for program.  The FBI and DEA have, however, been the investigative agencies involved in a series of cases before this court in which the government violated its obligations to produce discovery. For example, in United States v. Salemme, 91 F. Supp. 2d 141, 154 n.3, 212-13 (D. Mass. 1999), this court:

> issued general orders that had the effect of requiring the production of FBI documents memorializing Brian Halloran's claim that Bulger and Flemmi were responsible for the murder of Roger Wheeler.  When found by Special Agent Stanley Moody, those documents were given to Barry Mawn, the Special Agent in Charge of the FBI in Boston, to review because, Moody said in an affidavit, they contained information that was "obviously highly singular and sensitive."  They were not, however, produced in discovery in [Salemme] in time for the key witnesses, Rico and Morris, to be questioned about them. Rather, they were belatedly disclosed after repeated inquiries by the court. Similarly, important FBI documents concerning John McIntyre were also improperly withheld by agents of the Boston FBI until it was too late to question relevant witnesses concerning them.

United States v. Flemmi, 195 F. Supp. 2d 243, 249-50 (D. Mass. 2001).

The deliberate, delayed disclosure of the documents frustrated this court's ability to discern in Salemme the later proven fact that an FBI agent leaked information to informants James "Whitey" Bulger and Stephen Flemmi that prompted the murders of potential witnesses against them, John Callahan and John McIntyre, and others as well.  See State of Florida v. John Connolly, No. 719, F-01-008287-D (Fla. Cir. Ct. Nov. 20, 2008)(Judgment of Guilt); Shelley Murphy, Miami Jury Convicts Connolly: Ex-FBI Agent Guilty of Murder, Boston Globe, Nov. 7, 2008 at A1; McIntyre v. United States, 447 F. Supp. 2d 54 (D. Mass. 2006), aff'd, 545 F.3d 27 (1st Cir. 2008); Litif v. United States, 2010 WL 325374 (D. Mass. Jan. 29, 2010).

In United States v. Castillo, Cr. No. 01-10206-MLW, this court declared a mistrial in a case investigated by the FBI

because of the government's failure to disclose important impeaching evidence. Among other things, the United States Attorney prompted the FBI Special Agent in Charge to issue a memorandum instructing his agents on the government's duty to disclose exculpatory information. However, after a second trial began, the case was dismissed with prejudice because the defendant was found to have been irreparably harmed by another failure to produce important exculpatory evidence.

In <u>United States v. Diaz</u>, Cr. No. 05-30042-MLW, another case investigated by the FBI, it was alleged that members of the Latin Kings gang distributed drugs. A mistrial was declared because the government had not searched all of the relevant FBI files, some of which contained undisclosed material exculpatory information. Shortly before the scheduled second trial, the government dismissed the case because it realized that it had repeated the error. <u>Id.</u> (D. Mass. Dec. 19, 2006) (Gov. Motion to Dismiss Without Prejudice) (No. 158).

In June, 2009, after the errors in the instant case were revealed, a case investigated by the DEA, <u>United States v. Ocasio</u>, Cr. No. 07-10102-MLW, was also dismissed at the government's request. As this court stated in granting the government's motion:

> The DEA 6 [interview] report that's Exhibit 2 was prepared 8 months after an important event, the encounter in the lockup between [a key witness] Mr. Santos and Mr. Ocasio. Mr. Santos's identification of Mr. Ocasio in the lockup, which occurred before the photo identification occurred, . . . as the government recognizes, is . . . material to the issue of the admissibility of the photo identification and the government properly recognized that, in the circumstances, the photo identification was not reliable and could not be used in evidence. But even that belatedly prepared DEA 6 was disclosed very late. It was disclosed 10 months after it was prepared, 18 months after the event, and 16 months after the Local Rule required the disclosure of material exculpatory information relating to a foreseeable motion to suppress. At a minimum, those DEA 6 reports, Exhibits 1 and 2, reflect the failure of the DEA to properly train and supervise with regard to identification procedures and writing reports.

16

training for the Boston Police Department.

Following the program, Ms. Ortiz characterized it as having "considerable value."   United States Attorney's Dec. 30, 2009 Response to the Court's May 18, 2009 and Dec. 8, 2009 Orders at 1. She also made constructive suggestions for enhancing the value of possible future training programs involving prosecutors, defense attorneys, and judges.

As explained earlier, the court granted the request to defer deciding whether to impose sanctions in part to permit the then new Attorney General, Eric Holder, to begin acting on his pledge to improve the performance of the Department of Justice concerning its constitutional and other duties to provide discovery.   An Assistant General Counsel from the Executive Office of United States Attorneys involved in training attended the December 16, 2009 program and had the opportunity to assess the potential of such a joint effort as a possible model for emulation by the Department.[8]

--------

June 5, 2009 Tr. at 124.


[8]In June, 2009, the Judicial Conference Committee on Codes of Conduct revised its previous advice that judges should not participate in government sponsored training of only prosecutors or defense attorneys.   See Advisory Opinion No. 108.   Judges are now advised that they "may appear at 'closed' programs (open only to a one-sided audience), but should be willing and available to participate in training for interested attorneys representing the other side."   Id.   Nevertheless, judges are still advised that they "should not provide guidance on the ins-and-outs of practice before their courts if the audience is closed and includes attorneys likely to appear before them."   Id.   Therefore, it may

In addition, on January 4, 2010, the Deputy Attorney General issued three memoranda regarding criminal discovery practices. Jan. 5, 2010 Supplement to Gov. Dec. 30, 2009 Response to the Court's May 15, 2009 and Dec. 8, 2009 Orders at 1. One is "a memorandum to all prosecutors containing guidance regarding criminal discovery that [Assistant United States Attorneys] should follow to help ensure that they meet discovery obligations in future cases. This memorandum covers such topics as where to look for discoverable information, and the need to disclose material variances in witness statements." Id.

The Deputy Attorney General has also directed each United States Attorney to review and, if necessary, revise his or her office's discovery policies to assure that they conform with the requirements of the law, the Federal Rules of Criminal Procedure, Local Rules, and relevant court practices.[9]    United States

---

not be appropriate for a judge of the United States District Court for the District of Massachusetts to participate in an educational program only for prosecutors concerning the Court's practices and expectations regarding its Local Rules, which clarify and codify the government's discovery obligations in criminal cases. See Local Rules of the United States District Court for the District of Massachusetts 112.1 through 117.1. In order to secure judicial involvement in such programs, it may be necessary to make them open to defense lawyers as well as prosecutors. In any event, the reported success of the December 16, 2009 program prompted by this case has reinforced the court's view that such joint training has unique value to prosecutors, and to defense lawyers and judges as well.

[9]As the court has previously explained, the Local Rules of this District Court provide a detailed roadmap for the proper discharge of a prosecutor's duties concerning discovery in

Attorneys have also been directed to designate a discovery coordinator, who will be specifically trained to instruct his or her colleagues. Id., Ex. 1 at 1. In addition, new materials concerning discovery are being provided to prosecutors, and law enforcement agents will be trained by the Department of Justice as well.

It is too early to tell if the Attorney General's initiatives will make a difference. They are, however, a positive and promising response to the serious problems that have been manifested in cases before this court and many others. See, e.g., Stevens, 593 F. Supp. 2d 177 (D.D.C. 2009); id., No. 372, Cr. No. 08-231 (EGS) (D.D.C. Apr. 7. 2009) (Order); Shaygan, 661 F. Supp. 2d 1289 (S.D. Fla. 2009); W.R. Grace, No. 1147, Cr. No. 05-07-DWM (D. Mont. April 28, 2009) (Order); Kirk Johnson, Judge in Asbestos Case Angrily Lectures Prosecutors, N. Y. Times, Apr. 28, 2009, at A17 (discussing Judge Donald J. Molloy's criticism of federal prosecutors for failing to comply with discovery obligations); Jones, 620 F. Supp. 2d at 170-74, 185-92 (listing cases).

Recent developments confirm the court's sense that while Ms. Sullivan made inexcusable and inexplicable errors, she did not

---

criminal cases. See Jones, 620 F. Supp. 2d at 169-70. They "have been widely viewed as valuable and, indeed, worthy of emulation" by, among others, the Illinois Commission on Capital Punishment and the American College of Trial Lawyers. Id. at 170. Compliance with the Local Rules would prevent the inadvertent errors that have plagued this case and too many other cases in the District of Massachusetts.

engage in intentional misconduct because she had an "ends justifies the means" mentality or for any other reason. See Jones, 620 F. Supp. 2d at 183.  If this case had, however, involved intentional misconduct, a significant sanction would be essential.

The court hopes that Ms. Sullivan's experience will prompt other prosecutors to at least recognize that it is in their enlightened self-interest to discharge their discovery obligations properly.  In some instances, the failure to do so requires the dismissal of promising cases that they have worked hard to develop. See, e.g., Diaz, No. 158, Cr. No. 05-30042-MLW (D. Mass. Dec. 19, 2006)(government's motion to dismiss after a series of Brady violations prevented possible conviction of defendants who were videotaped selling drugs).  Among other things, such dismissals may return undeserving, dangerous defendants to the community.

Moreover, it remains true that, as Attorney General Robert Jackson told the United States Attorneys in 1940, the American people "really want[] the right thing done – want[] crime eliminated – but also want[] the best in our American traditions preserved."  Robert. H. Jackson, United States Attorney General, Speech to the Second Annual Conference of United States Attorneys: "The Federal Prosecutor" (April 1, 1940) in In the Name of Justice at 173 (Timothy Lynch, ed., 2009).[10]  Therefore, it is foreseeable

---

[10]Attorney General Jackson's 1940 address to the United States Attorneys was included in the book distributed to the participants in the December 16, 2009 program.  See Federal

that misconduct by a prosecutor will be publicized and injurious to
his or her reputation.   As Justice Jackson explained in attempting
to persuade federal prosecutors not to engage in intentional
misconduct:

> [r]eputation has been called "the shadow cast by one's
> daily life."   Any prosecutor who risks his day-to-day
> professional name for fair dealing to build up statistics
> of success has a perverted sense of practical values, as
> well as defects of character. . . . [The prosecutor] can
> have no better asset than to have his profession
> recognize that his attitude toward those who feel his
> power has been dispassionate, reasonable and just.

Id.  The instant case is a reminder that even inadvertent serious
errors may injure the reputation which every prosecutor should
prize.[11]

---

Criminal Discovery: Handbook Regarding Exculpatory & Impeachment
Material 5 (MCLE 2009).

[11]The court recognizes that Ms. Sullivan's errors have been
publicized and understands that this is painful to her.  However,
the court has not been influenced by that publicity in deciding
not to sanction her.

Judicial proceedings and records are open to the public in
part as a means of holding government officials, including
prosecutors and judges, accountable to the public that they
serve.  "Public access to judicial records and documents [and
proceedings] allow the citizenry to 'monitor the functioning of
our courts, thereby insuring quality, honesty, and respect for
our legal system.'" Federal Trade Commission v. Standard
Financial Management Corp., 830 F.2d 404, 410 (1st Cir. 1987)
(quoting In the Matter of Continental Illinois Securities
Litigation, 732 F.2d 1302, 1308 (7th Cir. 1984)).  See also Globe
Newspaper Co. v. Fenton, 819 F. Supp. 89, 90 (D. Mass.
1993)(access to records in criminal cases "plays a significant
positive role in monitoring the fairness, efficiency, and overall
performance of the Massachusetts criminal court system.").

Because the public is deeply interested in effective law
enforcement, prosecutors often receive favorable public

It is, however, more than self-interest that should motivate a prosecutor to seek to assure that he or she does not, even inadvertently, transgress. In <u>Brady</u>, the Supreme Court wrote that:

> Society wins when not only the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when an accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: "The United States wins its point whenever justice is done its citizens in the courts."

373 U.S. at 87; <u>see also</u> <u>Jones</u>, 620 F. Supp.2d at 184. The Deputy Attorney General recently quoted this inscription in instructing federal prosecutors on the importance of properly discharging their discovery duties. <u>See</u> Jan. 4, 2010 Memorandum from David Ogden, Ex. 1. to Jan. 5, 2010 Supplement to Gov. Dec. 30, 2009 Response to the Court's May 15, 2009 and Dec. 8, 2009 Orders at 1. Prosecutors, like judges and all other human beings, are imperfect. Therefore, it is only a true rededication to the ideal described by the Supreme Court, and etched into the entryway to the Attorney General's office, that will protect the rights promised to all people by our constitution. The Attorney General's recent

---

recognition for their cases. As the public is also deeply interested in the fairness of law enforcement, serious errors and intentional misconduct by prosecutors also often attract public attention. In essence, public acclaim, when warranted, and public criticism, when justified, are inherent features of a prosecutor's chosen profession. Therefore, a lawyer who achieves the extraordinary opportunity to serve as a federal prosecutor should not be regarded as punished when public attention is paid to his or her failure to discharge constitutional duties and to give integrity to our nation's commitment to law enforcement that is fair as well as effective.

initiatives communicate a commitment to this ideal which the court hopes and trusts federal prosecutors will prove is more than rhetorical.

This court is satisfied that Assistant United States Attorney Suzanne Sullivan understands her obligations and is now properly prepared to discharge her duties. In doing so, she will contribute to giving integrity to the commitments recently made by the Attorney General and the United States Attorney for the District of Massachusetts. The interests of recognizing the seriousness of violations of an important constitutional duty and of sending a message to discourage other prosecutors from even inadvertently failing to satisfy their obligations weigh in favor of imposing sanctions in this case. In addition, candor compels the court to acknowledge that experience causes it to be somewhat skeptical about the reliability of the assurances that have been given by the Attorney General and United States Attorney. However, these interests and doubts are outweighed by the court's desire to recognize the positive and promising actions of Ms. Sullivan, the current United States Attorney, and the new Attorney General, and to encourage their determined efforts to reestablish the Department of Justice's finest traditions by their future actions.

Accordingly, no sanction shall be imposed on Ms. Sullivan or the government for their conduct in this unfortunate case.

/s/ Mark L. Wolf
UNITED STATES DISTRICT COURT